UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

BUD JOHN CHAPMAN * Docket 09-CV-6099-A
*
versus * New Orleans, Louisiana
*
ENSCO OFFSHORE COMPANY * December 15, 2010
* * * * * * * * * * * * * * * *

VOLUME III OF III
JURY TRIAL BEFORE THE
HONORABLE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: The Young Firm
BY: TIMOTHY J. YOUNG, ESQ.
400 Poydras Street
Suite 2090
New Orleans, Louisiana 70130

For the Defendant: Fowler, Rodriguez & Chalos& Carroll
BY: DELOS E. FLINT, JR., ESQ.
BY: JACOB GARDNER, ESQ.
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130

Official Court Reporter: Jodi Simcox, RMR, FCRR
500 Poydras Street
Room HB-406
New Orleans, Louisiana 70130
(504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

**I N D E X**


| | Page |
|---|---|
| FOREST DWAYNE FOX | |
| Direct Examination | 3 |
| Cross-Examination | 19 |
| Redirect Examination | 34 |
| ERIC R. GEORGE | |
| Direct Examination | 36 |
| Cross-Examination | 54 |
| JULIE SLOCUM | |
| Direct Examination | 61 |
| Cross-Examination | 74 |
| Redirect Examination | 78 |
| ARTHUR LEO WILDE | |
| Direct Examination | 79 |
| Cross-Examination | 118 |
| Redirect Examination | 148 |
| BUD JOHN CHAPMAN | |
| Rebuttal Direct Examination | 153 |
| Rebutall Cross-Examination | 155 |
| CLOSING ARGUMENTS | |
| Timothy J. Young, Esq. | 164 |
| Delos E. Flint, Jr., Esq. | 176 |
| Timothy J. Young, Esq. | 189 |
| JURY INSTRUCTIONS | 192 |
| JURY VERDICT | 216 |

**MORNING SESSION**

**(December 15, 2010)**

* * * * *

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Thank you. Call in the jury, please.

(WHEREUPON, the jury entered the courtroom.).

**THE COURT:** Good morning. I hope you had a restful evening. Please be seated. We didn't start at 8:30 like I wanted, but that's because the lawyers and I were meeting in the back to simplify things for the rest of the trial so it will go real smoothly so that we'll be able to complete it today.

All right. Go ahead and proceed, counsel.

**MR. FLINT:** Thank you, Your Honor.

**THE COURT:** Who's your next witness?

**MR. FLINT:** Your Honor, at this time ENSCO will call Rusty Fox.

(WHEREUPON, **Forest Dwayne Fox**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** Rusty Fox.

**DIRECT EXAMINATION**

**BY MR. FLINT:**

**Q.** Good morning, ladies and gentlemen of the jury.

Rusty, would you please state your full name for the record.

**A.** My name is Forest Dwayne Fox.

**Q.** Tell us where you live.

**A.** I live in Montgomery, Texas.

**Q.** And how old are you, sir?

**A.** I'm 52 years old.

**Q.** And by whom are you employed?

**A.** I'm employed by ENSCO Offshore Company.

**Q.** In what capacity?

**A.** I'm a rig manager of the *ENSCO 8500*.

**Q.** Tell us a little bit about your educational experience and work history.

**A.** I graduated from high school in May of 1976, and started my offshore career on August 30th of '76. I started in the Gulf of Mexico as a roustabout and worked my way up over a ten-year period to night toolpusher. And I worked three years in the Gulf, then the rig was moved to Nigeria, where I went with the rig for six years.

Then we moved it to Spain. I worked there for two years. And this was with Sedco. During that time in Spain, we were bought by Schlumberger and became Sedco-Forex. I was then transferred to Brazil for one year as a driller. It was during the downturn. And then I had an opportunity to go back to Nigeria as a night toolpusher in 1987.

**Q.** Okay. Rusty, I want to interrupt you just for a second. For the jury's benefit, could you tell them a little bit about how a rig is set up and who the various positions are? You talked about a roughneck and a toolpusher. How does it work?

**A.** Okay. On the rig, the person in charge is the OIM, the Offshore Installation Manager. He is responsible for the rig and the people onboard. And then the toolpusher. We have a day pusher and a night toolpusher. Then the drillers, derrickmen, floormen -- and this is just the chain down -- and then roustabouts that work under crane operators and the deck foreman.

And then we have the maintenance crew, which are -- in some cases, we have electrical supervisors, mechanical supervisors. In other cases on certain rigs, we just have the electricians, ETs and the mechanics, and possibly assistant mechanics.

**Q.** Thank you. Now, why don't you pick up your personal history with Sedco-Forex. What did you do with them and when was that?

**A.** Like I say, we were in Spain at the time, the downturn. I got transferred to Brazil temporarily for almost a year as a driller. Then I got the opportunity to go back to West Africa -- to Nigeria as a toolpusher. And at that point, I worked several years a toolpusher. I did two, two and a half years in the Warri office as a training instructor.

Then I went back offshore as a toolpusher, and later became an OIM on a rig there, a jack-up in Nigeria.

**Q.** What company was that for?

**A.** That was with Sedco-Forex.

**Q.** Okay.

**A.** At that time I got an offer to move my family to Venezuela and go from offshore to onshore to office based. So I moved my family to Venezuela for four years, where I was a drilling superintendent, rig manager; same responsibilities. We lived there four years and then we moved back to Lafayette -- we were transferred back to Lafayette, Louisiana, for eight years, where I was rig manager of *ENSCO 24*, *25*, *29*, *81*, *105* and eventually the *ENSCO 7500*.

Two years ago, I was transferred from Lafayette to Houston to the deepwater business unit office which was created at that time and I became rig manager of *ENSCO 8500*, the new building.

**Q.** Okay. When we talk about "deepwater," what kind of rigs does deepwater have?

**A.** The deepwater rigs are -- the rigs that work under the deepwater business unit are dynamically positioned semisubmersible rigs.

**Q.** And those are rigs like the *7500*?

**A.** *7500*, *8500, -01* and on.

**Q.** Now, the jury's heard a lot of testimony about documents

and things of that nature. Can you tell us what the safe system of work is and when ENSCO implemented it?

**A.** Well, the safe system of work was implemented, started in 2001. It was a process that was put together consisting of work instructions, JSAs, cold work permit, hot work permits, confined space entry permit, gas test certificates and isolation certificates. It was a process that was put together to make it safe to do this work on the rig.

**Q.** And where do JSAs figure into the safe system of work?

**A.** A JSA is a step-by-step process that is -- that is used to -- in the preplanning process at the job site. And what they do is they take this -- use this as a guideline to identify additional hazards -- identify and mitigate additional hazards that are not identified in the work instruction.

**Q.** How long are JSAs kept?

**A.** JSAs are not meant to be kept at all. There's a place on the JSA where you document anything that you identify that should be added to the work instruction for future use. That -- that way it wouldn't be -- any learning that you have during this job when you do it or you identified it, you document it there to add it to the work instruction and have the database updated.

**Q.** So they get thrown away?

**A.** And then throw them away, yes.

**Q.** Now, where are the work instructions kept?

**A.** The work instructions --

**Q.** On the *7500*, that is.

**A.** On the *7500*, that's a good point. The work instructions were kept on the ballast control operator's computer. And because the control room is manned on a 24-hour basis, two 12-hour shifts, that way there's always someone there, and that anyone could go there and get a copy of any particular work instruction to do a job.

**Q.** This is a picture of the *ENSCO 7500*. Could you point and show the jury where the ballast control room is on it? There's a pointer up there that you can use.

**MR. FLINT:** James, if you wouldn't mind.

**THE DEPUTY CLERK:** You can just touch the screen wherever you think it is.

**MR. FLINT:** Is there a way we can make it yellow or --

**THE DEPUTY CLERK:** Yes.

**MR. FLINT:** I can do that?

**BY MR. FLINT:**

**Q.** Now, with regard to other things, what else is kept on the BCO's computer?

**A.** They also have the preventative maintenance system. It's kind of a joint effort there as far as issuing the PM routines on a weekly basis and then documenting completion of them. The barge engineer issues the PMs every Sunday; and then as they're

completed, they're taken to the BCO, who is there manning the console 24 hours a day, and they input the information given to them by the technicians or what's documented on the PM routines.

**MR. FLINT:** Your Honor, this is Exhibit 22.

**THE COURT:** Okay.

**MR. FLINT:** Can you all read that or do I need to make it bigger?

**BY MR. FLINT:**

**Q.** Would you kind of walk us through what's on a PM routine?

**A.** Well, this is a PM routine, EM-22, which means it's electrical, and it's a monthly PM, and it's just No. 22 for that group.

You know, just in the safety notes it talks about the first thing is review work instruction and complete JSA prior to beginning work; and, you know, prior to beginning any work, that the appropriate work permit and/or isolation permit is to be completed for the level of work to be performed in accordance with the permit to work system.

**Q.** Okay.

**A.** It's just a step-by-step of what's required for that PM.

**Q.** Does this safe system of work apply to every rig in the fleet?

**A.** That's correct.

**Q.** And it has since you started with ENSCO -- since 2001 when

it started the program?
**A.** That's correct.
**Q.** Now, have you ever heard of any card or requirement that says you don't need to fill out one of the forms, a work instruction, before you start a project?
**A.** No. There -- there was never a card or any -- any time limitation on using the permit to work system.
**Q.** Are there situations where it takes longer to fill out the permit than it does to do the job?
**A.** There are times that it can take 30 to 45 minutes to do the work instruction -- to review the work instruction, do the JSA, do the isolation, get the permit -- cold work permit, and actually be prepared to do the job, which could take 15 or 20 minutes.
**Q.** I'm going to show you another. Could you tell the jury what we're looking at this time?
**A.** This is a PM routine, ES-01, for the -- it's electrician semiannual.
**MR. FLINT:** This is Exhibit 23, Your Honor.
**THE WITNESS:** And it starts out in the same manner, you know, with the safety notes about reviewing the work instruction and completing a JSA prior to beginning the work, and just goes through the steps required for this PM.
**BY MR. FLINT:**
**Q.** What does "PPE" mean?

**A.** Personal protective equipment.
**Q.** And if an individual had to work and get a cold work permit, that's going to show up on the work instruction?
**A.** That's correct. That would show up on the permit and the work instruction, JSA possibly, if not identified any other place.
**Q.** And when an electrician or a crew member finishes a PM, what does he do?
**A.** When the PM is finished, you know, eventually -- they may not do it every time they finish one, they may collect a few -- but they eventually end up at the BCO -- handed off to the BCO to input into the system.
**Q.** And that, again, would be the control room right here?
**A.** That's correct.
**Q.** And that very same control room where the PMs go is where the work instructions are kept?
**A.** That is correct.
**MR. FLINT:** Tim, if you don't mind, I'd like to introduce the picture of the rig.
**MR. YOUNG:** That's fine.
**MR. FLINT:** I'll have it marked and entered into evidence as Exhibit 37.
**THE COURT:** Any objection?
**MR. YOUNG:** No, Your Honor.
**THE COURT:** All right. Thank you. That will be

admitted into evidence.

**BY MR. FLINT:**

**Q.** Looking at Exhibit 9 now, would you tell the jury what this is?

**A.** This is the U.S. Coast Guard certificate of the inspection --

**Q.** All right. And --

**A.** -- for *ENSCO 7500*.

**Q.** And tell them exactly what the Coast Guard does and kind of the inspection program that you all have.

**A.** On an annual basis, ABS and the U.S. Coast Guard come out to inspect all the safety gear and the life-saving equipment on the rig to make sure that it's -- it's to the standard required.

**Q.** And how does that tie into the PM system?

**A.** Well, we have PMs that are generated two to three months prior to these visits just to remind us that they're coming and to start making arrangements. We have to actually call them and request someone to come out to do this inspection.

**Q.** You used the term "ABS," what is that?

**A.** American Bureau of Shipping.

**Q.** What do they do?

**A.** Well, they support the Coast Guard. They do some of the inspections prior to the Coast Guard coming. And the Coast Guard just follows up, checks what ABS -- just checks the

paperwork that ABS has already done and then, you know, issues the certificate.

**Q.** And they're known -- are they what is known as a classification society?

**A.** That's correct.

**Q.** And the *ENSCO 7500* passed all these Coast Guard certifications and things of that nature at this time?

**A.** That is correct.

**Q.** I'm going to show you the third page --

**MR. FLINT:** This is Exhibit 11, Your Honor.

**BY MR. FLINT:**

**Q.** -- of the IADC report. Normally, on your daily drilling reports, what kind of information is included on the first three -- on the first couple of pages?

**A.** Well, the first couple of pages are the actual operation that's ongoing on the rig, and then the third page is the crew complement, the personnel that are onboard.

**Q.** Now, with respect --

**A.** -- that are being paid for by ENSCO.

**Q.** With respect to the *7500*, September 27th, who was the medic onboard?

**A.** It was Jeremy Carpenter.

**Q.** Who is he employed by?

**A.** He is employed by Medic Systems.

**Q.** And who are they?

**A.** They're a third-party medic company out of Lafayette, Louisiana.
**Q.** Now, in the event an accident takes place on the rig, what happens?
**A.** In the case of an accident, the medic is notified immediately and the patient either makes his way --
**THE COURT:** Excuse me. Hold on one second. Are you objecting?
**MR. YOUNG:** I am, Your Honor. This witness was not on the rig. He has no idea what happened after this man's accident. He's speaking in generalities.
**THE COURT:** Objection sustained.
**MR. YOUNG:** Thank you.
**BY MR. FLINT:**
**Q.** Were you the rig manager for the *7500*?
**A.** At the time?
**Q.** Yes.
**A.** Yes.
**Q.** Who handles the medical issues when something happens?
**A.** A third-party medic.
**Q.** How does it get handled?
**MR. YOUNG:** I'm sorry. Again, Your Honor, this --
**THE COURT:** Limit it to this particular instance.
**MR. YOUNG:** Yes.
**THE COURT:** Objection sustained.

**MR. YOUNG:** Thank you.

**THE COURT:** Do you have firsthand knowledge, sir, of how it was handled in this particular instance in the incident involving Mr. Chapman? Firsthand knowledge. You weren't on the rig at the time, were you?

**THE WITNESS:** I was not on the rig at the time.

**THE COURT:** Okay. Objection sustained.

**BY MR. FLINT:**

**Q.** Were you notified that an accident had occurred?

**A.** Yes.

**Q.** What doctors were contacted in connection with the incident?

**A.** I was told that the --

**MR. YOUNG:** I'm sorry, Your Honor. Objection.

**THE COURT:** Objection sustained. Hearsay.

**BY MR. FLINT:**

**Q.** Who decides if a medevac is required?

**A.** The med- --

**MR. YOUNG:** I'm sorry, Your Honor. In this case this man wasn't on the rig. He has no facts about this case.

**THE COURT:** He can answer that question. In general, who has the position of making that request? Who determines that?

**THE WITNESS:** The medic and the medical support -- his medical support.

**THE COURT:** Okay.

**BY MR. FLINT:**

**Q.** And in connection with ENSCO in the Gulf, who's the medical support for Medic Systems from Lafayette?

**A.** Ochsner in New Orleans.

**Q.** Thank you.

I want to talk a little bit about raises. Have any electricians gotten raises in the last two and a half years for ENSCO in the Gulf?

**A.** No, there's been no raises since 2008.

**Q.** Have you gotten a raise?

**A.** I haven't gotten one since 2007.

**Q.** Why is that?

**A.** Well, it's somewhat of a downturn. We actually had some layoffs over the past -- two years ago due to rig stacking. And since the moratorium -- the drilling moratorium was issued, there's been rigs leave the Gulf of Mexico and there's been an abundance supply of experienced personnel available to us from other companies.

**Q.** A few more questions, Rusty. When a rig is under tow, like the *7500*, what's going on with the pipe rack?

**MR. YOUNG:** I'm sorry, Your Honor. Same objection.

**THE COURT:** Objection sustained. Limit it to this incident, sir.

**MR. FLINT:** Your Honor, I would submit that there's

been some testimony about necessary work on the pipe rack and he's aware of the --

**THE COURT:** Be more specific with your question. You said, "What's going on with the pipe rack?"

**MR. FLINT:** Certainly.

**BY MR. FLINT:**

**Q.** What kind of operations would a crew be doing on a pipe rack while you're under tow?

**A.** With the pipe rack, there were some repairs going on. And, you know, during a tow is the only opportunity we might get to do this maintenance. And if we're not doing maintenance, we're generally picking up or laying down some type of pipe, preparing for the next location.

**Q.** How is that different from a jack-up?

**A.** Well, on a jack-up you virtually skid the rig in. I guess to better explain it, fold it up. So you can't really do any work like this due to the position of the derrick at the time, and then also the stability of the rig. You cannot -- it's not like a semi so you can actually do the work with the traveling equipment and the pipe racker while you're under tow.

**Q.** Now, during the course of this we've seen some documents that Mr. Young put up about one page of a fleet status report.

**MR. FLINT:** Tim, this is a fleet status report. This is a complete one. It's about five pages.

**MR. YOUNG:** We're fine admitting it, if you'd like

to. Your Honor, we'd like to admit the fleet status report as Exhibit 38.

**THE COURT:** Okay.

**MR. YOUNG:** Thank you.

**BY MR. FLINT:**

**Q.** Let's talk about the fleet status report. There are all kinds of SEC filings and things that you all have to do in connection with this, don't you?

**A.** That's correct.

**Q.** One of the biggest things has been the fact that we've had problems -- you've had problems with the moratorium and you have clients that haven't been paying you; right?

**A.** That's correct.

**Q.** And clients like Nexen?

**A.** That's correct.

**THE COURT:** Don't lead, counsel.

**BY MR. FLINT:**

**Q.** Who is the one who -- who are the companies who are employing this semisubmersible?

**A.** All of them?

**Q.** Yes.

**A.** Okay. My rig, the *ENSCO 8500*, is contracted -- is a joint contract with Anadarko and ENI Petroleum. The *ENSCO 8501* is a joint contract between Nexen and Noble Energy, a shared contract. The *8502*, *ENSCO 8502*, is 100 percent contract to

Nexen Petroleum. And the *8503*, which recently arrived in the Gulf of Mexico, is 100 percent to Cobalt.

**Q.** Are these rigs currently drilling wells?

**A.** The only rig that's working on a well today is my rig, the *ENSCO 8500*.

**Q.** What kind of well; are you doing exploratory or what do you do?

**A.** We're doing a completion. We cannot get permits to drill wells.

**Q.** And the other ones are not doing anything; right?

**A.** That's correct, standing by waiting on permits.

**MR. FLINT:** Your Honor, if I could have just a moment, please.

**THE COURT:** Sure.

**MR. FLINT:** Your Honor, we'd tender the witness.

**THE COURT:** Thank you.

Mr. Young, cross-examination.

**CROSS-EXAMINATION**

**BY MR. YOUNG:**

**Q.** Mr. Fox, I'm going to go first into the issue of ENSCO's financial status today. You mentioned the drilling contracts in the Gulf. Do you remember that?

**A.** That's correct.

**Q.** All right. This is the document that ENSCO's attorney had up a second ago. Will you read for me the highlighted portion

on the position that ENSCO is taking against the oil companies that have hired them to do all this work?

**A.** "ENSCO has rejected all force majeure notices received to date as invalid under the terms of the applicable drilling contracts."

**Q.** So what this tells us is that you all are going to Chevron and BP and the big old companies and you're still demanding payment for your day rates that they had contracted years ago to pay you all, despite the moratorium, despite all that; correct?

**A.** We don't have any contracts for any of the companies you named.

**Q.** I'm sorry. The people that you do have contracts with, your position is: We don't care if there's a moratorium. We have a legal contract where Anadarko or Chevron -- we can go through the names if you'd like -- but whoever hired you all, you all are taking the position in court -- or certainly out of court right now that those oil companies have to pay you whether you're drilling or not in the Gulf. Isn't that what that means?

**A.** We have taken that position, but have also, as you notice on one of the other, we have had to accept a reduced rate for one of the rigs thus far. They still refuse to pay us the full amount.

**Q.** But you all are arguing against that; correct?

**A.** No, we've agreed to that reduced rate.

**Q.** Let's go here. Another issue on ENSCO's future. You're aware Mr. Maxwell, who was involved in this incident, is still employed by ENSCO; correct?

**A.** That's correct.

**Q.** You're aware that Artemus Skipper, who was this man's supervisor, is still employed by ENSCO today; correct?

**A.** That's correct.

**Q.** You're still employed and you took part in this investigation; correct? You were employed by ENSCO at the time of this accident. You're still employed today; right?

**A.** That's correct.

**Q.** All right. ENSCO's actually building three large deepwater rigs at this point, *8504*, *8505*, and *8506*; right?

**A.** That's correct, they're under construction.

**Q.** You mentioned the day rate that you've negotiated. On this fleet status report, you had a day rate of $290,000 per day that your company would get paid. Do you know if that's the lower negotiated rate or is that one that was originally in effect?

**A.** The *8500* has not been affected by the -- any negotiation in the rig.

**Q.** The *8501* has a day rate of $370,000 a day that you all are paid when you're drilling. Has that rate been negotiated lower or is that the original rate before the moratorium that you

discussed?

**A.** That was the original rate. I'm not sure what we're getting paid today.

**Q.** And to be clear on that number: We've heard some testimony that the rig floor is real important because you all don't get paid unless you're drilling under your contracts; is that right?

**MR. FLINT:** Your Honor, I would suggest that's not quite --

**THE COURT:** Okay. Well, he's given a lot of latitude on the cross-examination. He can answer that, if you know the answer. Do you know? I don't want you to guess. If you know an answer to a question, sir; if you don't know it, you don't know it.

**THE WITNESS:** Repeat the question.

**BY MR. YOUNG:**

**Q.** Sure. The way you get paid your day rate that we're seeing here, this money, is if you're drilling for the client? Your rig floor is important to you as an oil rig, is it not?

**A.** The drill floor is important on a rig. Any rig.

**Q.** We heard yesterday or the day before that you make your money when you're drilling. You got to get that drill floor up and running; is that right?

**A.** If we're required to do something on the rig floor and we can't do it, we don't get paid.

**Q.** Okay. And that gets to what you had said a few moments ago about something might have been going on on the rig floor at this time that the electricians were supposed to do.

**MR. FLINT:** Your Honor, I --

**THE COURT:** Can you answer the question?

**THE WITNESS:** I don't know what the question is.

**THE COURT:** All right.

**MR. YOUNG:** That's all right. I'll reword it, Your Honor. I'm sorry.

**BY MR. YOUNG:**

**Q.** Let's go through the photograph that you were shown. By way of background, Mr. Fox, you actually did part of the investigation into this man's injuries; right?

**MR. FLINT:** Your Honor, may we approach the bench?

**THE COURT:** Yes.

(WHEREUPON, the following proceedings were held at the bench.)

**MR. FLINT:** The -- his injury report was excluded, and in my direct I didn't go -- his injury report was excluded and I didn't go anywhere near any investigation of this incident or anything of that nature. We just skipped it. I kept it specifically to the procedures of the safe work process, talking about raises and talking about who's working and who isn't. And I anticipate that Mr. Young is about to go off into an area that you have excluded.

**MR. YOUNG:** I'm going to ask him if he investigated how this accident happened, then I'm going to ask him some basic facts about it. And I'm going to show him a picture and say, "Where were these units that you understood where it happened?"

**THE COURT:** I have no problems with that.

**MR. YOUNG:** It's cross-examination.

**THE COURT:** Yes, but you're not going to go into anything I've already excluded.

**MR. YOUNG:** No. I'm going to go through the PM that he was shown.

**MR. FLINT:** Except the PM has nothing to do with the accident.

**MR. YOUNG:** You went into the PM with him, Dee. I'm going to show him the PM. It says "PPE" on it, personal protective equipment.

**THE COURT:** As long as it's relevant, that's fine.

**MR. YOUNG:** Sure, it's very relevant.

Thank you.

(WHEREUPON, the following proceedings were held in open court.)

**BY MR. YOUNG:**

**Q.** Mr. Fox, part of your job as rig manager -- I know you made it clear you were not on the rig when this happened; correct?

**A.** That's correct.
**Q.** But you did take part in an investigation after the incident; correct?
**A.** That's correct.
**Q.** In connection with that, did you gain an understanding of how this man's injury happened?
**A.** We -- we went out to try to determine how to -- how this happened and how to prevent it in the future.
**Q.** All right. This is the *7500* where the man's injury occurred; correct?
**A.** That's the rig, yes.
**Q.** In connection with his injury, will you point here where your investigation -- and you went out to the rig, you wanted to find out what happened. Where did you determine that these gauges had been left that he was trying to take off?
**A.** It was there. That's the --
**Q.** All right. Now -- I'm sorry, go ahead.
**A.** No. I was going to say, that's the two AC units right there.
**Q.** What we see right there, obviously, is a heliport where the helicopters land; is that correct?
**A.** That's correct.
**Q.** All right. And the path that employees would take to go from the helicopter to get inside the rig, where do the employees actually walk each time crew changes are done every

two weeks or better out there?

**A.** They would walk just past those air-conditioning units straight to the control room.

**Q.** Will you mark on the screen, please, the little path that they would take?

**A.** (WITNESS COMPLIES.)

**Q.** And the gauges were where you put the first dot; is that correct?

**A.** That's correct.

**Q.** In connection with your investigation, did you ask any of the rest of the crew on the rig if they had seen these gauges and if they took any action to try to get them off?

**MR. FLINT:** Your Honor, may we approach?

**THE COURT:** Objection sustained.

**MR. FLINT:** Thank you.

**BY MR. YOUNG:**

**Q.** You were asked about the helicopter, sir.

**MR. FLINT:** Your Honor, I never mentioned the word "helicopter."

**THE COURT:** That's okay. You can ask.

**BY MR. YOUNG:**

**Q.** You were asked, sir, how an employee -- how it's determined if an employee is evacuated from a rig. Do you remember that question?

**A.** I remember not being able to answer the question.

**Q.** I thought you said the medic makes the call --
**A.** Okay.
**Q.** -- whether or not to evacuate an employee.
**A.** Okay.
**Q.** Do you remember that?
**A.** The medic and his medical support makes that judgment, that call, yeah.
**Q.** But you do acknowledge that ENSCO ultimately is responsible for that decision the medic makes, do you not? You're not trying to pass the buck to a company that you all hire to do work for you on the rig?
**A.** The medic and the medical support are the only ones that are qualified to make that decision.
**Q.** But you all rely on them -- I guess, you're responsible for whatever decisions they make, are you not?
**A.** We -- we do whatever they recommend.
**Q.** This is your rig; right? You all own this rig, just to be clear. You all don't work for other people on it. This is a piece of equipment in the Gulf of Mexico that you all own; right?
**A.** That's correct.
**Q.** All right. If a man has an arm amputated in the middle of the night, would ENSCO have the ability to get a helicopter out there to remove this man and bring him to trauma treatment?
**A.** Yeah, there are medevacs available.

**Q.** At night; correct?
**A.** That's correct.
**Q.** You understand that this man was brought off on a regular crew change helicopter hours after these burns occurred. Did you learn that in your investigation?
**A.** I knew that the night before, because I would have known if a medevac was required. They would have let me know when I talked to them.
**Q.** Who would pay for a medevac? Let's just assume a man has an injury that somebody determines it's important to get them off immediately. Who comes out of pocket and pays that money, sir?
**A.** It depends on the contract.
**Q.** All right. In this case, if Mr. Chapman had been taken off that rig immediately, who would have bore that cost?
**A.** You know, I can't remember. I think the operator in that particular contract.
**Q.** You all were under a tow, I'll represent to you. Does that sound familiar?
**A.** Sorry?
**Q.** You all had actually stopped drilling and you were moving the rig. Do you recall that?
**A.** Yes.
**Q.** Okay. So being under tow, do you think ENSCO would have paid for it?

**A.** It doesn't -- you know, if you're under contract, it doesn't matter if you're under tow or not.

**Q.** You were shown these PMs. This one is the first one you were shown. And I think the gist of your testimony was that, basically, a PM should have been done or some sort of a permit should -- these documents should have been looked at before these gauges were taken off. Is that your position?

**A.** We -- the process is that we do a JSA before we do any job on the rig.

**Q.** Okay. And your testimony earlier -- I know you were clear on this -- it does not matter if the job is less than an hour or more than an hour for a JSA; is that your testimony this morning?

**A.** That's correct.

**Q.** All right. Have you ever seen a little card that's given to the employees that actually says if a job takes less than an hour, a JSA is not needed?

**A.** No. Never seen that.

**Q.** Will you read for me the highlighted portion on the minimum PPE -- and for the jury, what does "PPE" mean?

**A.** Personal protective equipment.

**Q.** All right. Will you read for me the portion of this PM that you were shown?

**A.** "Minimum PPE to include safety glasses, hard hat, boots with steel toe protection."

**Q.** There's no mention of any type of insulated -- heat-insulated gloves, is there?
**A.** Not in that, no.
**Q.** There's no mention of any type of neoprene gloves that the mechanic should use when they're working on these units, is there?
**A.** No.
**Q.** There's a statement also I want to explore with you at the bottom that I highlighted. Will you go ahead and read that to the jury from this PM you were shown?
**A.** "In certain locations a certified third-party company must be used to perform corrective action on units that contain Freon."
**Q.** Is the Gulf of Mexico one of those certain locations where Freon gets dealt with by third parties?
**A.** No.
**Q.** Where does ENSCO use third parties to deal with Freon?
**A.** I don't know of any place, to be honest.
**Q.** Do you know what that means on this PM?
**A.** The only thing that I could think of it would mean if you didn't have someone who was qualified or trained to do it, you would call out a third party.
**Q.** ENSCO is required to properly train the electricians before they're required to work on these units; correct?
**A.** Yes. We -- we have training.

**Q.** Do you know what type of training is done in regard to handling Freon?
**A.** We have -- I mean, Mr. Chapman attended advanced air-conditioning school and basic. That's -- you know, that's part of their training matrix and he had completed it.
**Q.** Do you know how many days each of those classes was?
**A.** I believe they're five-day classes.
**Q.** And that would be a total of ten days training to deal with these units; is that right?
**A.** Approximately.
**Q.** You mentioned something, sir, about JSAs and they get updated. We've heard a lot about JSAs. I guess I'm trying to figure out, is there a JSA for taking gauges off of an AC unit on ENSCO rigs?
**A.** Taking gauges off or working on it?
**Q.** Working on the unit, either one.
**A.** I mean, there -- we looked at this monthly PM that they have and, you know, there are -- they take whatever PM -- if there's not a -- if there's one available in the database, they should take it off there and then use that and a JSA to mitigate any risk. If there's not one available, then they take a blank form and they fill it out themselves.
**Q.** The database -- and I'm sort of moving ahead because I think I know some answers. What you all have on your rigs is a database of JSAs that are sort of step-by-step on how you do

procedures?
**A.** Of work instructions.
**Q.** And what this is is if somebody says, "I need to go work in the derrick and do some work in a derrick," you might have a JSA that says, "When you're doing, you know, work on the fingers in the derrick, this is how you do it." Is that right?
**A.** A work instruction.
**Q.** Work instruction.
**A.** You keep saying "JSA."
**Q.** Sure. You would call a JSA the work instructions also?
**A.** No. What I said when I explained the safe system of work is that the work instruction, we have work -- we have a history of -- a database.
**Q.** Okay.
**A.** And the reason we have those is we try not to relearn -- every time we learn -- we don't want every person to have to relearn the same step or the same hazard. So we try to capture all that and maintain it in this database.
But if there's something else learned, the JSA is used to capture any additional hazard and mitigation and, hopefully, it's transferred to the work instruction and it's revised and updated.
**Q.** Okay. Where are the work instructions then for the job this man would have been doing at the time?
**A.** It would be in the database.

**Q.** Okay. That you all have access to on your rig?

**A.** Sometimes these technicians and different groups will -- will have a copy of it that they make photocopies of and they just keep reusing it. Sometimes they may have a file in their -- in the electrical workshop, possibly. But the latest and greatest version is always in the database.

**Q.** Is there -- are there work instructions that we can see that talk about removing gauges from a high-pressure Freon unit?

**A.** I don't know if it specifically talks about the removal of the gauges. I think it does talk about using, you know, PPE, but I can't recall exactly.

**Q.** Okay. My point, sir, is: You said earlier that this man should have looked at the work instructions; is that right?

**A.** Well, what I said, or meant, if I didn't say it clearly, is that, you know, he should have planned the job that he took upon himself to do.

**Q.** But if he went to your database and looked for the work instructions, we don't even know if there are work instructions for removing gauges is what you're telling us today; right?

**MR. FLINT:** Your Honor, if I may, Mr. Chapman has testified he never even went and looked at the work instructions. So this is highly speculative and it's an inappropriate line of questioning.

**THE COURT:** Objection overruled. Answer the

question, sir. Repeat your question.

**MR. YOUNG:** Sure.

**BY MR. YOUNG:**

**Q.** We don't even know if there are work instructions in regard to the job this man was doing at the time he was injured, do we?

**A.** I don't know for sure if there's one that specifically talks about removing the gauges themselves, but I do know that, you know, the policy and the instruction is if you don't have one, you create one.

**MR. YOUNG:** That's all I have, Your Honor. Thank you.

**THE COURT:** That's it.

Redirect, counsel.

**REDIRECT EXAMINATION**

**BY MR. FLINT:**

**Q.** Is that, essentially, what a blank work instruction looks like?

**A.** That's correct.

**Q.** And you heard all these questions about these documents. When we looked at Exhibit 22, the very first line says, "Review work instructions and complete JSA prior to beginning work"; right?

**A.** That's the way all of them start out that are in the database.

**Q.** And then there are documents for cold work permits; right?
**A.** That's correct.
**Q.** When you looked at your work instruction, your JSA, is that going to tell you whether to do -- use a cold work permit?
**A.** No.
**Q.** I looked at No. 2, you're talking about work permits and isolation permits, line 2. Is that what we're talking about?
**A.** That is correct.
**Q.** So we've heard testimony that Mr. Chapman didn't do any of that stuff. But on this rig, on the *7500*, you're supposed to do this before you start any project; right?
**A.** That is correct.
**Q.** You were asked some questions about the tow and you testified that the operator would be responsible for the medevac. So the jury understands, who's the operator?
**A.** Whichever company we're contracted to, which at that time it was Chevron.

**MR. FLINT:** Thank you, Mr. Fox.

**THE WITNESS:** Thank you.

**THE COURT:** Thank you, Mr. Fox. You can step down.

Call your next witness, please.

(WHEREUPON, **Eric R. George**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** My name is Eric R. George, MD.

**THE COURT:** Any stipulation as to Dr. George's expertise?

**MR. YOUNG:** Yes, Your Honor, in the field of plastic surgery.

**THE COURT:** Plastic surgery?

**MR. FLINT:** He's an orthopedic surgeon as well and a hand surgeon, Your Honor, so --

**MR. YOUNG:** Agreed.

**THE COURT:** Okay. Thank you. Go ahead and proceed.

**DIRECT EXAMINATION**

**BY MR. FLINT:**

**Q.** Good morning, Dr. George. Would you tell the jury a little bit about yourself, particularly your medical school and some of your training?

**A.** Yes, sir. I completed my medical school in 1989. I completed a general surgery residency in '93. I completed a plastic and reconstructive fellowship of plastic and reconstructive surgery in '95. I completed an orthopedic hand through the Mayo Clinic in Phoenix, Arizona.

I am board certified in plastic and reconstructive surgery. I hold a Special Certificate of Added Qualifications in Surgery of the Hand through the American Board of Orthopedics. I have -- my practice has exclusively been the care of the hand and upper extremity since relocating here from

the Mayo Clinic training in Phoenix, Arizona, for 17 years.
**Q.** Could you tell the jury what "board certified" means?
**A.** In order to be board certified it requires a set curriculum of training; for instance, general surgery requires a certain number of years. Then there's tests following those examinations. Then you qualify for a fellowship, which is plastic and reconstructive surgery, that's two years, which I did in Michigan. You then sit through a rigorous exam and you submit all of the cases that you've done in order to be qualified to be accepted.
Once you pass the examination and once you submitted your number of cases, then you can be selected for boards. You take a written exam and then an oral exam. Following that, I did an orthopedic hand fellowship, and it's basically the same system. You spend one year doing just hands; and after that entire year of just hands through a system where you travel to multiple different hospitals and train with multiple physicians, you then take an examination.
Then you're nominated by some of your peers to be a member of what we call The Hand Society, which is the American Society for Surgery of the Hand -- I think there's about 1,100 of us now in the United States that have CAQs, Certificate of Added Qualifications -- and a member of the American Society for Surgery of the Hand. And then you're board certified and receive this Certificate of Added Qualifications.

**Q.** Where do your patients come from?
**A.** We have a very large regional practice throughout pretty much the Southeast. Our practice is exclusively hand and upper extremity. So we're a very -- a very small -- a very big practice, but we have a regional referral base, because there's not many hand surgeons in this community. So Texas, Mississippi, Arkansas, throughout all of Louisiana, and then a lot of Gulf and Gulf injuries.
**Q.** With regard to your practice, I take it you treat burn victims?
**A.** I have treated burn victims. Part of my plastic surgery training was a four-month stint to run and manage a burn unit in Michigan.
**Q.** And you've treated a lot of offshore workers?
**A.** Yes, sir, we treat a lot of offshore workers.
**Q.** During my opening argument, I was telling the jury that you also have treated some very famous people as well, haven't you?
**A.** I have. I've been fortunate to treat a lot.
**Q.** Like Pete Fountain?
**A.** Yes, sir.
**Q.** Emeril Lagasse?
**A.** Emeril, yes, sir.
**Q.** Who are some of the other people?
**A.** Some of the Saints players, some of the Hornets players,

some other actors. A lot of -- a lot of athletes receive injuries, and then a lot of the high-end, pretty well known businessmen from the United States.

**Q.** Now, when did you have an opportunity to examine Mr. Chapman?

**A.** I first had the opportunity to evaluate him on July the 7th, 2010.

**Q.** I take it he provided you with a history of how he got injured?

**A.** He did, sir.

**Q.** And told you a little bit about his treatment?

**A.** He did, sir.

**Q.** Could you briefly just tell the jury, essentially, the essentials of his treatment as you saw it?

**A.** Sure. He, basically, described himself to me as a 39-year-old electrician who stated on 9/27 was working for ENSCO offshore, was taking off some gauges on, basically, an air-conditioner. He tried to hold the gauge to stop the Freon from coming out of the apparatus and sustained a burn to his hand. He saw the medic, was given some pain medicines. They followed a burn protocol: Ice packs, and some Silvadene, place some bandages on the wound, and then sent him back onshore.

He was seen there initially at, I think it's pronounced, Lady of the Lourdes, one of the hospitals there, where he came under the care of a plastic surgeon. They did

some debridement and cared for the wound, and then he got some skin grafts.

He saw a physician in Pensacola, where they started him in a range of motion program for therapy and correcting to prevent scar contracture of the burn. He was then ultimately referred to another physician, Dr. Fred Meyer, who I know from Arizona, who did a second opinion on him. And then he presented with complaints mainly of some limitation of motion of the index and long fingers.

**Q.** This is a picture from your file. Essentially, what we're dealing with is the outside of his left -- top side of his left two fingers here?

**A.** Yes, sir. Exactly, as there appoints, the dorsum, we refer to that, or the top of the index and long finger.

**Q.** And we're talking about the PIP joints and things of that nature, where is that for the jury?

**A.** Correct. The PIP joints are the creases in the middle of your finger. The metacarpal joints are the ones near the hand; the PIP creases are the ones right in the middle, proximal interphalangeal joint.

**Q.** Now, you took a history from him, you told us. Did you perform an examination?

**A.** I did, sir. I performed an examination and noted minimal sequelae problems. There was very little problems with his right hand.

**Q.** I'm going to stop you there. Dr. Ortega and Dr. Meyer have indicated there was nothing wrong with his right hand. When you did your treatment, did you find anything wrong with his right hand?
**A.** No, sir.
**Q.** So all we're doing is focusing on his left hand?
**A.** Correct.
**Q.** And particularly the two fingers; is that correct?
**A.** Correct. I look initially at the entire hand, and what ultimately came to be the only sequelae or of significance was his -- it ultimately ended up being the issues were the top of the index and the top of the long finger. So, yes, sir, basically, that was what the full examination narrowed it to.
**Q.** All right. Can you tell us what your examination consisted of?
**A.** He didn't -- I did note some loss of the dorsal creases over the PIP joint. What that means, basically, is when you have a skin graft or you have new skin that's been placed over, you lose a little bit of the wrinkles, if you will, or the creases, which is suggestive of either a burn or a skin graft.
The skin was a little shiny and a little tight, which means that when you bring the finger for a full-fisted flexion, typically there's a little laxity of the skin. The skin was a little bit tight.
His -- he had what appeared to be a little mallet of

the distal joint of roughly 30 degrees in the index finger. What we mean by "mallet" is -- Counselor, is that the joint has a slight bend to it. A 90-degree mallet would be straight across. He had a slight mallet. So the joint had a little bit of a flexed posture.

His passive arc of motion, which is the way we push the fingers. We refer to that as passive. The ability to take the finger and pull it all the way down was measured, as was his active arc of motion. We asked him to show us what he could do with his fingers with his own power. Those were all measured.

**Q.** Active arc is kind of a subjective thing as well, isn't it?

**A.** Yes, sir. Active arc meaning we say, "Make your fist as tight as you can." Passive is we push it as far as it will go.

He lacked -- we also gave some measurements in that he lacked the palmar crease, which is another way to kind of make it something you could reproduce, of where the fingers got to the palm, and he lacked the palmar crease by a centimeter or two from the hand.

Overall, his sensation was intact, his joints appeared reasonable. I then performed a series of x-rays on him.

**Q.** Okay. Now, you also saw Dr. Meyer's records; is that right?

**A.** I received extensive medical records, including Dr. Meyer's, yes, sir.
**Q.** And you got all the First Baptist stuff and the records. Were your tests, did they come out, essentially, the same as Dr. Meyer's?
**A.** Almost -- I think we did a little -- we sent them to -- we sent him to the therapy center where they did actual goniometer measurements. But, in general, within two to three degrees of motion, they were similar to Dr. Meyer's reports.
**Q.** And with respect to -- you also saw the FCE that was done; is that correct?
**A.** I did, sir.
**Q.** Slight variances between grip strength; is that correct?
**A.** Yes, sir.
**Q.** But what was his -- as I look here, if you would like to --
**MR. FLINT:** Your Honor, may I approach the witness?
**THE COURT:** Yes, sir.
**BY MR. FLINT:**
**Q.** Do you have in your records these documents?
**A.** I do, sir.
**Q.** If you wouldn't mind just kind of walking the jury through the testing and what it was designed to show and tell them exactly what it showed.
**A.** Sure. We performed a series of testing through the

therapy center where we measure the skin changes, which is the first page of the report. Two-point nerve discrimination testing is where we use a statistic two-point measure and test the feeling of the tips of the fingers. All that was intact.

The next page is what we referred to as -- is this what you want, Counselor, me to walk them --

**Q.** Sure.

**A.** The next step is what we call range of motion measurements, and we use a goniometer, which is a tool that we place over each joint, and we measure what that joint can do. What we always do is we compare that to the unaffected joint, because certain people are very supple, other people are very tight. So we measured those.

We measured his grip strength, pinch strength, three-jaw, tip. These are all different types of measurement. And then, of course, we measured him with grip meters, which you all are all familiar with; measured what he can do with certain levels of a rung of a grip meter. And a grip meter is set very close, middle of the way, halfway, and then all the way out.

**Q.** And, Doctor, for your benefit, they saw a video yesterday of Mr. Guttman showing how to use a dynamometer, and that's what you're talking about with a grip meter?

**A.** That is correct.

So we measured his grip strength, comparing his right

to his left. And then we do a test called rapid exchange, which is where you take out the volitional control and you put in a technique where you're not controlling it through your brain because your reflexes are controlling it, and we measured his rapid exchange grip.

**Q.** Okay.

**A.** We then put all those numbers together and set up an impairment rating as it relates to that.

**Q.** Let's talk about the x-rays.

**A.** Yes, sir.

**Q.** What did your x-rays show?

**A.** AP, lateral and oblique, that's the way we aim the x-ray film, showed that there was some lytic changes, which means little holes or little sclerotic changes, over the radial condyle. We refer to the finger as radial is the thumb side, ulnar is the ring finger side. So over the radial condyle of the long finger was some small little cystic changes in the joint.

On -- there was some erosive changes into the condyle and into the head, but overall the joint was very congruent. It moved pretty efficiently. That was the only radiographic finding that was of significance.

**Q.** Then you had an opportunity to review the medical records, didn't you?

**A.** I did, sir.

**Q.** And what struck you about those, if anything?
**A.** Basically, I think the general conclusion of all the records, including multiple physicians, was the same: That he had sustained a burn; had very appropriate care of the burn, including grafting; had some limitation of motion in the index and long fingers, but not substantial.
**Q.** Now, I note in your review of medical records you noted that with regard to the validity testing, two of the four categories showed some sort of symptom magnification. Would you tell the jury, in an FCE, how these curves are generated and how it all works?
**A.** Sure.
**Q.** How it's put together.
**A.** For symptom magnification?
**Q.** Yes, in particular.
**MR. YOUNG:** I'm sorry, Your Honor, this doctor did not administer the FCE. He saw the patient for about less than an hour. He's now testifying about the FCE that Mr. Guttman talked about yesterday.
**THE COURT:** Okay. He's an expert. He can go ahead and testify to that.
**MR. FLINT:** Thank you, Your Honor.
**THE COURT:** You are familiar with that?
**THE WITNESS:** Yes, sir. The protocols are set up for -- by the hand surgeons for the FCEs for grip and rapid

exchange; and almost all the literature for validity testing has been written by hand surgeons on how to test for validity. Which is when we do a functional capacity exam, several of the exams that we do is the most -- one that's easiest to understand is what we call rapid exchange.

It's where we take a grip meter and we ask you to make -- "Sir, take this meter and grab it and squeeze it as tight as you can." They then give a certain force, 60 pounds, 70 pounds, 80 pounds. We know that in a patient that has a severely injured hand, their maximum sustained grip should always be stronger than their rapid exchange.

A rapid exchange test is where we pass the meter back and forth with a computer and ask them to squeeze as fast as they can, therefore, blocking their ability to volitionally control what they can do. We know that that rapid grip could never exceed their maximum sustained grip if they were using all of their muscles for recruitment.

So in his case he had several episodes where his rapid exchange was actually higher than his maximum sustained grip; and that is a test that's consistent with low effort, which means the patient didn't give full effort when we asked him to make maximum strength grip.

Several other things, and I won't belabor it today to go into details, but we also know that when someone squeezes an item, if you have to hold your hand really far

apart to squeeze something, your power is a lot less than if it's set at what we call our functional demand for grip.

Ideally, you want to grip something where your hand is about around a pop can. That's what we call rung two or three. That's where you'll have maximum power, not when something's really wide or not when something's really small. And we call that a Bell-shaped curve.

He deviated a little from the Bell-shaped curve on the left hand as well. Those are some of the examples of validity testing that are performed through FCEs.

**BY MR. FLINT:**

**Q.** Now, with regard to the FCE that he had in Pensacola, do you have a copy of that report with you?

**A.** I believe I do, sir. Is this the First --

**Q.** Yes, First Rehab Baptist Industrial Park, now known as the Andrews Institute.

**A.** I have it, yes, sir.

**Q.** With respect to the FCE, there was records in there that he was able to do chin-ups and hang -- do five chin-ups and hang for 60 seconds. Do you recall that?

**A.** I do, sir.

**Q.** And with regard to what this generated at the end of the day was an ability to -- he was qualified to do very heavy -- by the U.S. Department of Labor very heavy labor. And then Mr. Guttman and the people at Andrews indicated that they

knocked it back a step and thought he would be able to do heavy. Is that correct?
A. That is correct.
Q. When we talk about occasional lifts, how often would that be? That's a -- it's says a third of the time would be an occasional lift?
A. Yes, sir, that's what we refer to as occasional. So in any given day, one-third of it would be for occasional lifting.
Q. Now, in looking at your -- when we did your deposition, you had made mention that there was a typo, I think, in connection with maximum sustained grip on the left hand. I think it's 71 percent -- or 71 in this --
A. Pounds, yes, sir.
Q. So what does that mean for the jury?
A. That's the ability to squeeze an object with a certain amount of pounds. For instance, I have roughly probably -- I have 70 pounds of grip in my dominant hand and about 65 in my non-dominant hand.

Depending on what you do for a living, if you're a -- you know, if you're an arm wrestler, you may have 150 pounds; if you're someone who swings with ropes, you may have 120 pounds; if you're a 78-year-old lady in a nursing home, you may have 15 pounds of grip.

So it's the ability to squeeze something and then measure that tool. We've all seen that in some of those, you

know, playgrounds and some of these amusement parks where you can squeeze and see what your power is. That's what that measurement is an indication of.

**Q.** Now, the FCE that was done in Pensacola indicated something along the lines of 83 pounds grip. You were 71; is that correct?

**A.** That's correct.

**Q.** And Mr. Chapman gave good effort on your test, didn't he?

**A.** He did, yes, sir.

**Q.** Could you tell us what your recommendations were at the time?

**A.** Yes, sir. In summary, I felt that this patient was surely capable of performing almost all of his activities of vocational work. I noted that he would have a slight limitation in flexion and extension as it relates to his left index and long fingers.

So, basically, in summary, these two fingers were limited a little bit in full extension and a limitation slightly in full flexion.

So, basically, if a job that was put before him required him to be able to get the base of his index finger to the base of his -- to the distal end of his palm, he would not be able to do that. If his job required him to hold certain things that were more wider in grip, shouldn't give him any difficulties whatsoever.

**Q.** He shouldn't have a problem gripping something like a golf club or a baseball bat, should he?
**A.** No, sir.
**Q.** Or tools?
**A.** No, sir.
**Q.** You gave him an anatomic disability, didn't you?
**A.** I did, sir.
**Q.** What was the anatomic disability for his right hand?
**A.** His right unaffected hand, zero.
**Q.** And what was the anatomic disability for his left hand?
**A.** He had a 16 percent impairment of the hand, which translates to 14 percent of the upper extremity.
**Q.** And an anatomic disability has nothing to do with being able to function, does it?
**A.** That is correct. They're totally different. The AMA guides allows us to measure an anatomic disability of someone, which tells us what they've lost, but it doesn't mean what they can and cannot do.
For example, if you lose the tip of your finger, that's a 45 percent loss of the index finger, that's what the value is. If you're a construction worker, you're not disabled in any capacity whatever. You can perform, do everything you normally -- we've seen a lot of people we refer to as carpenter's fingers, they have no disability. If you're a violinists and you have that impairment and you lose the tip of

your finger, your career is over and you're 100 percent disabled.

So surgeons don't address disability. We just give you the impairment and we leave it to the lawyers to decide what they can and cannot do.

Is that clear?

**Q.** Yeah.

Now, there was some testimony that Dr. Meyer was a little leery of Mr. Chapman having to climb 100-foot tall ladder or be an ironworker working at unprotected heights. With your findings can this gentleman climb a ladder?

**A.** Absolutely, I think he can climb a ladder.

**Q.** Does that present any problems with him going to work offshore?

**A.** No, sir, I don't believe that. When you climb a ladder, your legs are the majority of what you need to do when you're climbing. Your hands are used for support in case you lose a little bit of your footing. And with that FCE, they showed us clearly that he could do chin-ups or pull-ups.

His dominant hand is his right. His index and long are slightly limited. But 25 to 50 percent of your grip strength comes from your ring and small fingers, and he's proved to us he's got 70 pounds of grip in that affected hand; therefore, I think he can do it.

**Q.** There is some other issues that we had discussed at your

deposition. Let's talk about dominant, non-dominant hand. Normally, when workers are using a dominant hand and the non-dominant hand, how does it work?

**A.** Well, in all of us, we're -- there's very few people that are truly ambidextrous. Almost all of us are either right-hand or left-hand dominant. We believe that about 15 percent of your grip strength is within normal limits for dominance and non-dominance. We know from watching work videos and studying about the hand that people usually, particularly laboring force, use their dominant hand for the majority of things.

If someone approaches you, you put out -- I'm right-handed -- you put out your dominant hand, "Stop." If you have a tough task brought about you, someone says, "Here, take this wrench and turn this bolt," very few of us use your non-dominant hand and grab a bolt and turn it.

It's -- the dominant hand is your -- is that's why it's referred to as that. And that's what you'd use to support yourself. That's usually the tool hand in most cases.

**Q.** And as I understand your testimony, are you familiar with what offshore workers do in their job?

**A.** I don't claim to be an expert in any way. I've been in practice nearly 20 years and I've seen hundreds and hundreds of videos of job, job tasks, not only for ergonomic training, but for injuries.

**Q.** And as far -- in your opinion, Mr. Chapman would be

safe -- it would be safe for him to return to work in an offshore oil rig?

**A.** Yes, sir. The new ones today that I've seen definitely do not require -- back in the old days, they had -- they did a lot of long-term swinging in and swinging out. And now, absolutely, I have no problem.

**MR. FLINT:** Thank you, Doctor.

**THE COURT:** That's it?

Cross-examination, Mr. Young.

**CROSS-EXAMINATION**

**BY MR. YOUNG:**

**Q.** Dr. George, what type of complaints did Mr. Chapman have when you saw him?

**A.** He reported that he had loss of range of motion and some tingling in his left hand.

**Q.** Did you ask him about pain?

**A.** We -- we asked him about a pain scale and he said he had mild pain.

**Q.** Did you ask him if it got worse when he used the hand?

**A.** We did not ask him about whether his pain got worse when he used it.

**Q.** You mentioned some testing that your office did.

**A.** Yes, sir.

**Q.** And I have the sheet from your office. Just for the -- for our benefit, it looks like you all actually clock them in

and clock them out when they go and do their testing?
**A.** Yes, sir.
**Q.** It took 40 minutes to do the hand testing that you've testified to; is that right?
**A.** In our office, yes, sir.
**Q.** And this is actually a sheet from your testing?
**A.** It is, sir.
**Q.** All right. Will you read for the jury what -- you've used the word "slight." You said he's got some slight limitation of his index finger. Will you read for us the impairment rating to his left index finger, please?
**A.** Yes, sir, 49 percent of the index finger.
**Q.** And then on the long finger, which is your middle finger; correct?
**A.** 28.
**Q.** And that gives his hand what disability rating?
**A.** It gives him a 16 percent impairment of the hand.
**Q.** And then the whole body, he's actually rated at 8 percent impairment to his whole body because of that?
**A.** That is correct.
**Q.** You do agree, Doctor, he's going to have trouble pinching with the left hand -- with the index finger of the left hand; correct?
**A.** Let me check his pinch strength.
**Q.** No, no. I'm just asking pinching/using?

**A.** Well, I want to answer that by looking at what his actual pinch strength is. Sometimes with just slight limitation you still have excellent pinch.

Just give me one second, Counselor, it's in his FCE. I got my records all mixed up here. I'm just going to look real quick and I'll tell you exactly what his pinch strength was.

I'm sorry, yes, sir, he had 16 pounds of key pinch, 21 on the right. He had 11 pounds of three-jaw, 19 on the right, and 8, and 15. So he had about a 35 percent diminution in power pinch.

**Q.** You agree, he cannot close his left hand the entire way?

**A.** That is correct. His index and long fingers do not come fully into the palm for a closed fist, yes, sir.

**Q.** And you were asked about the FCE, and you and I during your deposition went through the range of motions that they had found in September of '09, and your evaluation was July of 2010; right?

**A.** Yes, sir.

**Q.** So that would be about eight months -- actually, about 10 or 11 months later?

**A.** Yes, sir.

**Q.** First of all, on his grip strength on his left hand, in September of '09, that FCE showed 81-pound grip strength on the left; correct?

**A.** Okay. You'll have to show me where -- is that on -- you mean, on my report?
**Q.** No, no. The one that was initially done in Pensacola at First Baptist --
**A.** Okay.
**Q.** -- at Andrews Institute. I think it was 81 pounds. You just testified to a moment ago.
**A.** There was -- I remember there was one grip strength that was 81 pounds. You'd have to show me specifically to tell you if it was that one. I mean, I believe you, I just -- I don't have that to tell you, yes, there --
**Q.** Can you see what your grip strength was, because I think yours was 71?
**A.** I know what ours was, 71 pounds.
**Q.** Okay. And you know there was one that was 81; right?
**A.** Correct. Don't know what date and when.
**Q.** All right. Let's assume the 81-pound grip strength was done September of '09. We're now ten months later and his grip strength, according to you, is down 10 pounds to 71. Am I understanding the test result correctly?
**A.** Yes, sir.
**Q.** All right. When you were retained in this case by ENSCO's attorney, you were sent a letter, sir -- and let me show you, it's part of your file --
**A.** Yes, sir.

**Q.** -- and you were asked, "Would you kindly" -- "We would kindly ask that Dr. George contact Mr. Flint prior to writing your report in this case." My question to you is: Did you talk with the company lawyer before you issued your report?
**A.** No, that would have been probably my office people.
In other words, what -- typically, when we do IMEs, they sometimes -- attorneys will ask us to contact them so that, when we prepare the report, we answer any questions that may be the cause or the question of concern: "We want to know" -- "We don't want you to tell us a report and tell us that he can do this and this and this. We want to know, do you think he can do this or that," whatever you all are in here discussing.
So I did not speak to him, but I believe that was what the gist of that was, what he wanted to know.
**Q.** You were asked questions about whether he can return to work offshore. You do not know the details of what an electrician on an offshore rig has to do, do you?
**A.** I do not know the specific dictionary of occupational title for electrician offshore. I have a pretty good understanding of electrician, but not electrician offshore.
**Q.** Well, I mean, let's be fair, are you giving an opinion that he can go back to the job description -- have you ever seen a job description for ENSCO's electrician?
**A.** I've seen a job description for electrician, yes, sir.

I'm not sure if it was ENSCO's. I've seen the dictionary of occupational titles for electrician.

**Q.** There are functional tests that can be done on a person's injured hand, such as the Peg-Board test. You're familiar with dexterity tests that are done?

**A.** I am, sir.

**Q.** Will you give us some of those, the names of them?

**A.** The dexterities tests, I don't know all the names, but it's where they use different Peg-Boards, they hold monofilaments, they go through a series of coins. And I'm sure your dexterity testing experts would be better qualified to give you the names of each test.

**Q.** Was any of that testing done on Mr. Chapman by your office?

**A.** What we did in our office is different than what we did in the FCE. The functional capacity exam did do some dexterity testing. What we measured in the FCE was grip; range of motion; monofilament testing, which is sensibility testing; and goniometer, or range of motion measurement testing, for permanent partial impairment.

**Q.** But discussing the Peg-Board issue and the coins, did you do any of that testing?

**A.** Dexterity testing is not something that's unique -- that's more vocational. That's for a vocational rehabilitation expert, not for a hand surgeon, typically.

**Q.** So the answer is your office did not do any dexterity testing?

**A.** I'm sorry, no, sir. We don't do dexterity testing in any hand office.

**Q.** And I assume you reviewed the FCE from First Baptist, there was no dexterity testing done in that, was there?

**A.** Typically, that's voc. I can look at it and tell you if there was dexterity. That's vocational rehab, typically, is what that means by "voc." Let me look and see if there was any dexterity.

Grasping testing. Some fine grasping was tested, some firm grasping was tested, and some simple grasping was tested, which falls into some dexterity.

**Q.** But you were aware -- let me represent to you, Mr. Guttman testified yesterday that no dexterity testing was done.

**A.** Okay. Is that who prepared the FCE?

**Q.** He did.

**A.** I don't see anything in here other than simple manual testing.

**MR. YOUNG:** Okay. Thank you, Doctor.

**THE COURT:** Redirect?

**MR. FLINT:** No, Your Honor.

**THE COURT:** All right. Thank you, Doctor. You can leave.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Ladies and gentlemen, we're going to take our morning recess. We're going to reconvene in ten minutes. I'll remind you, do not discuss any testimony with each other.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

(WHEREUPON, the Court took a recess.)

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Bring the jury in.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** Please have a seat.

Call your next witness, please.

**MR. FLINT:** Your Honor, at this time we'd call Julie Slocum.

(WHEREUPON, **Julie Slocum**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** My name is Julie Slocum.

**THE COURT:** Your witness, counsel.

**DIRECT EXAMINATION**

**BY MR. FLINT:**

**Q.** Good morning, Ms. Slocum.

**A.** Good morning.

**Q.** Ms. Slocum, could you tell us where you live?

**A.** I live in Dallas, Texas.
**Q.** And by whom are you employed?
**A.** ENSCO Offshore Company.
**Q.** In what capacity?
**A.** I am the manager of risk management.
**Q.** Can you tell us a little bit about your education and then your work experience?
**A.** I graduated from LSU in 1976, and then went to work for an insurance company. I was there for 12 years and then went to work for a company called Penrod Drilling. In 1993, Penrod was bought by ENSCO, and I've been there ever since.
**Q.** In connection with your insurance work, what kind of stuff did you do? What were you all involved with?
**A.** I handled claims on behalf of Rowan, Reading & Bates, Penrod, Sonat, Global, the offshore company.
**Q.** Now, as a claims manager and in your capacity, what is it that you do day to day for ENSCO?
**A.** There's several functions that I do. One is that I handle all the claims of any of our employees that are injured on rigs worldwide. I'm responsible for any of the property damage to the rigs. If something blows up, I'd handle the insurance claim. I'm also responsible for any subrogation sort of claims, like where a boat would run into the rig.
And finally, I'm responsible for some of the purchase of the insurance for the company.

**Q.** Now, in 2008, were you serving in this capacity?
**A.** Yes, I was.
**Q.** And how did you come to be involved with Mr. Chapman?
**A.** What normally happens is every morning our Broussard, Louisiana office would either fax or scan in an e-mail to us a copy of the accident reports that had occurred in the previous 24 hours. So that's how I became aware of this incident, the accident report was sent to us.
**Q.** Now, in connection with his treatment, who picked the doctors for Mr. Chapman?
**A.** Well, initially, when he was brought in, we'd take him to the nearest facility, and so we chose the initial facility of where to bring him. After that, the initial doctor referred him to Dr. Odinet in Lafayette. And then when Mr. Chapman went home, he chose all the doctors and the physical therapy, everything there.
**Q.** And you've sat through this, so we're talking about Dr. Ortega and the Andrews people and the physical therapy people?
**A.** Correct.
**Q.** And who paid for all of this?
**A.** We did.
**Q.** Are you aware of any medical bills that aren't paid?
**A.** No, I'm not. And unlike your group health coverage, we pay 100 percent. There's no deductible, there's no co-pay.

**Q.** I'm going to show you a document. This is Exhibit 24.
**A.** Yes, sir.
**Q.** Would you tell the jury what that is?
**A.** This is a computer printout showing all the payments that we made to or on behalf of Mr. Chapman. You'll see that there are the checks to Mr. Chapman, which are either 280 or $4,609.17. Those went directly to him. And then the rest of these were the medical vendors or providers who treated or gave prescriptions.
**Q.** What is "maintenance"?
**A.** Maintenance is --
**MR. YOUNG:** I'm sorry, Your Honor. Let me object. Counsel is asking for a legal conclusion from a claims handler.
**THE COURT:** Objection's sustained.
**MR. YOUNG:** Thank you.
**BY MR. FLINT:**
**Q.** What do the maintenance payments represent?
**A.** The maintenance payments represent strictly food and lodging onshore that are comparable or similar to what he had offshore.
**Q.** And what does ENSCO pay for maintenance as a rule?
**A.** $20 a day.
**Q.** And what do other companies pay as a rule?
**A.** Well, when I initially started out, they were paying $8 a day. Many pay $15, something in the range of the 20-ish.

**Q.** And, again, this represents the expenses that the individual, not his family, has; is that correct?
**A.** That's correct. And it was never intended to pay your bills. It's strictly food and lodging.
**Q.** All told, how much maintenance did you pay?
**A.** $7,920.
**Q.** Okay.
**MR. FLINT:** Tim, we have the checks, if you want to verify that, or if we can stipulate to that, or we could put them in the record. Whatever you'd like.
**MR. YOUNG:** I think if the witness verifies the printout, then the printout is in the record as an exhibit. So I don't --
**MR. FLINT:** Would you object if we put them in or...
**THE COURT:** Well, we could put the checks in, or the copies in, or we could just rely on the printout. The printout is a summary of the checks; right?
**MR. FLINT:** Yes, sir.
**THE COURT:** I don't think we need to put that in, because this printout is in evidence.
**MR. FLINT:** Okay.
**THE COURT:** All right.
**BY MR. FLINT:**
**Q.** Now, when did you stop the payments for maintenance?
**A.** October 28th, 2009.

Q. And when normally is maintenance discontinued?
A. It's discontinued when the employee has reached what's called maximum medical improvement; that is they're as well as they're going to get, or they've been released to return to work, or they do come back to work.
Q. When was he at MMI in this case?
A. Well, actually, he was at MMI on September 24th or -- yeah -- 24th of 2009. I continued the maintenance a month longer -- well, I hadn't really intended it to be a month longer. But, normally, after an FCE, an employee will go back to see their physician who interprets what happened at the FCE.
I expected Mr. Chapman to return to Dr. Ortega; he ultimately did not; and so after a month it was apparent he wasn't going to, so I terminated the benefits then.
Q. Now, you made advances, didn't you?
A. Yes, sir, I did.
Q. And you did that to help out the Chapmans, didn't you?
A. Oh, absolutely. That's an amount of money that I do not owe, but I paid to them.
Q. And tell the jury what you did and how you arrived at how you did it.
A. We asked the Chapmans to send us a list of what their monthly bills were, and included everything that they had on there, be it their cell phone bill of $400 a month, or their child support, or payments for the motorcycle, or insurance for

one of their children.
Q. And what were you attempting to do?
A. What we were attempting to do is make certain that between the maintenance and advances they received sufficient money to pay all their bills while he was off so they only had to worry about him getting better.
Q. How much all total -- well, first of all, how much were the maintenance checks that you paid if the jurors want to take a look at the -- how much were the advances that you paid if the jurors want to double-check and look at Exhibit 24?
A. Each month they received a check in the amount of $4,609.17.
Q. And there was some additional checks that fell under that category as well; right?
A. Well, initially, we were unaware of what his monthly bills were. So to make certain that he did have some other income coming in, we paid him, I think, $1,000 or $1,500 immediately. Once we got the list of what their bills were, we paid him an additional check of $3,000 and something so that it added up to the $4,609.
Q. And specifically, you never got any bills, did you?
A. Oh, no, no. We got no backup for what they submitted.
Q. So there's no differentiation between what were Mrs. Chapman's expenses and what were Mr. Chapman's expenses?
A. No.

**Q.** How long did you continue the advances?

**A.** Those were paid through the end of September -- well, I guess they were paid through the end of August -- well -- of 2009. What we typically do, we'd issue this advance check the last Wednesday of every month so that the injured employee had the money at the beginning of the month so they could make their bill payments that came due at the first of the month.

**Q.** And I take it that the advances were discontinued because of the FCE in Florida?

**A.** Absolutely. At that point in time he was released and he was at maximum medical improvement.

**Q.** Did you take any personal steps in connection with Mr. Chapman returning to work?

**A.** Actually, I did.

**Q.** Would you tell the jury what you did?

**A.** During the summer of 2009, I contacted our human resources department to see if Mr. Chapman could come back to work for us; and if there was a chance that he might not be able to be an electrician -- which we didn't know yet because he was still undergoing treatment -- what other positions he might -- that might be available to him.

**Q.** And we heard testimony from Mrs. Chapman that nobody called. Would you tell the jury why during this process you couldn't call?

**A.** Well, I think Mr. Young asked yesterday why someone from

ENSCO didn't call them at the end of September to tell them that the benefits were going to terminate. And the reason why I couldn't call is Mr. Young had already filed a lawsuit and that prohibits me from being able to talk to the Chapmans.

**Q.** Before that, every two weeks the Chapmans got checks from you for advances and for the maintenance; is that right?

**A.** Every two weeks they got a check of maintenance in the amount of $280. The advance checks were just paid at the end of the month in one lump sum.

**Q.** During this period of time, did you hear any complaints from the Chapmans?

**A.** No, I heard no complaints.

**Q.** During the lawsuit, until Monday, did you hear any complaints from the Chapmans?

**A.** Up until Monday no one had ever said anything about the payments that I made to them.

**Q.** During the course of one of the witnesses' testimony, Mr. Young put this document up. These are for employee transaction -- or employee status change reports.

**MR. FLINT:** From Exhibit 3, Your Honor.

**THE COURT:** Okay.

**BY MR. FLINT:**

**Q.** Would you walk the jury through what this is and what this means?

**A.** Okay. This is a transaction notice. It's an internal

document that goes to human resources. In this particular one, it says that he's gone from an Electrician B to a Certified Electrician, because he's completed the RigSense program. At that time that was a computer-based program and it was available to every person and every position on the rig.

It gives you some information, some teaching, training in how to perform your job, and then there are tests along the way after each chapter. When you complete it, we feel like that you truly know the in's and out's of that position; and as a benefit for having done that, you get your salary increased by 4 percent.

**Q.** Okay. Moving on. This is another employee status change report. What does it indicate?

**A.** This indicates that --

**MR. YOUNG:** I'm sorry, Your Honor. Just let me object. This witness didn't fill any of these out. She works in their claims department.

**THE COURT:** Is this document in evidence?

**MR. FLINT:** Yes.

**THE COURT:** Okay. She can refer to this document.

**BY MR. FLINT:**

**Q.** Please continue.

**A.** This was done because Mr. Chapman had a death in his family --

**THE COURT:** Excuse me. Do you have firsthand

knowledge of this?

**THE WITNESS:** That he had a death in his family?

**THE COURT:** Well, about what is included in this document.

**THE WITNESS:** I didn't complete the document.

**THE COURT:** Okay. Do you have firsthand knowledge about what is included in the document? In other words, this document is in evidence, she can read it, because the jury's going to be given an opportunity to read it, but she's not going to be able to comment as to what she thinks it might mean unless she has firsthand knowledge.

**MR. FLINT:** Your Honor, I would submit that Ms. Slocum provided these documents and she knows what they stand for.

**THE COURT:** Well, I just asked her.

**THE WITNESS:** Okay. These are the typical sort of documents that we obtain -- we get a copy of everybody's personnel file whenever they have an accident. So these are the sort of things that I work with on a daily basis.

**THE COURT:** Okay. Go ahead. Objection overruled.

**THE WITNESS:** In this particular case, Mr. Chapman had a death in his family and then there was a problem with making some crew change. So the company paid him 36 hours of regular pay/compassionate leave.

**BY MR. FLINT:**
**Q.** So even though while he wasn't working, he got paid for attending a family funeral?
**A.** Sure, for 36 hours, three days.
**Q.** This is the next one. Can you read that?
**A.** I can read that, but I'm not really sure what that means.
**Q.** Okay. And then the one that Mr. Young put up, it says, "Terminated, failure to return from leave. WC/LOA greater than one year." Would you tell the jury what that means and why it's done that way?
**A.** Our practice is that for an employee who is injured on the job, we allow them for one year to purchase group health coverage at a lower rate, and that's health coverage for their whole family. We allow them to purchase insurance -- continue to get insurance from the company at the rate they were paying when they were working.
And so for people on the job, we have that ability -- or that's offered to them for one year. If you were injured off the job, let's say a car accident when you were home, those individuals are only offered the ability to pay the reduced rate for the benefits for six months.
**Q.** Mr. Chapman never asked for his job back, did he?
**A.** He never asked me. And in my conversations with human resources, they never mentioned that he did.
**Q.** Now, I want to talk briefly about the moratorium. You're

familiar with it?
**A.** Yes, I am.
**Q.** There's a lawsuit going on in this very same courthouse in connection with it?
**A.** Actually, I think there are probably at least two lawsuits going on here.
**Q.** What effect has it had on the deepwater rigs?
**A.** Well, the deepwater rigs, the operators can't get permits; and without permits, they can't or don't want to hire our rigs. They don't want to pay money if they're not going to be able to drill. So that's been a problem in terms of revenue.
**Q.** Have any drilling permits been issued to the shallow water rigs?
**A.** Not that I'm aware of.
**Q.** Now, as far as you're aware of, have any operators gotten any permits to drill?
**A.** Not that I know of.
**Q.** Now, the reason I asked you, we heard a little bit of testimony, you sat here with Rusty Fox. You're in Dallas; he's in Broussard; the electricians are wherever the rigs are. When was the last time anyone from ENSCO received a raise?
**A.** We haven't received raises in two and a half years.
**Q.** All told, how much did you advance to Mr. Chapman on behalf of ENSCO?
**A.** $55,310.04, I think.

Q. Is there any law that compels you to do that?
A. No, there isn't.
**MR. FLINT:** Your Honor, I tender the witness.
**THE COURT:** Thank you.
Mr. Young, cross-examination, sir.

**CROSS-EXAMINATION**

**BY MR. YOUNG:**
Q. Mrs. Slocum, have you ever spoke to the Chapmans?
A. I may have spoken to them one or twice. There was somebody else in our office who talked with them a great deal of the time.
Q. If they were to both testify today they've never talked to you before today, would you dispute that?
A. I think we probably talked once, but...
Q. But you're not sure?
A. I think we have, but I --
Q. How many claims are you handling right now on behalf of ENSCO?
A. Not very many right now. 20, 30.
Q. Do you know the exact number, or it's in the 20-to-30 range?
A. It's certainly no more than 30.
Q. How many people do work in your office handling claims? You said there's some other people in your office handling claims.

**A.** Right now no one else is handling claims but me.
**Q.** You mentioned a sheet where the bills were actually itemized. Do you have that with you?
**A.** No, I don't.
**Q.** All right. Does ENSCO still have that somewhere?
**A.** I believe it's still in the file.
**Q.** You knew you were coming to court today to testify, and I assume your lawyer met with you and said, "We're going to talk about the advances that we gave" --
**MR. FLINT:** Your Honor.
**THE COURT:** Objection sustained. Attorney/client privilege.
**BY MR. YOUNG:**
**Q.** Did it cross your mind to bring the sheet of bills that the Chapmans filled out for you, sent to you, that you're testifying about?
**A.** Well, actually, Mr. Young, until the trial started on Monday, I didn't know that there was an issue with anything on the maintenance or the advances.
**Q.** You were -- you gave some testimony about visiting the Chapmans and your reason why you did not visit them. At any time --
**THE COURT:** That's a mischaracterization, counsel.
**MR. FLINT:** Thank you, Your Honor.
**THE COURT:** Objection sustained.

**MR. YOUNG:** I'm sorry. I didn't mean to.
**THE COURT:** Unintentional mischaracterization.
**MR. YOUNG:** Sure.
**BY MR. YOUNG:**
**Q.** Did anyone from ENSCO ever go visit the Chapmans in Florida after this man's injuries?
**A.** No one from our office did. I don't know whether someone from Broussard went or not.
**Q.** You were asked about the functional capacity. Let me show you. The date of this was September 24th; is that right?
**A.** Yes.
**Q.** All right. And then you were also asked about this report?
**A.** Right.
**Q.** And the date of this is four days later, September 28th?
**A.** Correct.
**Q.** All right. And the reason stated was, "Terminated, failure to return from leave"?
**A.** Yes, sir.
**Q.** All right. "Workers' Comp," I guess. What does "LOA" stand for?
**A.** Leave of absence.
**Q.** "Greater than one year"?
**A.** Right.
**Q.** Is it ENSCO's set policy that an employee who's been on

Workers' Comp for a year or greater is automatically terminated?

**MR. FLINT:** Your Honor, I --

**THE COURT:** Objection overruled.

**THE WITNESS:** Is there a written rule, no, but that's been our practice.

**BY MR. YOUNG:**

**Q.** So any employee on Workers' Comp for a year or more is terminated?

**MR. FLINT:** Your Honor, may I -- there is no Worker's Comp in this case. It's a mischaracterization. Rephrase your --

**THE COURT:** Rephrase your question, counsel.

**MR. FLINT:** Thank you.

**BY MR. YOUNG:**

**Q.** Any injured worker who is not able to return to work within a year of his injury is terminated?

**A.** Yes, sir.

**Q.** You mentioned the $28 -- the $20 or $28 a day that you talked about, the maintenance -- and I don't mean to mischaracterize it. I think it's $20 a day --

**A.** Correct.

**Q.** -- that your company pays?

**A.** Yes, sir.

**Q.** You then said that you don't have to give the advances,

but you all did that in this case?
**A.** Yes, sir.
**Q.** Do you give advances to injured employees who have retained attorneys?
**A.** I'd pay. Yes, sir. I paid advances to people who had attorneys and who had lawsuits.
**Q.** Have you ever terminated advances because an employee has an attorney?
**A.** No, I've not terminated because they have a lawyer.
**MR. YOUNG:** Thank you, Ms. Slocum. That's all I have.
**THE COURT:** Thank you.
Redirect, counsel.

**REDIRECT EXAMINATION**

**BY MR. FLINT:**
**Q.** Ms. Slocum, just a brief couple of questions. The document that we were just looking at was exactly a year after the date of the incident, wasn't it?
**A.** Yeah, it was.
**Q.** This is an administrative thing, isn't it?
**A.** Yes, it is.
**MR. FLINT:** No further questions, Your Honor.
**THE COURT:** Thank you.
Thank you, Ms Slocum. You can step down.
Call your next witness, Mr. Flint.

**MR. FLINT:** Your Honor, at this time I would call Arthur Wilde.

**THE COURT:** All right.

(WHEREUPON, **Arthur Leo Wilde**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please state your full name and correct spelling for the record.

**THE WITNESS:** My name is Arthur Leo Wilde, spelled W-I-L-D-E, "D" as in "delight."

**THE COURT:** Is there a stipulation as to Mr. Wilde's expertise in the field of industrial air-conditioning equipment and procedures?

**MR. YOUNG:** Yes, Your Honor.

**THE COURT:** Thank you. All right.

Proceed, please.

**DIRECT EXAMINATION**

**BY MR. FLINT:**

**Q.** Good morning, Mr. Wilde.

**A.** Good morning.

**Q.** What I'd like to do is have you tell the jury a little bit about your background so they get a feel for how much you know in connection with this area. So could you tell us, essentially, how you started in the oil patch and when?

**A.** I started out in 1974 working as a B electrician in a shipyard -- a small shipyard in Houston, Texas, that built

offshore rig platforms. And at the time they had approximately eight, nine rigs under construction. And in about six weeks, they promoted me to electrical material coordinator for all of these rigs, and that's where it all started.

And ultimately, they ran out of contracts and I went with the last rig offshore.

**Q.** All right. You worked offshore on a rig as an electrician?

**A.** That's correct.

**Q.** For how many years and how many companies?

**A.** About 19 years.

**Q.** Okay. How many different rigs; how many different companies?

**A.** I've worked on platform rigs. I've worked on land rigs. I've worked on semisubmersible rigs. I've worked on jack-up rigs. I've worked on drillships. I've been on a variety of rigs, also for a variety of companies because of the economic downturn at various years.

**Q.** Now, with respect to serving as an electrician on all of these various rigs, were the electricians responsible for the air-conditioning systems?

**A.** Yes, sir, they were. Except for the one drillship, the electrician was responsible for the electrical side of the air-conditioning, but the mechanics themselves were responsible for the compressors because that was a 125-ton compressor.

**Q.** Now, in going through your curriculum vitae, you've been to the Carrier basic air-conditioning school; is that right?
**A.** That's correct.
**Q.** The Nance International basic air-conditioning school?
**A.** Yes, sir.
**Q.** You've been certified by the State of Texas to teach air-conditioning courses?
**A.** Yes, sir, as well as electrical.
**Q.** You've taught at colleges in Texas?
**A.** Yes, sir.
**Q.** And I believe for 15 years that you've taught at the Nance school; is that correct?
**A.** Yes, sir, I went to work for them in 1994.
**Q.** Looking at your certifications and memberships, would you tell the jury what EPA Section 608, NATE, and all those various things are?
**A.** EPA, of course, stands for the Environmental Protection Agency.

Nowadays, with the ozone depletion that you've heard probably, they require the people working on air-conditioning to be certified. And they must hold -- to work offshore, they must have at least a Type I, Type II certification, and they go through a two-hour closed book exam for that. Some can do it in 30 minutes, some can take an hour, some take the full two hours. But it is not a real easy exam. That's the EPA 608.

The EPA 609 is for people who are working on the automobile air-conditioners. They're a lot smaller and there's not too much volume involved, and that is only a 25-question exam, where the 608 is a 200 -- is 100-question exam. Okay?

The next one is a NATE exam. That is probably the most difficult air-conditioning exam. You're given two hours on each section. NATE stands for National Association of Technical Excellence. They've done a very good job in marketing their designation to the energy people, and on your light bill at home you may see, "Use a NATE certified technician for your air-conditioning." They've done some television advertising. So it's a difficult exam.

The next one is the ICE exam. I am a proctor to give the ICE exam. And that stands for Industry Competency Exam, and that is put out by the NHRI out of Arlington, Virginia. It's not quite as difficult as the NATE exam. And it's used a lot by the vocational schools, the air-conditioning vocational schools, that give a nine-month or two-year course. And it certainly gives the prospective employer an indication that this guy knows something about air-conditioning.

**Q.** Thank you.

Now, just a couple of other -- could you kind of go over some of your highlights for the jury to give a little bit of the flavor of some of the other things that you've done?

**A.** Well, some of the highlights -- one of the big highlights,

I worked in Saudi Arabia during the Desert Storm war, with all the smoke and everything else, you know. And they could not get me out, and they couldn't get relief in, so I was stuck over there for 9 weeks working 12 hours a day. That was a big highlight.

Another one was on the drillship itself, which we were working for Shell. We was trying to set a world water depth record, roughly in close to the same that BP's accident occurred, in 7,512 feet of water. And Shell did not want anything to happen to that well at all. And I had the opportunity to go work there for exactly one year under a contract-type basis.

I also pulled two inspection jobs at Daewoo Shipyard in Korea. One for the old Dual Drilling Company on a jack-up rig for quarters and -- the air-conditioning and the quarters inspection, the kitchen equipment. And the other one was a -- it lasted four months in Daewoo Shipyard for the old Sonat Company, which is now Transocean, and that was on a big semisubmersible. So those are certainly two highlights.

I was also able to land a contract to teach four electricians down in Lake Maracaibo in Venezuela. That was for Former (phonetic) out of France. And I did not know that the French people were going to come back and give an exam for those electricians. And once I got back in the United States, I found out from one of the men that had been there, they

tested those men. And of the four, three of them made 100 -- sorry.

**Q.** I think that's enough.

**THE COURT:** Yes, counsel. There's been a stipulation to his expertise. Let's move on, please.

**BY MR. FLINT:**

**Q.** Let's talk a little bit about what you were retained to do here. Frankly, I'd like to cut to the chase with respect to this. Would you tell the jury what this is?

**A.** That is a service valve. It's a liquid line service valve. In this particular case, it's mounted on the end of a filter drier. You may see that it looks like it's welded to it. It's really not. It's screwed in there. That filter drier comes with a plug and then the technician -- installing technician screws that valve into it, and then he'll run a brazing bead around it so that it cannot back out.

It is strictly a two-way valve. It operates much like your water faucet at home. So you front seat it to turn it off, and you back seat that stem and take off the cap down at the very bottom, what is labeled there as "service port," and you can screw on a set of -- a hose or a manifold gauge.

**Q.** When you're talking about front seat and back seat, during your deposition you were the one that likened it to a garden faucet?

**A.** Right.

**Q.** So in order to open this valve, the one on the left, as well as the water faucet, you turn it counterclockwise to the left?
**A.** To open it up.
**Q.** And to close it, you turn it --
**A.** Clockwise.
**Q.** -- clockwise to the right?
**A.** That's correct.
**Q.** So in connection with Mr. Chapman, if he was trying to close this valve, what direction should he have been trying to move it?
**A.** He would be going clockwise.
**Q.** Isn't this one of the preferred tools?
**A.** That's correct.
**Q.** And these were available on the rig, weren't they?
**A.** That's what I understand.
**Q.** You heard that from Mr. Maxwell, and you heard that from Mr --
**A.** Skipper.
**Q.** Thank you.
Now, I want to draw a distinction between you and Mr. Ritter. Mr. Ritter at one point in time called these accumulators, and he admitted that yesterday. This isn't an accumulator, is it?
**A.** No, sir.

**Q.** What's the difference between an accumulator and a filter drier?

**A.** A filter drier has a device in there to absorb moisture. An accumulator is primary to the cavity device that's mounted on the outside of the evaporator. The evaporator is that unit that's inside the house that gets real cold and it has a fan blowing across it with the cold air.

Sometimes you can get excess liquid and you do not want to get that liquid back into the compressor to slug it, because it can bust a piston, and so they put an accumulator in there.

**Q.** Okay. We're going to have to slow down, because slugging it and busting the pistons, it's beyond me.

**A.** Okay. I'm sorry.

**Q.** I don't know if the jury knows, but I certainly don't know what it is. So if you could just break it down.

**A.** All right. You don't want -- the main thing is on a compressor, you do not want liquid. That air-conditioning compressor is not designed to pump liquid. It's strictly for vapor only, gas, okay?

And so in order to keep any excess -- any liquid at all out of there, they will put in what is known as an accumulator. And it's married to a tank with a tube down in it. So the liquid is going into the tank, but the vapors are coming off the top to go back to the compressor. So the

compressor will always have vapor.
**Q.** Now, getting back to the valve. Looking at it from the underside, that's what it looks like; is that correct?
**A.** That's correct.
**Q.** And there are no threads on the inside?
**A.** That's correct.
**Q.** And there are threads on the outside to connect the hose to?
**A.** That's correct. And I brought one of those valves with me.
**Q.** That was the one I was showing to the jury earlier.
**A.** Earlier in the week.
**MR. FLINT:** And, Your Honor, I don't want to use the wrong term of art.
**BY MR. FLINT:**
**Q.** But this is a duplicate of the valve that was onboard the rig; is that correct?
**A.** That's right.
**Q.** And it works -- there's a cap over the stem, and the stem is where -- is where you would apply the wrench; is that correct?
**A.** That's correct.
**Q.** Now, I asked you to -- what did I ask you to do in connection with this case?
**A.** You asked me to review certain documents and make my

opinion on those particular documents. I did review those. I have sat here this week and listened to the testimony.

**Q.** Can you tell the jury what documents you reviewed in connection with your report?

**A.** I reviewed the deposition of Mr. Bud John Chapman, that was dated the 27th of April of 2010; also, the transcript of Artemus Skipper, that was dated the 28th of June, 2010; also, the expert report for Bud John Chapman by Ervin Ritter, that was the first one; also, the daily drilling reports for the time frame involved; also, the daily safety and operation reports for the time frame involved.

Also, the transcript of recorded statements of Mr. John Chapman by Robert Judge dated November the 24th; also, these days I've also received the deposition of Justin Maxwell; also of Ervin Ritter again, who was here earlier this week; also, the MSDS data sheet, I've reviewed that; also, the Carrier installation manual for this particular unit; and, also, sample valves, that I brought with me; and, also, the testimony of the past two days.

**Q.** And as we've sat here, you've heard the testimony of Mr. Skipper talking about the fact that they were asking Mr. Maxwell and Mr. Chapman to go work on the pipe rack system; right?

**A.** That's correct.

**Q.** And for the jury's benefit, the pipe rack system is what

moves the pipe on a semi to the drill floor -- it's like a giant robot -- and then it moves it back and stacks the pipe; is that right?
**A.** That's correct.
**Q.** And Mr. Skipper is the one that gave the instructions to Mr. Maxwell if there was time to remove the gauge; right?
**A.** Right.
**Q.** Now, would you start off, tell us what your first finding was.
**A.** Well, I understood that Mr. Chapman was on his third day on rig *7500* and he was assigned to work the night tour with Justin Maxwell, who was his senior. Mr. Artemus Skipper was the electrical supervisor of these two men. And before going off tour, Mr. Skipper got the two in the office and, in essence, told them, "Gentlemen, we have some work to do tonight on the rig floor. The glands -- or the packing glands for the cables for the racking system need to be replaced."
**Q.** And that's the cord grip that we've heard the term?
**A.** It's a basket-weave type of thing; and so as you pull it, it gets tighter and tighter and tighter. So it protects the cable and it also relieves the tension and pressure from the cable being pulled out of a gland.
**Q.** What happens if the cable gets --
**A.** Well, you're going to have a short.
**Q.** And then what happens?

**A.** Well, you could have a fire; or if the system is disabled, breakers start tripping, you know. I guess various -- so many things could happen.

**Q.** Okay.

**A.** But the point is that: On this racking system, which is a very important piece of drilling equipment, you're given very limited time on a drilling rig to do your maintenance on every part. You can't be doing it while you're drilling. So they were in the process of moving this rig. So everybody was needed on the rig floor to do their particular piece of maintenance.

And an electrician's job was to change these packing glands out. That was their assignment for tonight, and that was it. Mr. Skipper said, "Now, if you gentleman have time" -- and he specifically told Mr. Maxwell, not Mr. Chapman, because he had just met Mr. Chapman.

**MR. YOUNG:** I'm sorry, Your Honor, the witness is giving --

**THE COURT:** Under the rules of court, the expert witness is limited to testifying as to what was included in his report. So, sir, you're going to have to just direct your attention to what was included in your report, okay?

**MR. FLINT:** Your Honor, it was also in his deposition as well.

**THE COURT:** Thank you.

**BY MR. FLINT:**

**Q.** All right. So let's talk about what was in your report. Mr. Maxwell went to take the paperwork to the OIM's office for the pipe rack; right?

**A.** That's right. That's what he was told to do.

**Q.** And Mr. Chapman went to the control room to give the PMs to the ballast control operator where they're inputted?

**A.** That's right.

**Q.** And we heard Mr. Fox today talk about the fact that the work instructions are in the control room; right?

**A.** That's correct.

**Q.** Now, did Mr. Chapman go -- in your report you indicated Mr. Chapman didn't go to the control room. We heard that. He didn't go to the OIM. He went and decided to go work on this --

**A.** What I heard was that Mr. Maxwell had told him to go drop these off and then go back and meet me at the OIM office.

**Q.** So what was your first finding? What was your first opinion?

**A.** My first opinion was that he wasn't where he was supposed to be. He had stopped and said, "I'll grab these gauges off of here while I go by. It's not going to take me but just a few seconds, so I'll grab these gauges." He wasn't assigned to take off those gauges.

**Q.** Let me write this: He wasn't where he was supposed to be.

**MR. YOUNG:** I'm sorry, Your Honor. Counsel is simply writing the testimony of the witness, which I don't think is proper.

**MR. FLINT:** Your Honor, I'm just making a list. I can put it on the screen or I can put it up here.

**THE COURT:** Let him just testify. He doesn't need the aids -- the jury doesn't need the aids. They can listen to his testifying. Objection sustained.

**BY MR. FLINT:**

**Q.** In your statement you indicate that --

**MR. FLINT:** Do you want me to wait, Your Honor, for James to finish?

**THE COURT:** No, go ahead. Go ahead.

**BY MR. FLINT:**

**Q.** In your statement you indicate that Mr. Chapman was out of his assigned task; is that right?

**A.** That's correct.

**Q.** Now, let's talk about what that means, if he's out of his assigned task. We've heard all of the issues about working instructions, JSAs --

**MR. YOUNG:** Your Honor, I'm sorry, can we approach?

**THE COURT:** Yes.

(WHEREUPON, the following proceedings were held at the bench.)

**THE COURT:** I don't know what Mr. Young's going to

say, but what I think he's going to say is his continued comments about the testimony he's been hearing today -- over the course of this trial. Again, he is limited himself to what he has said -- he's previously testified to in his deposition and to what was included in his report. So he should not be referring to what he has listened to today or yesterday or Monday.

**MR. FLINT:** Your Honor, I will submit that he's at least entitled to talk about the testimony he heard from Mr. Ritter and to make certain statements regarding that.

**THE COURT:** I disagree. I disagree. He can certainly comment on if he had reviewed Mr. Ritter's deposition --

**MR. FLINT:** He did.

**THE COURT:** -- or his report.

**MR. FLINT:** He did.

**THE COURT:** And if he referred to that in his report or in his deposition, yes, but no new information will be presented under direct examination by this witness.

**MR. FLINT:** Well, Mr. Ritter revised his report in December, Your Honor, and I didn't get a chance to depose him, and I would submit that that at least should be --

**THE COURT:** Had that been brought to this Court's attention, I would have given you the opportunity to redepose him, but that was not brought to my attention. It is limited

to what was included in his report and deposition.

**MR. YOUNG:** My bigger --

**THE COURT:** Obviously, if Mr. Young opens any doors under cross, you can certainly --

**MR. YOUNG:** My bigger issue, Your Honor, was the witness just started talking. He just started talking about what it meant to be out of his zone of work, as if he's a rig expert. This man is an HVAC expert. And he --

**MR. FLINT:** He served for 30 years offshore.

**THE COURT:** But he's not an expert on that. He's an expert in air-conditioning procedures and --

**MR. YOUNG:** Exactly.

**THE COURT:** -- he's really going beyond his expertise.

**MR. YOUNG:** He's judging what my man was doing and how he was doing it from a non-technical, supervisory position.

**THE COURT:** So why don't you do this, so that there's not cause for embarrassment by anybody, why don't you merely direct his attention -- when we get back, why don't you direct his attention to his expert opinion as it relates to his field, and then ask him another specific question.

**MR. FLINT:** Okay.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** Proceed, please.

**MR. FLINT:** Thank you, Your Honor.

**BY MR. FLINT:**

**Q.** Mr. Wilde, I want to direct your attention as an HVAC expert to what happens when we're dealing with refrigerants and things like that, which can frostbite, as you discussed in your report. What are the types of things that R-22 will do to you in connection with working with this valve?

**A.** R-22 is a very -- a fairly high-pressured refrigerant; but when it's released at atmospheric pressure, the temperature of that refrigerant can go down to minus 40 degrees, and I think you'd all agree that that's pretty cold. And it can frostbite your fingers.

**Q.** And I'm looking at your report and you indicate that it's recommended that technicians wear gloves to protect their hands; is that right?

**A.** That's correct. You need some type of protection on that, and there is an MSDS data sheet. And on R-22 they specify specifically that leather gloves should be sufficient protection, but if you have a prolonged exposure, then you need some heavier insulated gloves.

As a result of this, we've also heard that ENSCO now requires insulated gloves. Mr. Skipper --

**Q.** Well, we can get into that. I just kind of want to keep us going and then we'll get to that.

**A.** Okay.

**Q.** Now, with regard to the gloves, there's stuff in the refrigerant; right?
**A.** There's stuff in the refrigerant?
**Q.** Yeah, there's hydrochloric acid, hydrofluoric --
**A.** Well, only if you have a burnout.
**Q.** Right.
**A.** I put that in there because we really did not know the situation of this particular unit, it's history. But if you have a burnout, there's acid that's been created inside that compressor and in the oil, and that is hydrochloric and hydrofluoric acid. Hydrofluoric acid is used in etching glass. So it's a very, very powerful acid, and that's the reason for having to be required to wear protective gloves.
**Q.** Now, Arthur, I notice that you have a comment here. Would you read the last comment in your first opinion? And you were just talking about people onshore, but tell us what you said?
**A.** "Even though many technicians do not wear gloves, it just takes one mistake."
**Q.** And ENSCO had a procedure that they were supposed to wear gloves; is that right?
**A.** Right, to hopefully prevent that one mistake.
**Q.** Opinion 2, would you tell us what your second opinion was?
**A.** My second opinion was that ENSCO had a safety policy -- we've heard a lot about that this week -- in which you have cold work permits in which you go through and detail exactly

what you're going to do, the steps you're going to take, what type of equipment that you need, and what type of protection gear you need.

This was not followed. Mr. Chapman just grabbed the hose and was going to take it off and go.

**Q.** And I think you indicated in your report that gloves were available and Mr. Chapman failed to wear them?

**A.** That's correct. Mr. Artemus testified here earlier this week that he, himself, would wear neoprene gloves if he was working on the units, and neoprene gloves was available probably back in the store room.

**Q.** Now, at one point in time in this case there was a little bit of a misunderstanding as to what valve we were actually dealing with. This is a picture that Mr. Chapman drew of the line. This is supposedly his accident site. Does this picture --

**MR. FLINT:** Your Honor, this is Exhibit 2 -- or Exhibit 3 of Exhibit 2.

**BY MR. FLINT:**

**Q.** Does this picture look anything like what we're dealing with here?

**MR. YOUNG:** I'm sorry, Your Honor. Let me object. He's mischaracterizing the plaintiff's drawing during his deposition. The plaintiff did the drawing. Counsel could have shown it to the plaintiff and the plaintiff could have

explained it at that point.

**THE COURT:** Objection sustained.

**MR. YOUNG:** Thank you.

**THE COURT:** Move on.

**BY MR. FLINT:**

**Q.** With respect to opening and closing valves, this valve is one unit; correct?

**A.** That's correct.

**Q.** It's not separated -- there's no separation between the valve and the service port, is there?

**A.** No, sir.

**Q.** Now, I'm going to bring that back up with one of your later opinions. Now, you talked about readings. Would you tell the jury how it is that you take a reading with the gauges?

**A.** On the manifold gauge, you have two gauges. You have a blue one and a red one. The blue one is used for low pressure, and the red one is used for high pressure. They will have a rubber-type hose, using a neoprene hose, with a little ferrule at the very end, that you attach to this gauge port here.

You do not need to open up the manifold gauge at all in order to get a reading because the refrigerant goes right straight up into the gauge itself.

**Q.** Now, I have one question with respect to that, and I asked it of Mr. Ritter and Mr. Chapman: Had he wanted to -- or as he

cracked the valve, he should have been able to see on the gauge that there was either pressure in the system or it was leaving; right?
A. Right. You'll have a certain amount of refrigerant inside that line and so that you -- that's going to be in there. Even when it's turned off, you still have that small amount of refrigerant, maybe an ounce or so, in that line, and it will read on that pressure gauge.
Q. All right. Now, opinion 3, you indicated that he was in a hurry and he failed to remember; is that right?
A. That's what I said.
Q. Would you continue on with your opinion?
A. And he somewhat admits to that when he says to Mr. Maxwell, "I messed up." He went to him and with hands and, "I messed up. I got refrigerant blowing all over the place."
Q. Now, we heard that Mr. Maxwell closed the valve; is that right?
A. That's right. He immediately went over there and turned the valve clockwise and closed it.
Q. So we know already from your report that Mr. Chapman wasn't where he was supposed to be; right?
A. That's correct.
Q. And he wasn't doing the task he was assigned to do?
A. That's correct.
Q. And he hadn't done any of the paperwork or even thought

about doing the sort of things that he was supposed to do in connection with doing these kind of processes?

**A.** That's correct.

**MR. YOUNG:** Your Honor, let me object. This witness is an expert on HVACs.

**THE COURT:** Objection sustained.

**MR. YOUNG:** Thank you.

**BY MR. FLINT:**

**Q.** Let's talk about the HVAC aspect of it. He never closed this valve properly, did he?

**A.** That's right.

**Q.** And had he closed the valve, would he have gotten any Freon on his hands?

**A.** Very, very, very little. In fact, many technicians, many of them don't even wear gloves.

**Q.** But he wouldn't have gotten any Freon on his hands, would he, if he closed it all the way? Would he?

**A.** Right.

**Q.** And the bottom line is: The only person operating this valve was Mr. Chapman?

**A.** That's right.

**Q.** Now, in your report, you were talking about the size of the units and high-side pressure. What does that mean? Would you please explain that to the jury?

**A.** This particular unit in question is a 40-ton unit and it

does hold approximately 80 pounds of R-22. Refrigerant --

**THE COURT:** Sir, why don't you sit back just a little bit because we're getting a little bit of vibration.

**THE WITNESS:** Okay.

And refrigerant, the high side of the system, or the condenser side of the system, the output of the compressor, that pressure is going to be based upon the ambient temperature. You have a lot higher pressure in the summer months than you will in the winter months.

So I looked and I did not find any temperatures on the rig at that particular one. They don't have that listed separately as a separate item. It would be nice to know what the temperature was. But, normally, it would be somewhere around 275 PSI.

Now, follow with me, if you would, and I'll try to make this real simple: You've got refrigerant coming into the compressor at a low pressure. It's a vapor. And that refrigerant has been heated up by the heat from your room, that's caused that liquid to boil off, and so it comes into the compressor as a vapor. You also have the heat of compression itself.

So those two heats are added together and you may have 275 degrees Fahrenheit coming out of that compressor, and that will burn your hand. Beginning students very quickly learn, you don't just grab your hand across that discharge

line.

As it enters the condenser coil, that big fan outside blowing and starts cooling that liquid -- I mean, that vapor down. When it gets past what we call the saturation point -- and I want to use an illustration of, what is the state of water at 32 degrees? Some of you are going to say, "Ice"; some of you will say, "Well, it's water"; some of you will say, "Well, it's a mixture of ice and water." It's all three. That's a saturation point for water at 32 degrees.

So refrigerants have a saturation point. And it's going to finally convert to a liquid inside that condenser. And we continue to cool that liquid, probably on about the last turn of the coil. And as it finally goes on through this filter drier, it's what we call subcooled. It's no longer a vapor, it's a subcooled liquid. And the actual temperature there may only be 100 degrees.

Now, Mr. Ritter testified that that is a very hot liquid. It's not a very hot liquid, it's a subcooled liquid. It may be sightly warm, but it's not hot. You can put your hand on it all day long.

**BY MR. FLINT:**

**Q.** Now, let's move on to your fourth opinion. What did you indicate in your report?

**A.** In my -- I believe in the haste of taking these gauges off, Mr. Chapman, in the haste of trying to get back to that

pipe rack or the job he was supposed to be doing, he cut corners. He failed to do the normal checks and balances that a technician kind of goes through mentally.

We heard from Mr. Ritter, a lot of these things are -- you know, you just kind of do them automatically. It's easy to kind of forget basics sometimes and cut corners, and I think that's what he was doing. He was grabbing those and getting on over to where he was supposed to be.

**Q.** Now, opinion 5, what did you tell us?

**A.** I made a statement in opinion 5 was that you need to know your equipment. This was a brand-new rig for Mr. Chapman. He had not worked on a semi. You got about 150 people onboard. A very sophisticated rig. He was probably very proud to be transferred over to this particular rig.

**THE COURT:** Sir, I'm going to ask that you stick to your expert report, okay? Thank you.

**MR. FLINT:** It's kind of close, Your Honor, but...

**BY MR. FLINT:**

**Q.** Mr. Wilde, you indicated that he failed to do the normal checks and balances that he went through mentally; right?

**A.** Yeah. And he did not -- he was not familiar with the equipment. You got to know the equipment.

**Q.** If you have a problem.

But, then again, this is not a particularly hard thing that somebody needs to know; right? How to turn it, at

least.
**A.** It's not hard; but if you're not familiar with it and not used to that type of valve, it could be kind of a strange animal.
**Q.** But here's my question: Had he had any questions, he had plenty of opportunity to ask; right?
**A.** Oh, sure.
**Q.** And we heard the testimony that the work sheets -- the work instructions were in the very same room where he was doing his PMs?
**A.** That's correct.
**Q.** Now, a couple of other things. I want to talk about the Nance school and what it is that you teach there because we've heard some discussion and we discussed it at length in your deposition.
With regard to -- with regard to this, we've heard testimony during the course of this case about the gauge. And in connection with the gauge, and I think you heard me ask Mr. Ritter, "Does it make any difference to the functioning of the air-conditioning if you leave the gauge off?" And Mr. Ritter said, "Yes."
Do you agree with that statement?
**A.** No.
**Q.** No. Why?
**A.** It doesn't do any harm to leave the gauges on.

Q. Okay. That's what my question is: It doesn't do any harm to leave it on, does it?
A. No.
Q. Is there any need for this gauge to be placed anywhere?
A. To be placed anywhere?
Q. Yeah. I mean, is there any need for it -- it had been sitting in for a couple of days -- several days, is --
A. It's not going to hurt a thing to leave them a couple more days or even another week.
Q. Now, as a practice -- let me rephrase that.
In terms of attaching them to the filter drier, that's just a personal preference, right, attaching the gauges there?
A. Yes, sir.
Q. Is this in any walkway?
A. Is it in a walkway?
Q. Yes, sir.
A. I understood that it's fairly close, but not within the walkway itself.
Q. That was what I was trying to get at.
Now, I'd like to look at your summary. What was your summary?
A. That I find that ENSCO did not do a thing wrong.
Q. Okay.
A. Not a thing.

**Q.** And you indicated they provided him with gloves?
**A.** Yeah.
**Q.** And he wasn't wearing the gloves to do the job at the time?
**A.** Right. And they even sent him to an air-conditioning school for some training.
**Q.** We're going to get into that too.
**A.** Okay.
**Q.** Let's talk very briefly about the gloves. You heard testimony that Mr. Skipper gave him gloves that I referred to as panty hose. The Gray Ghost Gloves; right?
**A.** That's correct.
**Q.** And those are the type of gloves that you'd use while working on a pipe rack; right?
**A.** That's correct.
**Q.** And if you're going to use refrigerants, you're going to use a different type of glove?
**A.** A heavier glove.
**Q.** And we heard personal preference, Mr. Skipper used the neoprene gloves?
**A.** That's correct.
**Q.** And other people used the cotton gloves?
**A.** Right.
**Q.** And the cotton gloves are better than the panty hose gloves; right?

**A.** Right. And some people use leather gloves.
**Q.** Now, at one point in time we thought that the valve, based on the picture that he drew, was connected somewhere else. And because of Justin's pictures, everybody discovered that this is what we were dealing with; right?
**A.** Right.
**Q.** So anything that you had discussed with respect to other valves is of no moment --
**A.** That's correct.
**Q.** -- since we know this is the real valve in question?
**A.** Right.
**Q.** Now, in your report, in your conclusion you also talk about the plan of action to remove the gauges; is that right?
**A.** That's correct.
**Q.** And what was your comments about Mr. Chapman?
**A.** He didn't have any kind of work permit. He had not gone through the process of a cold work permit. He wasn't even assigned to the task.
**Q.** And he chose to use his own plan; right?
**A.** Right.
**Q.** And that's what you wrote in your report?
**A.** That's right.
**Q.** Mr. Chapman sat here on Monday and he told us that the classes at the Nance school were -- I don't know how to characterize it, but he implied that they certainly weren't

very thorough. We discussed this at length in your deposition. I want you to tell the jury exactly what it is that these people do.

First of all, let's start with how many people have you taught over the years?

**A.** Probably a little better than 3,500.

**Q.** And what are the companies that go to Nance to have their people trained? Just give them some names that --

**THE COURT:** Counsel, why don't you get back to the microphone so we can hear you.

**THE WITNESS:** We have Exxon. We have Shell. All the production people. We have Transocean, ENSCO, BP, Pride. That's some of the major ones that we got.

**BY MR. FLINT:**

**Q.** How many people are scheduled to go through your school this year?

**A.** We will go a little bit past 400.

**Q.** And you just recently just stopped teaching; is that correct?

**A.** Yes.

**Q.** And for the prior 15 years, you've been teaching these classes?

**A.** That's right.

**Q.** Tell them what it is that you get for your money when you go to Nance International school.

**A.** We've three classes. We have a basic class, advanced class, and a troubleshooting class. And we're quite familiar with the training of people for these various companies.

And we have been told that in the basic class, which is primarily for EPA certification, but they need to know refrigerant too, we've been told that, "If you can teach our man how to find a leak, recover that refrigerant legally, fix that leak, charge that refrigerant back into the system properly, and also teach him how to braze" -- so he's going to have to stop the leak -- "if you can do all of that in four days, that's good." And that's what we attempt to do.

So in the basic class, we teach the basic refrigeration cycle. We do that through a cycle trainer that has glass tubes -- I'm sorry -- glass tubes that you actually see the flow of the refrigerant as it changes state. We also have one of the new 410A residential type units with gauges monitoring it, and it's a very high-pressure type refrigerant.

We teach the brazing on Wednesday afternoon. And then on Thursday, we teach the recovery and the -- through the window units of recovering that refrigerant out of there, do, quote, a simulated repair, and then put that refrigerant back into that system and charge it up properly. That's in the basic class, 25 percent hands-on.

Now, having come to the basic class, they are now eligible to attend the advanced class.

**Q.** Let me ask you very quickly: At the end of the basic class, what do you get if you participate in the program?

**A.** You get a certificate for having attended the class. We don't give them a final exam and they get an "A" or a "B" or anything of that nature. We give them a certificate that you have attended the basic class.

**Q.** But, in effect, they do have a test at the end of the week, don't they?

**A.** Well, we also have one right off the bat at the front and we have what's known as a pre-test that they take and to kind of give us an indication, what you already know, and who are we going to have to help the most, and that type of thing, during the week, and kind of see where the class is.

Then, at the very last day, the fourth day, of the basic class, we give them that same test all over again as a post-test and see how they did. So if the training coordinator says, "You know, we got a bad report. They didn't learn anything." Well, I don't know, on pre-test he made 10 percent; on the post-test, he got 70 percent. So it looks like he learned something.

**Q.** Now, Arthur, let me ask you this: On the fifth day, what do they do?

**A.** On the fifth day is the review and the actual test for the EPA. It's a difficult test. And we give the class an option, although no one ever turns us the other way, they always want

to -- let's do a little bit every day to prepare for that EPA test.

**Q.** So that's -- I'm just cutting to the chase, that's a test that they actually take and pass to be able to be qualified to deal with refrigerants?

**A.** Right. They need what's known as type I, type II certification.

**Q.** Let's talk about the second, the advanced class, the one that Mr. Chapman went to.

**A.** Right. That is a 50 percent hands-on. We kind of pick up where we left off in the basic class. In the advanced class, we go into a little more difficult subjects, why do compressors fail, what cause compressors to fail, what can you do to avoid these problems?

Also, we get into capacity control. Because some of these big compressors, like that 40-ton unit, that's hard on your electrical system for that thermostat just to start that motor up and just pick it up, a 40 horsepower motor. That's hard on that electrical system as a whole.

And so people, like Carrier, will put in what's known as unloaders. It's very similar to your Cadillac all-star engine, where you start off with all eight cylinders and gradually go down to 6 cylinders and then it goes to 4 cylinders.

So these loaders on these 06D and 06E compressors,

like what's on this unit here, it idles a cylinder bank --

**Q.** Let me stop you --

**A.** Okay.

**Q.** -- briefly, because when we're starting to talk about nomenclature.

The actual equipment that they're training on at Nance is very similar to the Carrier equipment on this rig?

**A.** Right.

**Q.** Specifically, there are two-way valves in your classroom that the students operate?

**A.** Yes, yes.

**Q.** Okay.

**A.** So we teach them how to operate that loader/unloader, okay?

Now, in the cycle trainer, we use that again and they have to hook up some gauges to that cycle trainer. It has built-in gauges, but we want them to hook some -- a set of gauges up and get used to that. And they take readings, they figure out the super heat of that unit, they figure out subcooling, they're taking electronic temperature readings, that sort of thing.

Another thing that we teach in the advanced class is advanced brazing. So we teach them how to braze copper to steel.

**Q.** For brazing, for those of us who don't know what that is,

what is it?
**A.** Similar to welding.
**Q.** Okay.
**A.** And also how to braze copper to aluminum, and how to braze copper to brass.
**Q.** And the reason you do this is because a lot of the refrigeration equipment is made of copper; right?
**A.** Oh, yes. Oh, yes. All the lines are copper these days, okay? And we're seeing more and more aluminum, so we also teach them how to work with aluminum too.
**Q.** I was going to say, with respect to how you finish off the course --
**A.** We have a large about 10-ton unit that has an 06D compressor that's kind of a baby size to what we got on here. This is 06E on this compressor -- on this unit. And the 06D is just slightly smaller. If a person didn't know the difference, you wouldn't be able to -- you'd think they were the same compressor, but they're really not.
So we have a unit that has an open-drive compressor that's belt-driven. That's fairly large. And then we also have next to it this 06D compressor. The evaporator and condenser is the same for both of them. And we can switch between the two of them. And the student has to valve off one and open up the valves on the others.
These are the three-way valves that they use there.

We have a filter drier at the bottom of the condenser unit with a little valve similar to that. We don't use it to hook up any gauges to it. We also have a few small valves with some Schrader valves on it.

That particular unit is bugged. We have some toggle switches on it and we can set up about ten problems on that. I've done it so many times, I've got each one of those switches memorized.

**Q.** So to cut to the chase, Arthur, the bottom line is: You have all this equipment that mimics the type of equipment you'd see on an oil rig or a semi?

**A.** That's what it's really geared for.

**Q.** And what you do is you guys set up a problem set and you trick little things and then tell them to go troubleshoot it and be able to repair it?

**A.** That's correct.

**Q.** And so they're getting real-life, real-world instruction on the type of problems they encounter offshore?

**A.** We also, in the advanced class, to a certain of capacity, you may have a 10-ton unit, but is it actually putting out 10 tons; you may have a 5-ton, is it putting out 5 tons. So in the classroom itself, we have taught them how to figure the capacity of a unit through taking air readings and different formulas that's used. And they go through that --

**Q.** What does that have to do with regard to somebody who's

working on a rig?
A. Well, certainly if you don't get proper air flow, you've got a problem. If you have a 10-ton unit and it's not putting out 10 tons, it's only putting out 5, well, you better find out why.
Q. Let's just, in brief review, in summary, you found that ENSCO did nothing wrong; right?
A. That's correct.
Q. And in connection would it, kind of going in reverse order, you said, "Know your equipment," and you feel Mr. Chapman knew, but he forgot?
A. That's correct. Or he may not have known this particular equipment because he didn't have it on a previous rig.
Q. And we heard Justin talk about a mental glitch; is that right?
A. Right.
Q. And then you also have -- you believe he was in haste to get the gauges off to get back to the pipe racking system where he belonged. I think you used the term "cut corners"; is that correct?
A. Right, that's right.
Q. And he failed to do the normal checks and balances that a technician goes through mentally?
A. Right.
Q. And we heard that he failed to do the paperwork as well?

**A.** Right.
**Q.** And you attributed significance to his comments, "I messed up," and felt that he was probably in a hurry and had a mental block and failed to remember?
**A.** That's correct.
**Q.** And we went over the fact at your deposition, and today, and from the testimony, that all he had to do was close that valve properly and no Freon would come out of the hose?
**A.** That's exactly what Mr. Maxwell did.
**Q.** And finally, Mr. Chapman was not assigned to take off the gauges, but was assigned to be following Mr. Maxwell and be at the pipe rack?
**A.** That's who Mr. Skipper had assigned it to.
**Q.** And had he been working at the pipe rack, this would have never happened?
**A.** That's correct.
**MR. FLINT:** Your Honor, at this time, I'd pass the witness.
**THE COURT:** Thank you.
Ladies and gentlemen, the time is now noon, we're going to go ahead and take our lunch break. As soon as we return from lunch, Mr. Chapman's attorney will be cross-examining this witness. I think this is the last witness that the defendant has to present.
So the time is now noon. I'll remind you, do

not discuss the case with each other. You will get the case for deliberation early afternoon. We'll see you back here at 1:30.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**(OFF THE RECORD)**

**(LUNCHEON RECESS)**

* * * * *

**AFTERNOON SESSION**

**(December 15, 2010)**

* * * * *

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Bring in the jury, please.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** Mr. Wilde, come on up.

Go ahead and proceed, counsel.

**CROSS-EXAMINATION**

**BY MR. YOUNG:**

**Q.** Good afternoon, Mr. Wilde.

Right now you currently teach -- or, I'm sorry, until the last year or two, you actually taught for Nance; is that correct?

**A.** No, this past year.

**Q.** Are you employed by Nance right now?

**A.** Still employed by Nance.

**THE COURT:** Why don't you put the microphone down now a little bit, sir. That's a little bit too low. There we go.

**BY MR. YOUNG:**

**Q.** And Nance is the company that ENSCO pays money to to train their employees; correct?

**A.** Yes. I assume their bill's current.

**Q.** Just so we understand though: You're actually employed by

a -- you're a customer, basically, of this company in a sense? You're a client. You get paid by them to send people to you --

**A.** We're a service provider is what we are.

**Q.** Correct.

Do you know how much income Nance made off of ENSCO last year training their employees?

**A.** I have no idea. I'm not privy to that information.

**Q.** Can you give us an idea, sir, when you're sitting in a training class, how many people from ENSCO do you usually see out there?

**A.** We may see none; we may see two or three.

**Q.** And that continues throughout the year for each class?

**A.** Yes, right.

**Q.** And you all run these classes -- I have a schedule. You all run them for a long period of time each year; correct?

**A.** That's correct. Actually, we've been running these classes since 1970. So they run constantly except for the holidays.

**Q.** I think you said you actually train about 400 offshore guys.

**A.** This year we will exceed 400 -- slightly over 400.

**Q.** And those are all offshore workers; correct?

**A.** That's correct.

**Q.** The companies --

**A.** Every now and then we might get one or two that's not --

like, the U.S. Coast Guard may send someone to us.
**Q.** One of the reasons that you encourage these companies to use you is because -- and I've seen this on your literature-- you actually say that if they train their employees, they save money because they don't have to pay third-party people to go out there; isn't that true?
**A.** That's correct. Normally -- this is the way we put it: Normally, one service call that they saved will pay for the course.
**Q.** Okay. Let me show you the course. How much of the time do you think for basic is in the classroom?
**A.** I'm sorry, restate your question.
**Q.** I'm sorry. How much of the -- for basic do you think is actually hands-on -- I'm sorry, not in the classroom -- how much is hands-on?
**A.** 25 percent on basic.
**Q.** And how much is it for advanced?
**A.** 50 percent.
**Q.** And so we understand: The basic class is a four-day class, and on the fifth day you take the EPA test?
**A.** That's correct.
**Q.** So that would mean that one day during the basic is what you're calling hands-on; right?
**A.** Well, it's divided up during the four days.
**Q.** And then if we move forward to the advanced class. Again,

that's a four-day class?
A. Five days.
Q. Five days.
And 50 percent of that is hands-on, which would be about two and a half days?
A. Yes, that's correct. Right.
Q. All right. So Mr. Chapman, even though he's been through your basic and your advanced, he's really only had three and a half days of hands-on training other than what he gets taught and shown out on the rig by different people; right?
A. It could be. I haven't added up the hours or whatever.
Q. The unit you all use at Nance to teach from is actually a 19 -- actually, it was there in 1994 when you went there; correct?
A. That's correct.
Q. You all have modified it some so you can teach from it; correct?
A. That's correct.
Q. Everyone who has been through your Nance class actually gets the certificate?
A. That's correct.
Q. There's -- and I think you said there's no test at the end to say you qualify or not. You give everybody who goes and sits there in a chair for four days the certificate; right?
A. For having attended.

**Q.** Okay. You mentioned the pre- and the post-test that you all do now. That does not have anything to do with whether the person graduates the class. That's just information that you all use so you can tell your customer, "Look, this guy did improve. Even though he might be at 70 percent now, he was 10 percent when he came in," was the example you gave us?
**A.** That's one objective. The other objective is to see whether or not he is still lacking in certain areas or he's confused about something. Because we do go over that post-test with the entire class.
**Q.** All right. You -- during your deposition, sir, you actually had checked Mr. Chapman's file from Nance; correct?
**A.** That's correct. I looked it up.
**Q.** And you all did not always do those pre- and post-tests, did you?
**A.** No.
**Q.** You all have started doing that since Mr. Chapman went through; right?
**A.** Yes.
**Q.** All right. So when he went through, there was no testing done at all. He was just given the certificate --
**A.** There was testing done, but not in that particular format.
**Q.** What type of testing was done?
**A.** They see a video -- for example, on Tuesday, they see a video on the refrigerant characteristics and then they take

a -- what we call skills check quiz -- actually, Carrier calls it -- that's what they call it -- skills check quiz. And there's approximately 50 questions that's asked, and two different parts to identify refrigerants and what the characteristics are: What's a CFC, what's an HCFC, what's an HFC, that sort of thing.

**Q.** Okay. That doesn't have anything to do with attaching hoses to filters or valves, does it?

**A.** No, that's later.

**Q.** Other than that test, is there any testing that's done back when this man went through?

**A.** Yes.

**Q.** Okay. What testing was done when this man went through?

**A.** In the Thursday class on recovery, he's required to recover from -- a refrigerant from a modified window unit. We've got a number of these and we modified those little Schrader valves on them. They have to recover the refrigerant out of there and do a simulated repair, pull a vacuum on the unit, and then charge it back up again.

**Q.** When we look at classifications for recovery of Freon, what are the classifications as you go down? If a person gets a certificate, what classes would they be? Is there, like, class I, class II, class III?

**A.** You mean for refrigerants?

**Q.** Yes.

A. I'm not quite sure. I've never heard that terminology used before, class of refrigerants, no. You may be referring to the EPA.
Q. Okay. What is the EPA?
A. Environmental Protection Agency.
Q. I understand. What are their classes or types?
A. Class I, class II, class III.
Q. Okay. Will you educate us on what that means, please?
A. Class I is for small appliances, and a small appliance is one that contains five pounds or less. Usually, a hermetic concealed condenser -- I mean, a compressor, and it's factory-charged and self-contained. An example would be a Coke machine, or window unit, or household refrigerator. Those are all small appliances.
The next one is a class II. A class II appliance is an appliance that is not necessarily self-contained, it does not necessarily have a hermetic concealed compressor, although it could, and could have a semi-hermetic compressor. And the main thing is it's not self-contained. You can't take it out of the box and just plug it in.
Then you have a type III certification for EPA, and those are low-pressure water chillers, like you use in this building here probably -- don't know. I've never seen it -- but they're used in high rise office buildings, colleges, universities in which you're cooling water and then sending

that down through insulated pipelines to evaporator units.

**Q.** Let's stay on the class I and class II. In connection with this unit that we're talking about, where would that fall under these categories?

**A.** Class II.

**Q.** Class II. All right.

Is the EPA test that you give to everyone during the basic test -- at the end of the basic test the same?

**A.** First of all, we do not necessarily give it to everyone in the basic class. We have students that arrive that's already certified. They're just there for the basic only. They got their certification -- EPA certification somewhere else.

Sometimes they came for a previous EPA testing, but they did not pass all the elements of it -- there's four different elements that has to be passed if they're going to get everything -- and so they're coming back to be retested.

**Q.** Okay. But the classification -- I mean, the test that you give for the EPA class level is the same; correct?

**A.** Yes.

**Q.** Okay. You don't have different tiers or different levels of EPA classification?

**A.** We just give the EPA exam, 100 questions.

**Q.** This is actually from the Pennsylvania College of Technology, Penn State?

**A.** Negatory.

**Q.** Which one do you use now?
**A.** We're using one from VGI out of Arlington, Texas.
**Q.** When did you start using that one?
**A.** Oh, approximately three years ago.
**Q.** Do you know if it was before or after Mr. Chapman went through?
**A.** Probably after. I think he attended the basic class on about 2004.
**Q.** All right. Let me stay on the class with you for a second. I'm trying to give us an idea of what was happening for these eight days in Beaumont. You all actually have a three-way service valve -- let me show the jury -- you all actually have a valve like that on your modified Carrier unit; correct?
**A.** Not like that one, no, sir.
**Q.** You do have a valve like that that you --
**A.** We do have a three-way valve, but it's bolted to the compressor itself. It's not just sticking out.
**Q.** All right. I'm sorry. My point is that: This piece of equipment, being a valve itself, is used on your test unit; correct?
**A.** The unit that we have has a three-way valve that we can demonstrate and that they do turn, and back seat, and front seat, and all that kind of stuff.
**Q.** And this three-way valve is where they attach gauges to.

You were testifying on direct that they actually take a pressure test and they attach to this three-way valve; correct?
**A.** That's correct, that's correct.
**Q.** Just so the jury understands: In comparison, this port is seated -- you all use that term, don't you, how a valve is seated?
**A.** Yes.
**Q.** This port is actually seated different than the three-way valve, is it not?
**A.** That's correct.
**Q.** Explain to the jury what that means when a person goes up and tries to loosen or tighten, let's say, this port to begin with?
**A.** This one is like your household water valve outside your house, and it works the same way.
**Q.** Okay. Meaning which direction would you turn it to --
**A.** You would turn it outward in order to receive some water, attach your garden hose to that, and you'd front seat it to turn the water off.
**Q.** Now, compare that to how you would turn this valve stem in order to open or close --
**A.** That one works different. On that one you back seat to close off the gauge port.
**Q.** All right. What that means is you, basically, turn it a different direction than you do --

**A.** That's correct.
**Q.** -- this port to the which the gauges were attached at the time of the injury?
**A.** That's exactly opposite.
**Q.** At Nance the only training you would have given to John through his basic or advanced class would be using this type of port that's in the picture here, the three-way?
**A.** On that large unit?
**Q.** Correct.
**A.** On that large unit?
**Q.** Yes.
**A.** We do have one on the cycle trainer.
**Q.** Okay.
**A.** And when we do a pump-down on that, we use a small valve. It has a big handle on it, not a little valve stem, but it's a big handle.
**Q.** But that's sort of different than these two valve stems that we're talking about, is it not?
**A.** Well, it's just that Carrier mounted a big handle to fit your hand better than using a little wrench.
**Q.** All right. But a person uses their hand to turn that valve; right?
**A.** Yes.
**Q.** But when John went through training, he was trained by Nance, that ENSCO provided -- ENSCO sent him to, to open or

close valves on this type of equipment in the picture; right?

**A.** Yes.

**Q.** You mentioned earlier that when John was on the *74* -- and, again, I'm working my way towards the accident -- when John was on the *74*, your understanding is there were no air filters out there?

**A.** There's never any air filters?

**Q.** No filters, I'm sorry. Filters, the thing we've been talking about for three days.

**MR. FLINT:** Your Honor, if I may, I don't recall ever mentioning --

**THE COURT:** Rephrase your question, counsel.

**MR. FLINT:** Thank you.

**BY MR. YOUNG:**

**Q.** You were asked about when John worked on the *74* and whether equipment was there or not. Do you remember that question?

**A.** Not really.

**Q.** All right. I think, Mr. Wilde, you were actually asked, "Did he know his equipment?" And I think one of your opinions -- you went through your opinions and your report, and one of them was you faulted him because he didn't know his equipment, and you always have to know your equipment, you said.

**A.** That's correct. The equipment on the *7500* is different

than on the *74*.

**Q.** All right. And that is part of my question. You understand from reading the depositions in this case that there were no filter units, being those big pieces right there, to which the gauges were attached. There were none of those on the *74* --

**A.** I have no knowledge one way or the other whether there was or was not. There has to be a filter.

**Q.** Right. Do you know if it was sealed?

**A.** I don't know whether it was a canister -- I mean, a replaceable cartridge-type filter or whether it was a sweated-in filter.

**Q.** Let's go to this filter unit. You do have one at Nance, do you not?

**A.** Yes.

**Q.** That filter at Nance does not have any type of a port on it, does it?

**A.** Yes, it does have.

**Q.** It does?

**A.** It does have.

**Q.** Okay.

**A.** We don't always use it though.

**Q.** Okay.

**A.** Only if we're going to change out that filter, and we don't change that filter every week.

**Q.** Have you all added the port recently, sir?
**A.** No, sir. It's been there all along.
**Q.** Okay. We'll come back to the port being on it. But you all do not actually give the employees that come to your class any training on the filter, do you?
**A.** In what aspect are you speaking of now?
**Q.** What type of training, if any, do you give the employees from ENSCO and the other companies in regard to filter units, such as this one in the picture?
**A.** In the classroom, when we talk about filters, we do mention a canister-type filter and we also have one for a show-and-tell type of thing, if the instructor wants to use it. We also have one down in the lab that's actually hooked into that big 10-ton unit. But, like I said, we don't always change that out.
If we've had problems with that unit, when they get to the advanced class or troubleshooting class, they actually repair the unit. We've done that many times. That doesn't mean every class gets the opportunity to tear it down and put it back together.
**Q.** All right, sir. Is there any set curriculum or any set steps that you go through each class at Nance that is taught to the attendees in regard to these filters?
**A.** We mainly just cover filters in general: That a unit has to have a filter, what is its purpose, how can you check a

filter, whether it's clogged up or not, what type of filters do we have, what's available, who manufactures them, what is the absorbent or desiccant that's inside of it.

**Q.** There is no use of the filter as far as a trainee, such as this man or anybody else from ENSCO, putting their hands on a filter, is there?

**A.** When I was teaching, we had two filters: One from Emerson Controls and one from Sporlan. And then I would show a demonstration on those two different filters, because they're entirely different, they're manufactured different. One has desiccant beads totally inside. The other one has a rock inside that refrigerant -- it does not stop all the dirt that can pass on through, whereas the other one has desiccant beads and there's no way for any trash to get through there.

So I tend to promote that Emerson cycle controls filter, and that is a show-and-tell type of an item.

**MR. YOUNG:** Your Honor, if I may approach the witness and give him his deposition, and this is in regard to my question about whether there was a port on the refrigerant filters that are used with Nance and my question about whether the employees have hands-on training with the filters that are there.

**THE COURT:** That's fine.

**MR. YOUNG:** This is page 26, lines 3 through 18.

**THE WITNESS:** Is that on my deposition?

**THE COURT:** You can read before and after that as much as you'd like.

**BY MR. YOUNG:**

**Q.** Will you read for us, Mr. Wilde, the question I asked that --

**THE COURT:** Wait, wait, wait, wait. Hold on. Hold on. I'm not sure he's finished reading. Let us know when you're ready.

Are you ready, sir? Mr. Wilde, are you ready?

**THE WITNESS:** I'm ready.

**THE COURT:** Okay. Go ahead.

**BY MR. YOUNG:**

**Q.** Will you read for us the question I asked at page 26, line 3, and the answer you gave?

**A.** You asked: "So there is no port on the refrigerant filters that are used in Nance's training?"

I said: "Yes" -- I said: "That's correct."

**Q.** All right. Read my next question, please, and the answer.

**A.** "And I'm assuming that there is no use at all of the filter during the training or is there?"

And I stated, "Other than the fact that they have to identify -- they have a lab exercise to do in which we have put numbers on different parts of the system and they have to go all over that thing and find the numbers and identify the proper, or whatever it's called, the proper name that we call

it by."

**Q.** All right. And then the next question I asked about, will you go ahead?

**A.** "Okay. But as far as putting their hands on it and taking the lid off to try to switch out the filter out or anything like that?"

And then I said: "No, negatory."

**Q.** And then you said: "It's not done"; correct?

**A.** It's not done.

**Q.** In connection with that -- those two questions that you just read to us, my next question is: At the Nance training classes, basic and advanced, trainees, like this man and anybody else from ENSCO who would attend, would never ever be taught or instructed in any way to put gauges on a filter port, would they?

**A.** Never ever is a finality that I cannot agree with. Because --

**Q.** You don't have ports on your filters, do you?

**A.** Here's why -- here's why I say that: Because there's been many times in our classes in which that big 10-ton unit has failed, it's had a leak, we've lost all the refrigerant, and we have had to have the students, either the advanced class or the troubleshooting class, actually repair that unit, pull a vacuum on it, whatever refrigerant is still left in there, pull it all out, charge it all back up properly, put a brand spanking new

sock filter in there and everything.

So I can't say never ever.

**Q.** But you don't have a port on the air filter, do you?

**A.** Yes, on the -- yes, yes, yes.

**Q.** The refrigerant filter, I'm sorry.

**A.** Just like that little -- just like what you see in the film there. We do have a canister-type filter like that on that big 10-ton unit.

**Q.** Am I reading something different here in your deposition where you answered --

**A.** I don't know.

**Q.** Again, my question, sir, and can you explain what I'm not understanding, I said: "So there is no port on the refrigerant filters that are used in Nance's training?"

And your answer in your deposition that you just read for us was: "That's correct."

**A.** That's right. I was probably thinking of the little, small filters that we use constantly, you know, and there's no port on those.

**Q.** Okay.

**A.** So I would stand corrected on that.

**Q.** You do agree that you and I had been discussing this very picture, and ones like it, when we were going through your deposition asking about the refrigerant filters?

**A.** I remember the deposition. We really got mixed up on all

these pictures and everything as to what went where and identification and everything else.

**Q.** Let's move forward to the accident. We know that the gauges had been left on this port; correct?

**A.** That's what I understand, that's what it was all about.

**Q.** And you testified earlier that they were -- you were asked were they in a walkway and you said, "No, not in one." How close to the walkway were these gauges?

**A.** I don't know if I ever heard an actual dimension. If I did, for some reason, I want to think of like three feet, but I wouldn't -- I don't want to make that my final figure either.

**Q.** So your understanding is they were about three feet from the walkway?

**A.** I'm not real sure exactly how far.

**MR. FLINT:** Your Honor, I suggest --

**BY MR. YOUNG:**

**Q.** Would that make a difference in your opinion as to whether it would be more appropriate or more urgent for someone to remove the gauges?

**A.** No.

**Q.** If they were laying in a walkway, would you think it would be urgent to remove them?

**A.** The gauges would not be laying in a walkway. They may be hanging up on one of those pieces of pipe, but they're not going to be laying on a walkway.

**Q.** Let's go forward to the gauges being attached to this unit. Nance would never train anyone -- or to your knowledge Nance never does train anyone to leave gauges on a filter, do they?

**A.** Nor do we train them not to leave one on the filter.

**Q.** I guess that was my point earlier: You all don't talk about these filters during your training other than just to identify them?

**A.** That's correct. And how they're constructed, what is the purpose of them.

**Q.** Nance never tells anyone that they should check pressure on the filter from this port, do they?

**A.** No, but we do mention that they can.

**Q.** All right. You're aware of the Carrier manual in this case, the Carrier manual for this unit?

**A.** I'm familiar with the installation guides for it, yes.

**Q.** All right. Isn't it true, you heard Mr. Ritter testify yesterday that the Carrier manual of this unit actually recommends taking pressure tests at the three-way valve, which was the first picture we showed?

**A.** I heard that, but I never did find it in the Carrier manual, and I have it right here.

**Q.** All right. Did you find anything in the Carrier manual about where a pressure gauge -- pressure readings should be taken?

**A.** No, sir. It just says, "Take pressure readings."
**Q.** Sure.
Do you agree the only reason you would hook the gauges up to the filter would be to take a quick reading; there would not be any reason to leave gauges on the filter port?
**A.** I agree with the first half of your question, that it's an easy way to take a pressure reading right there; but as far as leaving it there or not leaving it there, no.
**Q.** All right. I don't understand. Will you explain your answer for me? Do you believe there's any reason to leave the gauges attached to this port?
**A.** There could have been.
**Q.** Will you go, sir, to page 37 of your deposition?
**A.** Okay.
**Q.** And on line 7 will you read the question I asked you and the answer you gave at that time?
**A.** You asked: "All right. Would there ever be a reason, a need, to leave those gauges on that port on the filter?"
And I answered: "I don't see a reason for it."
**Q.** And there may be a determination, people may be trying to figure out if there's any reason to leave the gauges on this port?
**A.** And somewhere in this, maybe further down the sentence, when we were talking on the phone on this deposition, I said: "You remember that was at the time in which a hurricane was

coming along, and there may have been a rush to hurry up and get out of the rig and they just left -- they left the gauges there."

**Q.** So you are speculating that a hurricane evacuation may have --

**A.** I'm just saying that could be one reason to leave the gauges on. You said is there ever a reason, and I'm saying that hurricane evacuation would be one reason. There's no problem in leaving the gauges on. You can leave them on there six months, it wouldn't hurt. In fact, we -- we encourage -- we even put gauges on units that we sell. We talk to students, it's advantageous to have them on there.

In our 410A residential unit in our lab, we have mounted a set of gauges very similar to the manifold gauges, and they're permanently on there. Because 410A's a very high-pressure refrigerant and we just don't care for the students to start messing around with unscrewing them and putting them back and everything like that.

**Q.** Let me go back to -- we're going to come to the answer you just gave in a second. Let me go back to what you said a second ago about any reason why you may leave them on there. I guess you do agree with me that whoever left those gauges on there had no reason to do so, no technical reason in regard to this equipment.

You agree there was no technical reason for those

gauges to be on there, do you?
**A.** We don't know why they were left on there.
**Q.** I know that, sir. Will you go to your deposition, page 38, line 2, please?
**A.** "Whoever left those gauges on there had no reason to do so, had no technical reason in regard to this equipment?
"Technical reason, no; but as to why they left it on, I have no idea."
**Q.** I agree. There has been no evidence as to who left the gauges on, has there?
**A.** We've not been able to find any evidence.
**Q.** We haven't. We've not been able to find any evidence on why they were put on there to begin with, have we?
**A.** We don't know who left them on.
**Q.** We don't know why they put them on to begin with, do we?
**A.** Oh, I've got speculation, but I'll keep it to myself.
**Q.** Okay. You said something a moment ago about Nance teaching them whether or not they should leave gauges on that filter. I believe you touched on that. My question to you is: You all at Nance, what you teach at Nance would never ever encompass having someone leaving gauges on that filter port for a period of days, would it?
**A.** We would encourage them to place gauges on a unit permanently. That's what we encourage.
**Q.** Will you go to your deposition on that same page, sir,

page 38, line 16? Will you read the question I asked and the answer you gave at that time?

**MR. FLINT:** Your Honor, I suggest that he allow him to read the whole page and line 5, both before and after.

**THE COURT:** Well, he can read as much as he wants. Read it to yourself, first, sir.

**THE WITNESS:** Line 16: "Understood" -- you're saying: "Understood. What you all teach at Nance in the basic and advanced classes would never ever encompass having someone" --

**MR. FLINT:** Your Honor --

**THE WITNESS:** -- "leave gauges on that filter port for a period of days?"

**THE COURT:** I asked him, okay? Mr. Wilde.

**THE WITNESS:** Yes.

**THE COURT:** Sir, just please read it to yourself and then Mr. Young will ask you specific questions. Read it to yourself so you can refamiliarize yourself with your testimony. Where would you like for him to read?

**MR. FLINT:** I'd like him to start at the beginning of page 39. It's the same questions he asked earlier.

**THE COURT:** Where would you like for him to read, from when to when? 39 to where?

**MR. FLINT:** Line 5 throughout the rest of the page.

**THE COURT:** All right. Sir, please read page 39,

line 5 through the rest of the page.

**MR. FLINT:** Yes, sir. Thank you.

**THE COURT:** Just read it to yourself and then Mr. Young will ask you a question.

**MR. YOUNG:** Frankly, Your Honor, if he'd like to read 38, 16, all the way through 39, 18, that's fine.

**THE COURT:** Did you hear that, Mr. Wilde? All right, sir. Go ahead.

**THE WITNESS:** (WITNESS COMPLIES.)

Okay. Your question.

**BY MR. YOUNG:**

**Q.** Again, my question was: You all -- what you teach at Nance would never ever encompass having someone leave those gauges on for a period of days?

**A.** That's correct. But that's not to say that we discourage it either. It's just not a topic that's brought up other than the fact that we encourage them, maybe for convenience purposes, to mount some gauges permanently.

**Q.** Were there permanent gauges mounted on this unit?

**A.** I'm not really certain, but I don't think there were.

**Q.** And if there are permanent gauges mounted on a unit, you can do a pressure test there, can you not?

**A.** It's convenient for the technician because there's so much noise on a rig, sometimes you don't even know if that compressor's running or not. You can't tell whether it's

running. So it's nice for that technician to be able to walk by that unit, look at the gauges, high side, low side, and say, "Hey, that unit's not even running," or either, "The pressure's a little low and I need to check on it." So there's some advantages of having some permanently mounted gauges.

And they see in our lab on the 410A unit how they can do it with just regular gauges that you buy in the refrigeration wholesale place by taking a little metal bracket, drilling a hole in it, taking the hose off, putting the little gauge right there, and putting a little nut on it, and then putting your hose there, and leaving it permanently attached.

**Q.** Do you think that would have been something easy for ENSCO to do before September 27th, 2008, to this unit?

**A.** It's easy anytime.

**Q.** All right.

**A.** And they see that in the class, you know.

**Q.** All right. You mentioned when you were talking about the window unit that they do retrieve the refrigerant from, part of the EPA certification is that they have to actually take the refrigerant out of the window unit; is that right?

**A.** Yes, that's correct.

**Q.** You mentioned that that had a Schrader valve in it; correct?

**A.** That's correct.

**Q.** Let me ask you to assume that on the *74*, the rig he was on

before this, all of the ports had Schrader valves in them.

**MR. FLINT:** Your Honor --

**THE COURT:** Let him finish the question.

**MR. FLINT:** Certainly.

**BY MR. YOUNG:**

**Q.** My question to you, sir, is: Would there have been any way possible, technically, for Freon to discharge at a high-pressure rate from a port that has a Schrader valve?

**THE COURT:** All right. Your objection.

**MR. FLINT:** My objection is I don't think the *ENSCO 74* was even really mentioned in the course of my discussion. This was all about the *7500*, and we talked about his training.

**THE COURT:** I'll let him answer that one question, but we're not going to spend a lot of time on the other rig. Answer that one question, sir.

**THE WITNESS:** If the Schrader valve is working properly, it seals off -- it seals itself off.

**BY MR. YOUNG:**

**Q.** Okay. If someone on the *7500* rig had hooked up gauges to the filter port, which you agree with me is not a part of the training at Nance; correct?

**A.** Well, we teach them to hook up gauges, but...

**Q.** Not to the filter port, though, do you?

**A.** We teach them that there's several locations that you can take pressure readings from and whatever's convenient for them

is fine. But as far as regular recovery, that would not be a place to recover it; but if you just want to spot check pressures, okay.

**Q.** You agree with me that there's no technical reason for them to have left them on there too; correct?

**A.** I don't see any reason, unless it's just convenience or something for the future.

**Q.** The last two issues very briefly, Mr. Wilde. You were -- actually, one last -- one issue. You were talking about gloves at some point and what type of gloves should be used. I think you actually testified that some technicians don't wear gloves when working on units; is that right?

**A.** That's correct.

**Q.** Let me show you the ENSCO preventative maintenance, PM.

**A.** Let me qualify my previous statement. Some people don't wear gloves; some people don't wear seatbelts.

**Q.** Does ENSCO in their PM -- in their PM that they talk about, do they tell these employees that they should put on either heat-insulated gloves or neoprene gloves?

**A.** Where?

**Q.** In the PM, which is a preventative maintenance, that we're looking at on the screen, does ENSCO tell their employees to wear either neoprene gloves that we've talked about or higher level heat-insulated gloves?

**A.** I'm not real sure prior to the accident what it was. Now

I understand from Mr. Maxwell that they do have heat-insulated gloves. They're leather, but they're heat-insulated that they should wear.

**Q.** What is the date of this PM, sir?

**A.** July 9, 2009.

**Q.** That would have been about eight or nine months after this man's injuries; correct?

**A.** Okay.

**Q.** Do you see anything in there about neoprene gloves or the heat-insulated gloves you are telling me that they're now supposed to be using?

**MR. FLINT:** Your Honor, I have an objection. This is like asking an apple farmer about an orange tree.

**THE COURT:** Objection sustained. Rephrase your question, counsel.

**MR. FLINT:** Thank you.

**THE WITNESS:** Not on the screen. I don't see anything on the screen.

**THE COURT:** Sir, I've told -- you don't have to answer that question.

**MR. FLINT:** You don't have to answer.

**THE WITNESS:** Okay.

**BY MR. YOUNG:**

**Q.** Actually, Mr. Wilde, one last issue. We talked about the EPA for a second. Does every person that passes the EPA

class -- well, let me ask this: You said that the EPA test has actually changed. It used to be with Penn -- Pennsylvania -- Pennsylvania Technical -- Penn State College of Technology; right?
**A.** Right.
**Q.** You all now use something from Virginia, I think you said Arlington; is that right?
**A.** Texas. Arlington, Texas. VGI --
**Q.** I'm sorry, Arlington, Texas.
**A.** -- out of Arlington, Texas.
**Q.** Has the type of level increased or changed in any way?
**A.** The test that the EPA gives was written way back in 1992, and they're still using the same tests.
**Q.** Do you believe Mr. Chapman had been type II, meaning high-pressure qualified, after he took Nance's class?
**A.** I believe he did get a type II certification, if I'm not mistaken.
**Q.** Is this the type of card that you would give to a person from ENSCO that passes your class?
**A.** That's from Penn -- that's from Pennsylvania College. You get one very, very, very similar to that from VGI.
**Q.** But, again, we agree, that the type has not changed. It's the same test --
**A.** No.
**Q.** -- it's just a different provider?

A. He got type I here, small appliances. And according to that, he would not be certified for what he was working on.
Q. I understand. He would actually not be certified to work on any of those units on the *74* either, would he?
A. That's right.
Q. But you understand he worked on there for five years on their units; correct?
A. I'm not going to report him.
**MR. FLINT:** Your Honor, again, he's talking about the *74*.
**THE COURT:** Objection sustained.
**MR. FLINT:** Thank you.
**MR. YOUNG:** Thank you, sir. That's all I have.
**THE COURT:** Redirect.
**MR. FLINT:** Just brief.

**REDIRECT EXAMINATION**

**BY MR. FLINT:**
Q. When your deposition was taken, where was it taken?
A. October the 12th of this year.
Q. Where?
A. It was taken in Beaumont, Texas.
Q. Was Mr. Young even present?
A. No, sir.
Q. He did it by phone; right?
A. Right.

**Q.** Were there communication errors?
**A.** Yes.
**Q.** Now, I draw your attention to line [*sic*] 39, line 5 -- 5 to about line 9. In response to Mr. Young's question --
**THE COURT:** Hold on. Let him read it to himself first.
**THE WITNESS:** I'm there.
**THE COURT:** You all right? All right. Go ahead.
**BY MR. FLINT:**
**Q.** You answered that there is no time limit to leave these on, didn't you?
**A.** That's correct.
**Q.** That's in your deposition.
Now, just to clean up one last thing. When he was asking you about the PM certificates. If there are going to be documents that are going to talk about protective measures, that's going to be in the work instruction and the JSAs that ENSCO has, not in the PM document; isn't that right?
**A.** Yes, that's my understanding.
**Q.** And you've heard the other people testify that have all come through here in the last several days that the first thing you do is go get your work instruction, and they start going down the list. And, in fact, on the second one that they saw it said, "Wear heat-insulated gloves if you're going to deal with Freon"; right?

**A.** That's right.

**MR. FLINT:** No further questions, Your Honor.

**THE COURT:** Thank you, sir. You can step down.

Call your next witness, Your Honor.

**MR. FLINT:** One last question, Your Honor, if it's okay.

**THE COURT:** All right.

**BY MR. FLINT:**

**Q.** Just so the jury understands: When we're talking about, it would have been hanging off of those hooks? Just if that would have been the gauge, you'd hang it up, you wouldn't leave it lying on the deck?

**A.** That's right. That's what it's for is to hang those gauges up.

**MR. FLINT:** Your Honor, that's it.

**THE COURT:** That's it. Great.

Thank you, sir. You can step down.

Call your next witness.

**MR. FLINT:** Thank you, Mr. Wilde.

Your Honor, at this time the defense rests.

**THE COURT:** Okay. Counsel, do you have any rebuttal witnesses?

**MR. FLINT:** May we approach the bench?

**THE COURT:** Yes.

(WHEREUPON, the following proceedings were held at

the bench.)

**MR. FLINT:** With regard to the rebuttal witness, I'm just unaware of what they've heard about a little ticket, and I have no idea if one is going to miraculously appear on rebuttal.

**THE COURT:** A little what?

**MR. FLINT:** A little ticket.

**THE COURT:** A little ticket?

**MR. FLINT:** Yeah, like a little stub or something.

**MR. YOUNG:** What's it look like? What have you heard about it?

**MR. FLINT:** Well, no, I'm just --

**THE COURT:** Wait, wait. What are the parameters of -- you plan to call Mr. Chapman again?

**MR. YOUNG:** Yes.

**THE COURT:** He's already testified. What are the parameters within which you would like for Mr. Chapman to be called as a witness in rebuttal?

**MR. YOUNG:** To address the issue of whether or not there was some standing set rule that everyone should fill out a JSA and go through all this paperwork.

**THE COURT:** And this is directly related to the testimony of --

**MR. YOUNG:** The last four witnesses. Everyone has said that. Everyone's criticized him for not filling out this

kind of paperwork, and it was barely addressed during his testimony.

**THE COURT:** Okay. And you --

**MR. YOUNG:** I'm sorry, Your Honor. To be honest, for the record to be complete, that was never even mentioned in the pretrial order, just by way of background, that he didn't do this paperwork. We've now heard this whole defense for three days that's come about.

**MR. FLINT:** It's been in Mr. Wilde's report for months.

**THE COURT:** Well, it should have been listed in the report, but it wasn't brought to my attention.

**MR. YOUNG:** No, and really it was not covered in the pretrial. Out of fairness, we now need to have the plaintiff take --

**THE COURT:** Absolutely. Do you plan to -- do you have any documents?

**MR. YOUNG:** No.

**MR. FLINT:** That's what --

**THE COURT:** Okay.

**MR. FLINT:** Just for the record, I did try and get the work -- all the other things, but they had a date after September 27th because of the way that they did it, which you saw all the various documents dated after September 2008. So I tried to get them in, I tried to use them, but you were

objecting. So...

**MR. YOUNG:** Thank you.

**MR. FLINT:** Thank you, Your Honor.

**THE COURT:** Okay.

(WHEREUPON, the following proceedings were held in open court.)

**THE COURT:** All right. Mr. Chapman.

Ladies and gentlemen, for your information, procedurally, the defense has now rested. The plaintiff is allowed to call rebuttal witnesses, and Mr. Chapman is going to be recalled for a very limited purpose.

Go ahead, Mr. Young.

**THE DEPUTY CLERK:** I'll remind you that you're still under oath.

**THE WITNESS:** Yes, sir.

(WHEREUPON, **Bud John Chapman**, having been previously duly sworn, testified as follows.)

**REBUTTAL DIRECT EXAMINATION**

**BY MR. YOUNG:**

**Q.** Good afternoon, John.

**A.** Good afternoon.

**Q.** You heard for the last two days about what I heard witnesses testify to is that there was some supposed rule on the *7500* that a JSA should have been done by you before this job was done. Do you remember hearing all that testimony?

**A.** Yes, sir.
**Q.** When you came over from the *74*, where you had worked for years, what was the policy on these JSAs there?
**A.** Any job --
**THE COURT:** Get a little bit closer. Go ahead.
**THE WITNESS:** Any job less than an hour, you do not need paperwork.
**BY MR. YOUNG:**
**Q.** Did that apply also to the work permit -- or the cold permit that we've heard about?
**A.** Yes, sir, that was in the safe systems of work.
**Q.** Did anyone from the *7500* give you any type of an orientation where they said --
**MR. FLINT:** Your Honor, we're leading the witness, now.
**THE COURT:** Don't lead.
**BY MR. YOUNG:**
**Q.** When you got to the *7500*, were you ever told about any type of JSA policy there?
**A.** No, sir. I assume that it was fleet-wide.
**Q.** Were you told about any type of cold work permit policy?
**A.** No, sir. Like I said, I assumed that it was fleet-wide for the SS or W.
**Q.** You testified Monday that Skipper Artemus said in a meeting with you and Justin --

**MR. FLINT:** Your Honor, if I may -- this is an inappropriate question recharacterizing the testimony when he has a witness on direct.

**THE COURT:** Rephrase your question, counsel.

**BY MR. YOUNG:**

**Q.** Did Skipper Artemus at any point before you tried to take the gauges off ever discuss with you a JSA?

**A.** No, sir.

**Q.** Did he ever discuss with you a cold work permit?

**A.** No, sir.

**Q.** Did he ever discuss with you work instructions, I think we've heard talked about?

**A.** No, sir, he did not.

**MR. YOUNG:** That's all I have, John. Thank you.

**THE COURT:** Any cross-examination, sir?

**MR. FLINT:** Yes, please.

**REBUTTAL CROSS-EXAMINATION**

**BY MR. FLINT:**

**Q.** John, the reason Mr. Skipper never discussed a work information -- work instruction, a JSA or a cold work permit with you is because he didn't expect you to be working on this valve; isn't that right?

**A.** Skipper, Justin and I were all in the same room when he said, "If you all get a chance tonight, take that off," in general. He did not say, "Justin, if you get a chance."

**Q.** Didn't you tell us that on the spur of the moment, walking out of the BCO operator's room, you decided that you alone would go take this off? Didn't you tell us that on Monday?
**A.** I did not say "spur of the moment." I said as I was walking back by it, I said, "Oh, yeah, I need to take them gauges off."
**Q.** I asked you specifically, "Was it a planned event?" and you said, "No." Isn't that true?
**A.** I mean, I didn't sit there and go, "Well, let's see, I got to do this and this and that," no. I mean, it's --
**Q.** You were walking by it --
**THE COURT:** Wait, wait. Sir, he's not through.
**MR. FLINT:** I'm sorry.
**THE COURT:** Finish answering the question, and speak a little bit louder, get a little bit closer, please.
**THE WITNESS:** Oh.
**THE COURT:** Were you through or you weren't through? I thought you were still talking.
**THE WITNESS:** I was just, basically, saying, I mean, I didn't just, "I think I'm going to do this," and not think about things, no.
**BY MR. FLINT:**
**Q.** In reality, there were --
**THE COURT:** Get behind the mic, please, counsel. I'm having trouble hearing.

**MR. FLINT:** I just want to get out from behind the ELMO.

**BY MR. FLINT:**

**Q.** In reality, there are procedures and policies in place that require you to do this; isn't that right?

**A.** In the safe system of work that I'm used to seeing, and I have a card on it, it says if general maintenance requiring less than 45 minutes to an hour -- or, excuse me, I think it does say an hour, actually -- you do not need a permit.

**Q.** You know, I've heard a lot about this card, but I've never seen it.

**A.** Do you have it? I will show it to you?

**THE COURT:** Sir, your job is to answer questions, not to ask questions.

**THE WITNESS:** Oh, I'm sorry. I didn't mean to.

**THE COURT:** No problem. Just answer the question.

**BY MR. FLINT:**

**Q.** You sat here and you listened to Mr. Fox; you listened to your co-worker from the *74*, Mr. Maxwell, who you joined back on the *7500*; we listened to Mr. Skipper, to date, nobody has ever heard of your mystery card. Do you have a copy?

**THE COURT:** All right. Strike the last statement. No "mystery card," sir.

**BY MR. FLINT:**

**Q.** No one has seen the card that you are discussing. Do you

have a copy?
**A.** I can try to get one.
**Q.** Have you presented a copy to your lawyer in the two years of this lawsuit?
**A.** I think we've mentioned it before during testimonies before, but...
**Q.** That's not the question. Did you present a copy to your lawyer?
**A.** Personally, did I?
**Q.** Yes, sir.
**A.** No.
**Q.** Now, let's talk very briefly about the way that the system is set up. When you go into the computer on the rig, isn't it true that you're going into a computer database that's -- it's system-wide?
**A.** Yes.
**Q.** So if you tap into the system from the *ENSCO 7500*, or the *8501*, or the one that you were on, the *74*, the same documents are going to pop up?
**A.** They're all the same.
**Q.** So you all are playing with the same deck of cards?
**A.** Hopefully.
**Q.** And can you point to anywhere in the computer where this card that you claim exists shows up?
**A.** In that program?

**Q.** Yes, sir.
**A.** No, it's just something they passed out.
**MR. FLINT:** I have no further questions, Your Honor.
**THE COURT:** Redirect, counsel?
**MR. YOUNG:** No, Your Honor.
**THE COURT:** Thank you, Mr. Young.
You can sit down, Mr. Chapman.
Any other rebuttal witnesses?
**MR. YOUNG:** No, Your Honor.
**THE COURT:** The plaintiff rests?
**MR. YOUNG:** Yes.
**THE COURT:** The defense rests?
**MR. FLINT:** Yes, sir.
**THE COURT:** All right.
Ladies and gentlemen, you've now heard all the testimony in this case. We're going to go ahead and take about a ten-minute recess so that counsel can prepare for their closing arguments. Closing arguments will be limited to 20 minutes apiece, and then I'll read you the final instructions, and then you'll begin deliberation.
Thank you very much.
**THE DEPUTY CLERK:** All rise.
(WHEREUPON, the jury exited the courtroom.)
**THE COURT:** Okay. The jury's out. Any motions by plaintiff?

**MR. YOUNG:** No, Your Honor.
**THE COURT:** Any motions by defendant?
**MR. FLINT:** Yes, Your Honor.
I would reurge the motion with respect to the issue of unseaworthiness. We've now heard all the testimony and there's not one witness who's testified that the valve is not sufficiently fit for its intended purpose. As a result of that, the only thing I think that should go to the jury are the issues of operational negligence, which would fall under the Jones Act. That would be my first motion.
**THE COURT:** Okay. Denied. I'll note your objection.
**MR. FLINT:** Excuse me?
**THE COURT:** I'll note your objection. Denied.
**MR. FLINT:** Thank you.
With regard to the Jones Act claim, I would reurge the motion I made earlier for all the reasons that I cited earlier. And I feel that the evidence is such that, particularly in Mr. Chapman's own testimony, he admitted that nobody was at fault. It's on page 119 of the transcript. I think that alone is enough to knock out that leg of this claim. For that reason, it should not go to the jury.
**THE COURT:** He's not a lawyer. He doesn't know what legal fault is. I'll note your objection. Denied.
**MR. FLINT:** Thank you, Your Honor.
With respect to the final one with regard to

maintenance and cure, Your Honor, we've provided you with some issues. We've had a lot of discussion off the record. And I would submit that it was imperative to at least present evidence of your lodging, your groceries, and your electricity in order to cover, and I think that's a key thing. You can't just lump it in with cable bills and TV and things that we know that are excluded.

For that reason, I would ask that that be dismissed as well.

**THE COURT:** Well, of course, I think both counsel had agreed that the issue of cure is not an issue.

**MR. FLINT:** I mean, maintenance, if I --

**THE COURT:** Maintenance alone, right. And I'm denying that. I'll note your objection.

**MR. FLINT:** Thank you, Your Honor.

**THE COURT:** All right. Have you all had a chance to look at the final version of the verdict form and the instructions? You were given copies of each last night. We met this morning at 8:00 this morning to go over it. Counsel for both parties had the opportunity to make some suggestions of changes.

We have changed it on the issues agreed to by counsel as ordered by the Court, and you should have had since lunchtime the final version. So have you had the opportunity to look at that? The only changes that were made were the

changes that we did discuss in chambers this morning.

Mr. Young, have you had the opportunity to review this? Do you have anything else that you would like to bring up as relates to either the general instructions or the verdict form?

**MR. YOUNG:** No, Your Honor.

**THE COURT:** Thank you.

Mr. Flint?

**MR. FLINT:** Other than our discussions on the record previously, Your Honor, no.

**THE COURT:** Okay. Thank you very much.

As I said, there will be 20 minutes allotted per side for closing argument. James will let you know, Mr. Young, after 15 minutes --

**MR. YOUNG:** Thank you.

**THE COURT:** -- have run, and then you decide how much more time you want to spend. You'll be given a total of 20 minutes as well, Mr. Flint, unless his esteemed co-counsel is going to do closing argument. All right. See you all in a couple of minutes.

Jodi just brought to my attention that we didn't put anything on the record. You made a comment you have no other changes except what we put on the record.

**MR. FLINT:** Yes, sir.

**THE COURT:** I don't think we put anything on the

record. We were in chambers, I believe, when we spoke, or did we put it -- well, Jodi would remember, I wouldn't remember.

**MR. FLINT:** What we discussed in chambers, you said that all of our objections to your knocking out our suggested jury charges were automatically put in the --

**THE COURT:** Yes. Jodi, counsel for defendant -- Tim, did you present any proposed jury instructions?

**MR. YOUNG:** We did. We're fine with the pattern.

**THE COURT:** Any proposed jury instructions filed by either the plaintiff or the defendant that have not been included in the general instructions that I'll be giving are on the record and noted for the record as being objected to that I did not include the proposed jury instructions by either the plaintiff or the defendant.

**MR. FLINT:** That's what I was referring to.

**THE COURT:** Good. All right. Thanks.

(WHEREUPON, the Court took a recess.)

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** Ladies and gentlemen, we're now going to have closing argument. As I said, each party will be given 20 minutes. Since the plaintiff has the burden of proof, he can go first and last, but for a total of 20 minutes.

Mr. Young, we will let you know when 15 minutes have elapsed. Go ahead and proceed, please.

**MR. YOUNG:** Thank you very much, Your Honor.

**CLOSING ARGUMENTS**

**MR. YOUNG:** Good afternoon, everyone.

Three days ago when we started, we didn't know how this man's injuries had occurred. We all saw photographs of his injuries. You knew they were very, very serious. We saw the stages that they went through, as it got worse and worse as he waited on the rig. You saw actually before his surgeries how they had to cut his fingers to relieve the pressure. You then saw his finger after the surgery -- his fingers.

What we've been able to piece together over the last three days is that ENSCO uses a company called Nance, and they called that company into court to try to justify what happened. We saw that ENSCO switched this man from one rig, where he had a stellar safety record, he was praised on that rig, they switched him over to another rig, and within three days he almost lost his hands.

We saw that at Nance they do not use filters when they train people, and we saw those pictures in the last 15 or 20 minutes. What they use are called three-way service valves. And you heard Mr. Ritter testify yesterday that the place on this Carrier unit where they're supposed to attach gauges is to the three-way service valve.

We heard that that is the exact type of

equipment John used on the *74*. We heard he never had any injuries on the *74* using those service valves. And we heard that those service valves actually have Schrader port -- Schrader valves on them. Those service ports actually have Schrader valves. And everybody agreed that Freon would have never blasted out of a service valve with a Schrader valve in it -- service port with a Schrader valve in it.

This injury could not have happened on the *74*. That's what we've been able to piece together. We've also pieced together that ENSCO trains this man and they give him a type I refrigeration certification, and this is all that they get with the basic class. And we know that that relates only to small appliances.

This is the same class, we know, that everyone from ENSCO goes through. Justin Maxwell said he went through their class; Skipper Artemus said he went through the Nance class in Beaumont. This is who ENSCO uses to train them.

What we don't know is how many other people on the rigs have type I training that are working on 80-ton commercial HVAC units on parts of the unit for which they've never received any training; and that's where these gauges had been attached, to a part of the unit that this company in Beaumont doesn't even train employees to work with.

Moving forward. We know that when John got there the gauges were about two or three feet from the walkway.

We know that John alerted Skipper, who actually saw them himself. A question I didn't ask Skipper was, "How long would it have taken you to do something about them?" And we know that no one can tell us who put the gauges on, how long they were on there, or why they were put on.

And we know that this man was taking steps to make the rig safer. He almost loses his hands and they come into court saying it's his fault, doing his job with the gloves they gave him, as they told him to do it, on the equipment they supplied to him that other people had hooked up and left alone and abandoned.

You all are going to be given questions in a few minutes. I'm going to run through these very briefly with you. This is the verdict form.

The first question you're going to face is: "Do you find ENSCO was negligent on September 27th, 2008, in a manner which was a cause of the injury, in whole or in part, to plaintiff?"

Now, each of these questions has to be answered by a preponderance of the evidence. And I want to show you some charges that Judge Zainey is going to read to you, and he'll actually give a copy of them to you, if necessary.

But as you read through here, as you listen, the important part I want to focus on is: "You must answer all the questions from a preponderance of the evidence. By this is

meant the greater weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so."

And another way to think of it, you all, is if you have scales, you just need one scale to tip a little bit further. You need 51 percent of the evidence to be on this side versus 49 percent on that side. Because some of you all may think, you know, they raised a good point, or two or three; but when you go to the scales and you say, you know, we think 51 percent is on this side, 49 on that side, it means you affirmatively find in favor of John. That's what a preponderance of the evidence is.

It's not like TV or in criminal cases where they say "beyond a reasonable doubt." No one would ever be compensated in the system. The system only requires compensation to this man if you all think in your gut more likely than not, this is how it all came down and ENSCO is at fault.

Now, I'm going to talk about negligence too, because a question you're asked is: "Do you find they were negligent?" This is a special kind of case. This is a Jones Act case. It applies to all the rig cases. Anybody who comes into court with an injury or a loss claim with a rig accident, they face what's called the Jones Act law. And the law is

meant to be liberal for seamen. It's meant to protect these people.

The word "negligence" is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees, who are seamen, including the duty to provide for the safety of the crew.

If you all find that this company did not provide for the safety of the crew, you check off they were negligent. If you find the negligence -- excuse me, if you go down, there's more indications: "Negligence under the Jones Act may consist of a failure to comply with a duty required by law." They have a duty to provide the seamen with a reasonably safe place to work. If you all find that ENSCO did not meet those obligations, they're legally negligent in this case. That's what the word means under the Jones Act.

One way I look at negligence, and I ask myself in cases, "Could this man's injury have been prevented before it happened?" As we go down on the sheet, we see that an unknown worker leaves the gauges on the unit. That's one area that could have been prevented. If he did what he should have done, he would have never left the gauges on; we wouldn't be here; this man would be making $90,000 working offshore still.

The next day, Artemus Skipper sees the gauges as he exits the helicopter. Artemus gives John the Gray Ghost Gloves. They've actually come in and criticized him for using

the gloves that he was given to do his work on the rig. John reports to Justin the gauges are on the unit. There's no records or notes on why the gauges were on the unit.

If you remember with Artemus Skipper, I asked him a quick question, I said, "Mr. Skipper, did you have time during these three days to take them off yourself?" And he was honest and he said, "I probably could have." Right there, that's the second one down: He has time to take them off.

Before you get there, his general instruction to them is, "When you all get time, you all get the gauges off." He didn't sit there and say, "Justin, I'm talking only to you. John, don't do this." This was a fast group meeting where he said, "You all do this; and then after that, you all do this."

Justin sends John with the paperwork right past this unit. One of my thoughts during this case was, "Why didn't Justin just take the paperwork himself and on his way back catch the gauges"; and if he was forward thinking, he might have done that.

John gets burned doing what he was told to do, using the gloves he was given, in the same way he did on the *74* for four years.

The next question you're going to get asked on this form is whether the vessel was unseaworthy. What that means under the law, and the judge will tell you this, that, "The rig owner has a duty" -- "owes to every member of the crew

employed on this rig the absolute duty to keep and maintain the ship and all its decks and passageways, appliances, gear, tools, parts, and equipment of the rig in a seaworthy condition at all times.

"Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. If the owner does not provide a seaworthy rig, a rig that is reasonably fit for its intended use, no amount of care excuses the owner."

You all have to decide if gauges sitting on a port two feet from a walkway by a heliport with a cap sitting there creates an unseaworthy vessel. If you all say that's a standard we don't want out in the Gulf of Mexico, we want you guys to run clean, good vessels out there that are accident-free and that are hazard-free, then you all come back and check this rig is not seaworthy. It's an unseaworthy rig.

One thing I showed you all that's just consistent with their pattern out there were the other safety violations they had. And you all saw these from the daily reports we went through. This one's three days before the man's accident when they get on the rig.

You remember I went through these with, I think it was Justin Maxwell. There was a rope hanging from the SDL ring. He has the rope removed to prevent it from getting hung up on the cable sheave. If you all remember, that was in the

BOP area, and that's called the blowout preventer. The point is: When there's a big explosion on a rig, the blowout preventer is what's supposed to stop the oil from going everywhere.

This rope is dangling from this tremendously important safety area. They write it up, they clean it up, that's great. But the fact is a rope somehow got there. They probably don't know who put it there or why it was put there.

The next area -- this is the next day -- excuse me, this is the 27th, actually, the day of his accident, there's a fire hose strung out after the pit cleaning operation was completed. Somebody left a fire hose out. He drains the hose and stores it properly.

The next day going forward -- and this is an important one -- the employee was removing a split ring from the elevators, insert lock pin. He went to the warehouse, he got the proper keeper pin for the elevators.

For you all's information, I asked this to Justin, "Elevators are the pieces of equipment that carry the drill pipe and the casing on the rig floor. If those things fail, you're going to have about eight guys standing around under a piece of pipe that's 90 feet tall and falling on them," and they're sticking pins in the elevators that don't belong in there out there.

You're going to be asked -- and ENSCO's entire

case has been that this was all John's fault -- you're going to be asked to decide if you think there's any blame on John. That's question No. 3: "Was the plaintiff, Bud John Chapman, negligent in a manner which was the cause of his own injuries?"

I'm going to suggest to you that he was trying to clean up someone else's mess; he was using the gloves he was told to use; he went to all the training they provided, eight days total, and about three that were actually hands-on; he's actually using a card that doesn't certify him to do this, even though he's told to clean it up and do it, and he worked for four years with AC units with that same card on the *74*; he doesn't know there's not a Schrader valve in it, which is that safety pin we talked about; and he's turning the valve stem, that had been opened to dust and dirt for days or weeks, and he closed it as tight as he could.

And you heard Mr. Ritter talk about, you don't leave the valve stem open to dirt and grime because it could cause it to jam and then it has to work its way through the system.

**THE DEPUTY CLERK:** You have about three minutes.

**MR. YOUNG:** Thank you.

One other issue I want you to consider when you're trying to judge John: This is what he's paid for for the accident so far; he then went through this because of the accident; then he had his burns grafted -- skin grafts; then he

went through 50 days of therapy and 88 days, that you all have heard all about. This man has suffered enough because of this accident.

When you move forward, and you don't answer the No. 4 question, that there's no finding of fault on John; if you find this was ENSCO's entire fault, you don't answer question 4. Simply, if there's any -- if you believe John is to blame for these injuries, that's the only way you have to answer question 4; if there's no blame on John, you move past that, you go to damages.

When you get to damages, you're going to have several categories here: Past, present and future pain and suffering; emotional and mental suffering; loss of wages; fringe benefits. I'll let you read through them.

What I want to discuss last are the two issues here, about economic damages and pain and suffering damages. Dr. Rice from LSU came yesterday, and these are pretty easy to calculate. We used what the man actually earned the year before his injuries happened. We didn't earn the 90-something -- we didn't use the 90-something-thousand-dollar figure, and this is an exhibit. You all can ask for this. It will be sent back with the book.

We didn't use the 90-something-thousand-dollar figure. I had him run the 101 because that's what ENSCO put in the personnel file. Using what he actually earned the year

before this, his losses come at the bottom of $943,000, and the fringe benefits are $228,000. Some of you all may be thinking that's an entirely high amount of money. You all are compensating him for the next 30 years of his life.

The way this works is what you all today decide today closes the book on this. He lives with it next year; he lives with it five years; he lives with it ten years. If his hand gets worse, he lives with you all's decision. When you all compensate him, you need to think in a 30- to 40-year life span, and that's why Dr. Rice did that. He explained to you all he would have kept working, he would have had these great opportunities, raises, et cetera. You all are not compensating him for the next two weeks, Christmastime and all that. You're dealing with this man's life here, his future.

On the pain and suffering element, what I suggest is sort of a sliding scale, and there may be some cases -- there are cases that don't belong in court; there are other cases that clearly need to be brought to court.

When you look at general damages, and Judge Zainey is going to tell you, there's no guide to this, there's no statute, there's no rule book on what you all can award for pain and suffering. You're trying to compensate him for what he's been through, which is an extremely hard thing to do.

As a guideline, what I think of is: How serious is the injury? Is this a broken bone that heals? Is this a

sore back where you have a surgery and you get 90 percent relief? Or is this a permanent injury where the man cannot function like he did before? And that's your sliding scale on this side: How serious is it? How long does it go on?

Some injuries are fortunate: You have a back surgery; you get great results; it doesn't go on very long. Every single doctor talked about this man can't close his hand. It's not going to get better. You heard about his grip strength actually getting worse. He's 39 years old. You all need to think ahead and think: What kind of position is he going to be in in 5 years, 10 years, 20 years? Is the hand going to get better or worse? You all are trying to compensate him somewhere in this scale of seriousness versus length of time.

I have put down an amount for very serious -- what I would consider a very, very serious injury, a permanent disability, maybe a $2 million award for pain and suffering. And some people may think that's very, very high; some people may not think it's fair enough. It just depends on where you all see his injury fall within that award.

You may think that's the type of an award a brain injury victim should have; you may think that's someone who lives with chronic pain on a daily basis, yet it's an individual decision you all have to make. You also have to make a decision based on the kind of person you think he is and

how much has this affected him and his family.

**THE DEPUTY CLERK:** You're at 17.

**MR. YOUNG:** Thank you.

I'm going to sit down now. I want to leave you with a last thought that: You all do have to pick a side in this case. I mean, you have to side with one of the parties in this case. It's a very tough decision.

When you're going through all the evidence -- I'm going to speak to you for a minute or two in a second -- but you want to think: What is your decision going to encourage? Is it going to encourage a company be safer; is it going to help someone; or are you going to encourage a company just to fight claims harder and make it even harder for the next person to get through those doors?

Thank you.

**MR. FLINT:** May it please the Court.

**THE COURT:** Thank you.

**MR. FLINT:** Ladies and gentlemen of the jury, on behalf of myself, Jacob, Ms. Slocum, Mr. Fox, and ENSCO, we want to thank you for taking time to be here and participate in this. If you remember in voir dire, when the judge was asking all these questions, you all swore that you would not let sympathy decide this case. We were going to decide it on the facts.

As I told you in my opening, I was going to only

put on truthful witnesses who told you the truth. And I told you I was going to use a PowerPoint and we were going to prove these things. And as you can tell, after having heard all this personal testimony, personal responsibility is a key to this case, as is common sense.

Now, the most important testimony you heard was from Mr. Chapman himself. At the end of his testimony with me, I asked him: "Didn't you tell us earlier this was a fluke thing?"

His answer: "Accidents happen, man. You can't control them. They're going to happen no matter how safe you are.

"QUESTION: "And didn't you say it was nobody's fault in your statement; correct?

"ANSWER: It can happen to anybody.

"Nobody's fault; right?"

The answer: "It's nobody's fault."

That's the testimony from Mr. Chapman. Those words came out of his very same mouth to all of you. That's what he said before the lawyers got involved, that's what he said before there was a lawsuit.

Frankly, I never heard any word of "negligence" or "unsafe" from Mr. Ritter's testimony. In fact, he said it's okay to leave those things, the gauges, there. No big thing. If you're going to pick them up, you put them in the toolshed.

I didn't hear him say anything about the valve being unsafe.

And for Mr. Young to sit here and tell us that a man with 16 years experience, and as an electrician he knows how to operate valves, would have a problem closing that and taking a hose off -- I've beaten up the analogy of a garden hose. He didn't even use the tools that were available for the job, which were there. Everybody told you, Mr. Skipper, Justin. You can only go so far to protect individuals who don't want to be protected.

Let's review the testimony of what Mr. Chapman did admit to. He admitted that he had only been on the rig for three days and had been -- it had different equipment on it than he had seen before. He admitted that he was assigned to work with Justin Maxwell, who was familiar with the rig. Justin was his buddy. You saw Justin. He likes John.

He admitted that he attended a meeting with Artemus Skipper when they were told that they were supposed to work on the pipe rack. He admitted at the time of his accident he was supposed to be with Justin Maxwell in the OIM's office doing paperwork.

I find it very interesting that Mr. Young chose to show you the documents that ENSCO records every type of bad situation on these rigs to make sure that these things don't happen. You heard that they are paperwork freaks. In order to do something, you have to take -- you have to fill out a

document. Why? To remind you, to remind everybody: There are dangers out here, have you thought about this; have you thought about that?

Mr. Chapman wasn't thinking. He said that, in response to my question, as he walked out of the BCO, he said, "Oh, let me just go grab those things," and didn't stop and think.

Now, you've heard multiple testimony, everybody knows, just like a garden hose, you turn it off, you crank it off. And then he had an opportunity to just double-check the gauges to see whether or not it was full or not. He didn't do that. He wasn't thinking, and that's why he panicked. That's why he ran to Justin Maxwell going, "Come here, come here." And that's when Justin Maxwell went and cleaned up the mess. At no time did you hear anybody say that this wasn't true.

After the event, Mr. Maxwell [*sic*] said, "Man, I messed up. I screwed up." He told his supervisor, Mr. Skipper, "Man, I'm sorry. I messed up." He never even met Mr. Skipper. Two months later, he gives a statement saying, "Crap happens. I just did a fluke thing," and he went on to admit that the incident was nobody's fault.

Does he seriously expect you to believe that as his hands were put under the Freon and he was getting burned that he was thinking about the rig's safety record, a rig that he had never been on? That's total horse manure.

Now, I've listened to plaintiff's counsel's version of this case. On one hand he's saying, Mr. Chapman, who's been an electrician for 16 years, needs to be told how to unscrew a hose -- or a valve. On the other hand, I heard Mr. Chapman's testimony that, "This is a simple thing and I didn't think I needed to do any paperwork." So they need to make up their mind which version they're going to try and sell to you.

Specifically, I asked Mr. Chapman: "Do you recall -- this is something that you wouldn't need to tell anybody how to do?" He said, "Yeah, it's a simple thing." His term was "simple."

Now, during deliberations the judge is going to read to you what the law is. And Mr. Young began to go over some of the things of it. One of them is going to be contributory negligence. Before I go any farther, since we're talking about the verdict form, when you deliberate, if you believe that Justin [*sic*] was the cause, was at fault, as he admitted, you check, "No, ENSCO was not at fault."

Next, you heard no testimony from anybody that there was a problem with that valve. It worked before; it's worked for two and a half years since. The definition of "seaworthiness" is whether or not the vessel is fit for its intended use.

And you, in fact, when the judge reads you the

instructions, he's going to say that a shipowner doesn't have to have an accident-free ship. "The owner of a rig is not required to furnish an accident-free rig. He need only furnish a rig and its appurtenances that are reasonably fit for their intended use and a crew that is reasonably adequate for their assigned tasks."

We met that standard. So when you go back there, you check "no" for No. 2.

Now, I have to address this -- I don't think you should -- but the issue of contributory negligence. Mr. Chapman is held to the same standard. He has to act as what a reasonably prudent person would do. "A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances." His experience, his training, and his education all come into play. "In other words, under the Jones Act, he has the duty to exercise that degree of care for his own safety that a reasonable man would exercise in like circumstances." He didn't do it.

Frankly, I would submit, if anybody doesn't want to quit after the first two, if you feel that way, you're entitled to put: "Mr. Chapman is 100 percent at fault for his accident."

Now, I heard Mr. Young make the argument that he was -- Mr. Skipper gave him Gray Ghost Gloves, the panty hose gloves that we talked about. Mr. Skipper thought he was going

to go to work on the pipe rack. Nobody thought he was going to go work with Freon.

Had he done the proper things that everybody across the fleet had done, the work instruction, the JSA, he would have at least stopped to think about whether or not he had the right gloves on. As we demonstrated from the beginning of the case, this is just like turning a valve off on your faucet. You've got to turn the valve all the way off before you take it off the faucet. Because he didn't do it, he got burned. This is a man who was a certified electrician.

Now, let's look at what's really going on. He's the captain of his own destiny and he decides to sail off into unknown waters. Where is he supposed to be? He's supposed to be with the OIM -- in the OIM room with Justin. That's his first mistake, he didn't follow his orders;

Two, he left the man he was assigned to work with, the man who knew the rig inside and out. If he had any questions, he could have asked Justin, but he decided to go do his own thing;

Three, you heard him say he didn't think, give any real thought to what he was doing at the time he began working with the Freon;

Four, he had been trained, and he admitted it in response to my cross-examination, to review the work instructions, the Job Safety Analysis, and when working with

chemicals to review something known as the MS data sheet, and we also have the cold permit too.

He was wearing gloves that had the consistency of ladies' panty hose. That's a term that he used. I didn't make this up, I got it from him. Now, initially, he was the only person that was involved in closing the valve. So if you're going to go rogue, you at least should do it right, but he failed to do it.

And who -- he never closed the valve all the way; and it's his friend who cleaned up the mess afterwards, and you heard Justin say that. And Justin likes Mr. Chapman. His term was, "He had a mental glitch." He said this at the very end of his testimony, if you recall.

With regard to the unseaworthiness issue, I just want to remind you that Mr. Ritter, in response to my questions: "If you put a gauge on a piece of equipment on the service port, is it going to affect the function -- it's not going to affect the function of the equipment?"

He said, "Correct."

"In fact, you could leave the gauge on for a week and it's not going to affect the function of the air-conditioning system, is it?"

And his answer to me was: "Yes, that's correct."

And then my question to him, their own expert:

"There was no real need to remove the gauge at any point in time other than to put it back in the tool room?"

And his answer was: "That's right."

So even Mr. Ritter said you can leave these things hanging around if you want to check the pressure.

Now, you also heard Mr. Ritter admit, in response to my questions, that if Mr. Chapman was going to be working with equipment that he didn't know about, he needed to familiarize himself with it. He also admitted that in order for Mr. Chapman to have gotten Freon on his hands, he just didn't close the valve all the way.

Of utmost importance, Mr. Ritter admitted that Mr. Chapman was involved in another task at the time of the injury. So he was -- that's what led Mr. Wilde to say that he was in a rush and wasn't thinking about what he was doing. Remember, both Mr. Chapman and Mr. Ritter admitted that Mr. Chapman never asked anybody about the equipment on the *7500*, because he thought he knew everything and he could do it. Why? Well, he has 16 years experience. And because he wasn't thinking of the big picture, he got bit.

So let's review the reasons for the accident: He wasn't where he was supposed to be; he left the man he was assigned to work with; he didn't give any thought to what he was doing; he had been trained to review these things, and he didn't do it; and we know from the testimony that he was

wearing gloves that were not designed for the job that he was doing, nor did he use the right equipment that was available. Physics don't lie, ladies and gentlemen.

Now, let talk about medical for a minute. He was treated by Dr. Ortega. And all of the doctors, Dr. Ortega, Dr. Meyer, and Dr. George, all have seen him and said his right hand is fine, he has no anatomical disability, and he has no functional disability.

Mr. Guttman, who you saw his video, indicated that with all the tests and things that they did, and he specifically mimicked the jobs that he would do offshore, people at the Andrews Institute felt that he could go back to work offshore. He could do heavy labor. Initially, the Bureau of Labor Statistics kicks it out saying, "very heavy labor"; but to be safe, they knock it back to "heavy labor." And an electrician offshore is a medium level job.

Now, skipping around a little bit, but we talked about the fact that the judge is going to charge you with contributory negligence, and we discussed that.

But in response to what Mr. Young said, he had a couple of things: If this, then that. Well, had he gone where he was supposed to, this wouldn't have happen. Had he not, on the spur of the moment, decided to do something different, this would not have happened.

James, how am I doing on time?

**THE DEPUTY CLERK:** You're almost at 15.

**MR. FLINT:** Thank you.

Had he stopped to fill out the paperwork and other things of that nature, it wouldn't have happened. If he properly closed the valve, it would not have happened. If he was wearing something other than panty hose things, it would not have happened.

Dr. Eric George. He treats Pete Fountain, football players, cooks, people who use their hands. He's the man. He checks him out, he looks at all the records, and does his own tests, and he's acknowledging that there is a deficiency here, but he can do work. He can do what he used to do. He can return to work to the job that he wants, if he wants it.

I don't know about you, but I found it very interesting that Mr. Chapman is here today, and we know from Ms. Hoffman's testimony and from the testimony of his wife, that he's able to ride a motorcycle pretty well with both hands, because that's one of his hobbies. I mean, seriously, how can you come in here and tell us you can't work if you're riding motorcycles?

Now, you're also going to hear a little bit about maintenance. And maintenance is to replace the food -- the value of the food and lodging he got onboard the vessel. It's not to take care of your kids with another woman, your

cable TV, and things of that nature. All it is is replacing one man's food and one man's board.

And you heard the testimony from Ms. Slocum, ENSCO did what is proper under the law. They paid him $20 per day pursuant to maintenance. And then because ENSCO wants to take care of their employees, they gave him advances to make up the difference of what he was making, having been off, to try and make it so that everything balanced out at the end when he came off. They're under no obligation to do that. Companies don't have to do that.

**THE DEPUTY CLERK:** Three minutes.

**MR. FLINT:** So ladies and gentlemen, when you fill out the verdict form and you get down to No. 5 and 6 -- obviously, if you fill out 1 and 2 with a "no," you can move on to 5 and 6. With maintenance, No. 6: "Does defendant, ENSCO, owe maintenance to John Bud Chapman in conjunction with injury?" The answer is, "No." No. 6, you answer, "No." With that, you don't have to do it.

"Did ENSCO act unreasonable with regard to their payment of maintenance?" The answer is, "No." They took care of this man.

Obviously, you don't have to answer No. 9.

Now, I have to comment on No. 5, just because I have to comment on all the evidence. From my opening argument, obviously, you know that we don't feel that damages should be

awarded in this case. Mr. Chapman has been reestablished in the position he was at at the time that -- of his accident. He was taken care of for a year. And his own doctors, Dr. Ortega and the people in Pensacola -- those are all people they chose -- said he could return to work.

Briefly, I want to run you through the testimony of the economist. Randy's calculations were based on the information provided by Mr. Young. Mr. Chapman never made more than $82,000 a year. And you've heard testimony from a number of people that salaries have been frozen for two and a half years, because there's a problem in the oil patch and there's a downturn.

He admitted that he wasn't provided with any of the fringe benefits from his current employer. The fringe benefits balance. They were health, medical, dental and vision, as I recall. So Mr. Rice was not -- Randy Rice wasn't provided with a $55,000 credit that ENSCO provided him.

So if you feel compelled to fill this thing out, the past lost wages should be the $60,000 minus the $55,000 -- and this is Exhibit 35 -- and that would be $5,000. And I believe that the figure, assuming -- very briefly, Mr. Christianson never even found a job for him. Ms. Hoffman went out and found any number of jobs, a number of which paid $27 an hour, and she actually spoke to these people. So using the $27 an hour against his $32 an hour, that generates

something in the neighborhood of about $170,000, was my recollection. You can put that number in there, if you think it is, and then you can back out the percentage.

Again, I only comment on this. I really think that Mr. Chapman has been taken care of. He's had his day in court, and I think it's time that you all need to send him home.

**THE DEPUTY CLERK:** Time.

**MR. FLINT:** How much?

**THE DEPUTY CLERK:** Time.

**MR. FLINT:** With that, ladies and gentlemen of the jury, I want to thank you for your time and ask that you fill out the verdict and rule in our favor. Thank you.

**THE COURT:** Thank you, Mr. Flint.

Okay. Mr. Young.

How much time, James?

**THE DEPUTY CLERK:** Two and a half minutes.

**THE COURT:** Two and a half minutes.

**MR. YOUNG:** Now, ENSCO's attorney just talked about the company being paperwork freaks and how they document every dangerous condition and how they're paperwork freaks. I don't think you all have missed this, because we've beaten it for three days, but they wanted this man to fill out paperwork and they're blaming him, and they don't have the paperwork from the guy who put these on to begin with. I don't think that's been

missed by anybody.

But they're coming into court controlling all of these documents, having access to all the documents, funneling out to us what they want to. And the big paperwork in this, which is: Who put these on; why were they on there; were they serving a purpose; should the man have even been required to take them off; we don't get to see that. You all don't get to see that. They can't find it. Nobody's ever owned up to this.

And in their world of offshore oil rigs, that's okay. In their world, the way they run the rigs out there, they don't worry about that. What they do is they come into court, spend a fortunate, make us spend a fortune trying to get this man's case in front of you all. You all need to send a signal in this case that that's not the standard that you all want in this community.

You all are going to be standard bearers. Judge Zainey's going to talk to you about that. In a very real way, you all get to decide the standard. Don't encourage them, please, to do more of this down the road. They're going to keep raising the bar, and they're going to keep getting sloppier and sloppier.

When he's doing what he's told, with the equipment he's told, et cetera, he gets hurt. And they come into court and they say, "You didn't do this little paperwork, that technically we didn't do either, but we're going to blame

you for it, because we're talking about massive injuries now that happened to you, and we don't want you to get any money for these injuries, so what we do is we blame you as the victim."

Even though, and Mr. Flint made a comment about he had never worked with the equipment, but he never asked anyone on the rig about that equipment. You all know all this, the card they gave him didn't even qualify him to work on the *74* on these units. This is like horrible negligence out there.

I want to speak about one or two last points here. What you all do today, it will directly affect this man, and there are very, very few circumstances where you all can sit, as a group, and directly affect this man's life. If you think about it, people volunteer, people donate to charities. You all get to decide, you get to write down your answers; and what you all write on that piece of paper determines his future.

**THE DEPUTY CLERK:** Time.

**MR. YOUNG:** I do want to thank you all for your time. What you're doing is very, very important. And I want to ask you just to take your time deliberating. Some of you all may feel very strongly about the case. It has to be unanimous. So you're all going to have to agree. If some of you all feel strongly, please, hold your ground for John.

Thank you.

**THE COURT:** All right. Thank you very much.

We're getting the general instructions and we will pass them out to each of you so that you can follow along when I read to you, so bear with us for a couple of minutes.

**(OFF THE RECORD)**

**JURY INSTRUCTIONS**

**THE COURT:** Members of the jury, you have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you, the jury, are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

You have heard the closing arguments of the attorneys. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

You must answer all questions from a preponderance of the evidence. By this is meant the greater

weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so. In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or only an unimportant detail.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any factor, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence, the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

Expert witnesses.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or

experience in that technical field -- he is called an expert witness -- is permitted to state his opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he or she testifies regularly as an expert witness and that his or her income from such testimony represents a significant portion of that person's income.

Deposition testimony.

Certain testimony was presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness' testimony may be presented, under oath, in the form of a deposition.

Sometime before this trial, attorney's representing the parties in this case questioned a few witnesses, actually, under oath -- I think there were, what, three depositions?

**MR. FLINT:** Yes, sir.

**THE COURT:** Okay.

A court reporter was present and recorded the testimony. The questions and answers were shown to you. This deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weighed and otherwise considered by you insofar as possible in the same way as if the witness had been present and had testified from the witness stand in court.

Bias, corporate party involved.

Do not let bias, prejudice or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

Jones Act (negligence), unseaworthiness, maintenance.

The plaintiff, Bud John Chapman, is asserting three separate claims against the defendant in this case.

The plaintiff's first claim, under a federal law known as the Jones Act, is that his employer, ENSCO Offshore Company, was negligent, and that ENSCO's negligence was a cause of his injuries. The plaintiff's second claim is that the unseaworthiness of a rig, the *ENSCO Rig 7500*, caused his injury. The plaintiff's third claim is for -- actually, it's for maintenance, not for cure.

You must consider each of these claims

separately. The plaintiff is not required to prove all of these claims. He may recover if he proves any one of them. However, he may only recover those damages or benefits that the law provides for the claims that he proves; he may not recover the same damages or benefits more than once.

As I stated, cure is not an issue in this case.

Jones Act (negligence).

Under the Jones Act, the plaintiff, Bud John Chapman, must prove that his employer was negligent. Negligence is the doing of an act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean anyone's negligence caused the accident.

In a Jones Act claim, the word "negligence" is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees, who are seamen, including the duty of providing for the safety of the crew.

Under the Jones Act, if the employer's negligent act caused the plaintiff's injury, in whole or in part, then you must find that the employer is liable under the Jones Act.

Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that the plaintiff was injured

because the defendant failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendant was negligent.

The fact that the defendant conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendant was negligent or not.

You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain practice has been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long accepted practice may be an unsafe practice. However, a practice is not necessarily unsafe or unreasonable merely because it injures someone.

A seaman's employer is legally responsible for the negligence of one of his employees while that employee is acting within the course and scope of his job or employment.

If you find from a preponderance of the evidence that the defendant assigned the plaintiff to perform a task that the plaintiff was not adequately trained to perform, you must find that the defendant was negligent.

Unseaworthiness.

The plaintiff seeks damages for personal injury that he claims was caused by the unseaworthiness of the

defendant's rig, the *ENSCO Rig 7500*.

A rig owner owes to every member of the crew employed on its rig the absolute duty to keep and maintain the ship and all decks and passageways, appliances, gear, tools, parts and equipment of the rig in a seaworthy condition at all times.

A seaworthy rig is one that is reasonably fit for its intended use. The duty to provide a seaworthy rig is absolute because the owner may not delegate that duty to anyone. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. If an owner does not provide a seaworthy rig -- a rig that is reasonably fit for its intended use -- no amount of care or prudence excuses the owner.

The duty to provide a seaworthy rig includes a duty to supply an adequate and competent crew. A rig may be unseaworthy even though it has a numerically adequate crew, if too few persons are assigned to a given task.

However, the owner of a rig is not required to furnish an accident-free rig. He need only furnish a rig and its appurtenances that are reasonably fit for their intended use and a crew that is reasonably adequate for their assigned tasks.

The rig owner is not required to provide the best appliances and equipment, or the finest of crews, on his

rig. He is only required to provide gear that is reasonably proper and suitable for its intended use, and a crew that is reasonably adequate.

In summary, if you find that the owner of the rig did not provide an adequate crew of sufficient manpower to perform the tasks required, or if you find that the rig was in any manner unfit in accordance with the law as I've just explained it to you and that this was a proximate cause of the injury, a term I will explain to you, then you may find that the rig was unseaworthy and the rig owner liable, without considering any negligence on the part of the defendant or any of its employees.

However, if you find that the owner had a capable crew and appliances and gear that were safe and suitable for their intended use, then the rig was not unseaworthy and the defendant is not liable to the plaintiff on the claim of unseaworthiness.

Causation, Jones Act and unseaworthiness.

Not every injury that follows an accident necessarily results from it. The accident must be the cause of the injury.

In determining causation, a different rule applies to the Jones Act claim and to the unseaworthiness claim.

Under the Jones Act, for both the employer's

negligence and the plaintiff's contributory negligence, an injury or damage is considered caused by an act or failure to act if the act or omission brought about or actually caused the injury or damage, in whole or in part.

In an unseaworthiness claim, the plaintiff must show, not merely that the unseaworthy condition was a cause of the injury, but that such condition was a proximate cause of it. This means that the plaintiff must show that the condition in question played a substantial part or was a substantial factor in bringing about or actually causing his injury, and that the injury was either a direct result or a reasonably probable consequence of the condition.

Contributory negligence (Jones act and unseaworthiness).

The defendant contends that the plaintiff was negligent, and that the plaintiff's negligence caused or contributed to causing his injury. This is the defense of contributory negligence. The defendant has the burden of proving that the plaintiff was contributorily negligent. If the plaintiff was guilty of contributory negligence that contributed to his injury, he nevertheless may recover. However, the amount of his recovery will be reduced by the extent of his contributory negligence.

A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The

circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment, but also his own experience, training, and education. In other words, under the Jones Act a seaman has the duty to exercise that degree of care for his own safety that a reasonable seaman would exercise in like circumstances.

If you find that the defendant was negligent or that the rig was unseaworthy, and that the negligence or unseaworthiness was a proximate cause of the plaintiff's injury, but you also find that the accident was due partly to the contributory negligence of the plaintiff, then you must determine the percentage the plaintiff's contributory negligence contributed to the accident.

You will provide this information by filling in the appropriate blanks in the special interrogatories. Do not make any reduction in the amount of damages that you award to the plaintiff. I will reduce the damages that you award by the percentage of contributory negligence that you assign to the plaintiff.

Maintenance.

The plaintiff's third claim is that, as a seaman, he is entitled to recover maintenance. This claim is separate and independent from both the Jones Act and the unseaworthiness claims of the plaintiff. You must decide this claim separately from your determination of his Jones Act and

unseaworthiness claims.

Maintenance is a seaman's remedy. Plaintiff is a seaman; thus you must determine whether he is entitled to maintenance.

Maintenance provides a seaman, who is disabled by injury or illness while in the service of the ship and the means of maintaining himself while recuperating.

A seaman is entitled to maintenance even though he was not injured as a result of any negligence on the part of his employer or any unseaworthy condition of the rig. To recover maintenance, the plaintiff need only show that he suffered injury or illness while in the service of the rig on which he was employed as a seaman, without willful misbehavior on his part. The injury or illness need not be work related, it need only occur while the seaman is in the service of the rig. And maintenance may not be reduced because of any negligence on the part of the seaman.

Maintenance is the cost of food and lodging. A seaman is not entitled to maintenance for that period of time that he is an inpatient in any hospital, because the cure provided by the employer through hospitalization includes the food and lodging of the seaman.

A seaman is entitled to receive maintenance from the date he leaves the rig until he reaches the point of what is called "maximum cure." Maximum cure is the point at which

no further improvement in the seaman's medical condition is reasonably expected. Thus, if it appears that a seaman's condition is incurable, or that the treatment will only relieve pain, but will not improve a seaman's physical condition, he has reached maximum cure. The obligation to provide maintenance usually ends when qualified medical opinion is to the effect that maximum possible cure has been accomplished.

If you decide that the plaintiff is entitled to maintenance, you must determine when the employer's obligation to pay maintenance began and when it ends. One factor you may consider in determining when the period ends is the date when the seaman resumed his employment, if he did so. However, if the evidence supports a finding that economic necessity forced a seaman to return to work prior to reaching maximum cure, you may take that finding into consideration in determining when the period for maintenance ends.

If you find that the plaintiff is entitled to an award of damages under either the Jones Act or unseaworthiness claims, and if you award him lost wages, then you may not award him maintenance for the same period of time. That is because the plaintiff may not recover twice for the same loss of wages. However, the plaintiff may also be entitled to an award of damages for failure to pay maintenance when it was due.

A rig owner who has received a claim for maintenance is entitled to investigate the claim. However, if

after investigating the claim, the rig owner unreasonably rejects the claim for maintenance, he is liable for the maintenance payments he should have made, and any compensatory damages caused by his unreasonable failure to pay. Compensatory damages may include any aggravation of the plaintiff's condition because of the failure to provide maintenance.

Thus, you may award compensatory damages because the shipowner failed to provide maintenance if you find by a preponderance that: One, the plaintiff was entitled to maintenance; two, it was not provided; three, the defendant acted unreasonably in failing to provide maintenance; and four, the failure to provide the maintenance resulted in some injury to the plaintiff.

A plaintiff's award of maintenance is limited to the food and lodging he would have received while working on the ship.

Damages (Jones Act and unseaworthiness).

If you find that the defendant is liable, you must award the amount you find by a preponderance of the evidence as full and just compensation for all of the plaintiff's damages. Compensatory damages are not allowed as a punishment against a party. Such damages cannot be based on speculation, for it is only actual damages -- what the law calls compensatory damage -- that are recoverable. However,

compensatory damages are not restricted to actual loss of time or money; they include both the mental and physical aspects of injury, tangible and intangible. They are an attempt to make the plaintiff whole, or to restore him to the position he would have been in if the accident had not happened.

You should consider the following elements of damages to the extent you find that the plaintiff has established such damages by a preponderance of the evidence: Physical pain and suffering, including physical disability, impairment, and inconvenience, and the effect of the plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life; mental anguish and feelings of economic insecurity caused by disability; income loss in the past; impairment of earning capacity or ability in the future, including impairment in the normal progress in the plaintiff's earning capacity due to his physical condition; post-medical expenses; the reasonable value, not exceeding actual cost to the plaintiff, of medical care that you find from the evidence will be reasonably certain to be required in the future as a proximate result of injury in question.

Some of these damages, such as mental or physical pain and suffering, are intangible things about which no evidence of value is required. In awarding these damages, you are not determining value, but you should award an amount that will fairly compensate the plaintiff for his injuries.

Any award you make to the plaintiff is not subject to income tax; neither the state nor the federal government will tax it. Therefore, you should determine the amount that plaintiff is entitled to receive without considering the effect of taxes upon it.

Compensatory damages.

If you find that the defendant is liable to the plaintiff, then you must determine an amount that is fair compensation for all of the plaintiff's damages. These damages are called compensatory damages. The purpose of compensatory damages is to make the plaintiff whole; that is to compensate the plaintiff for the damage that the plaintiff has suffered. Compensatory damages are not limited to expenses that the plaintiff may have incurred because of his injury. If the plaintiff wins, he is entitled to compensatory damages for the physical injury, pain and suffering, mental anguish, shock and discomfort that he has suffered because of the defendant's conduct.

You may award compensatory damages only for injuries that the plaintiff proves were proximately caused by the defendant's allegedly wrongful conduct. The damages that you award must be fair compensation for all of the plaintiff's damages, no more and no less. Damages are not allowed as a punishment and cannot be imposed or increased to penalize the defendant. You should not award compensatory damages for

speculative injuries, but only for those injuries which the plaintiff has actually suffered or that the plaintiff is reasonably likely to suffer in the future.

If you decide to award compensatory damages, you should be guided by dispassionate common sense. Computing damages may be difficult, but you must not let that difficulty lead you to engage in arbitrary guesswork. On the other hand, the law does not require that the plaintiff prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit.

You must use sound discretion in fixing an award of damages, drawing reasonable inferences where you find them appropriate from the facts and circumstances in evidence.

You should consider the following elements of damage to the extent you find them proved by a preponderance of the evidence.

Calculation of past and future damages.

Damages accrued.

If you find for the plaintiff, he's entitled to recover an amount that will fairly compensate him for any damages he has suffered to date.

Calculation of future damages.

If you find that the plaintiff is reasonably certain to suffer damages in the future from his injuries, then you should award him the amount you believe would fairly

compensate him for such future damages. In calculating future damages, you should consider the standard table of mortality as compiled by the United States Bureau of the Census or other recognized mortality table.

Reduction of future damages to present value.

An award of future damages necessarily requires that payment be made now for a loss that plaintiff will not actually suffer until some future time. If you should find that the plaintiff is entitled to future damages, including future earnings, then you must determine the present worth in dollars of such future damages.

If you award damages for loss of future earnings, you must consider two particular factors:

First, you should reduce any award by the amount of the expenses that the plaintiff would have incurred in making those earnings.

Second, if you make an award for future loss of earnings, you must reduce it to present value by considering the interest that the plaintiff could earn on the amount of the award if he made a relatively risk-free investment. The reason why you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to the plaintiff if he receives it today than if he received it in the future, when he would otherwise have earned it.

It is more valuable because the plaintiff can

earn interest on it for the period of time between the date of the award and the date he would have earned the money. Thus, you should adjust the amount of award for future loss of earnings by the amount of interest that the plaintiff can earn on that amount in the future.

If you make any award for future medical expenses, you should adjust or discount the award to present value in the same manner as with loss of future earnings. That isn't applicable in this case. This is not an issue.

However, you must not make any adjustment to present value for any damages you may award for future pain and suffering or future mental anguish.

Loss of future earnings.

If you find that the plaintiff is entitled to an award of damages for loss of future earnings, there are two particular factors you must consider. First, you should consider loss after income taxes; that is, you should determine the actual or net income that plaintiff has lost or will lose, taking into consideration that any past or future earnings would be subject to income taxes. You must award the plaintiff only his net earnings after tax. This is so because any award you may make here is not subject to income taxes. The federal or state government will not tax any amount which you award on this basis.

Second, an amount to cover a future loss of

earnings is more valuable to the plaintiff if he received the amount today than if he received the same amount in the future. Therefore, if you decide to award plaintiff an amount for lost future earnings, you must discount it to present value by considering what return would be realized on a relatively risk-free investment.

Injury, pain, disability, disfigurement, loss of capacity for enjoyment of life.

You may award damages for any bodily injury that the plaintiff sustained and any pain and suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life that the plaintiff experienced in the past or will experience in the future as a result of the bodily injury. No evidence of the value of intangible things, such as mental or physical pain and suffering, has been or need be introduced. You are not trying to determine value, but an amount that will fairly compensate the plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be awarded for those elements of damage. Any award that you make should be fair in the light of the evidence.

Lost earnings, time, earning capacity.

Any earnings lost and any loss of ability to earn money sustained in the past and any such loss in the future.

Duty to deliberate.

It is your sworn duty as jurors to discuss the case with each one -- with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judge -- judges of the facts. Your only interest is to seek the truth from the evidence in the case.

Instructions on deliberations.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you, as well as the exhibits which the Court has admitted into evidence. Please leave any exhibit -- well, you don't have exhibit books because we're now electronic. The courtroom deputy will bring you the exhibits. Select your foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during the trial.

After you have reached your unanimous verdict, your foreperson is to fill in on the form your answers to the

questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I'll then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise.

You may now retire to the jury room to conduct your deliberations.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:** Okay. The jury's now out. Does plaintiff need to put anything the record?

**MR. YOUNG:** No, Your Honor.

**THE COURT:** Does defendant need to put anything on the record?

**MR. FLINT:** No, sir.

**THE COURT:** Let me just say this: I'm going to

address Mr. Chapman -- please have a seat -- I'm also going to address Ms. Slocum. The jury is out. I don't know how they're going to rule. They might rule for Mr. Chapman; they might rule for Ms. Slocum, your company, ENSCO.

I want to congratulate, in advance, both of you. I'm going to congratulate you because of the selection of the attorneys that you picked. Mr. Chapman, your attorney, Mr. Young, did an incredible job for you. The facts are the facts are the facts. He presented the facts in the best way that he possibly could, and I think he did a wonderful job for you.

Ms. Slocum, the same for you. Mr. Flint, and co-counsel, you did a fantastic job on behalf of ENSCO. And regardless of how the jury verdict is -- or what the jury verdict is, I think you should be very proud of the representation by your counsel; and by your counsel, Mr. Chapman.

With that said, we'll be in recess. Give us your cell numbers so that we can get ahold of you.

**THE DEPUTY CLERK:** I've got.

**THE COURT:** James is already on top of it.

Okay. So we'll take a recess right now.

In the old days, any exhibit and every exhibit that I put in the -- that counsel agreed to or that I had ruled on in advance it would be admissible went to the jury.

Subsequent to that -- and I've had no problems in doing that in the past. However, sometimes I was a little bit concerned, quite candidly, that some of it might not have any relevance even though both parties agreed that it would be admissible.

So I changed that. As I stated in the back to you guys when we had our pretrial conference, the exhibits that I would allow the jury to look at in the jury room were those exhibits that were referred to in open court.

Now I understand that there is a disagreement by you guys as to what exhibits were referred to.

**MR. YOUNG:** I think --

**THE COURT:** Is that an accurate statement or have you agreed to the exhibits?

**MR. YOUNG:** No. I think just on one, Your Honor. It was the Freon safety alert. I don't know -- it was a one-page Freon alert. I don't think it was ever shown by anyone. It might have been mentioned, but it wasn't shown.

**THE COURT:** So you don't think it was shown but mentioned, and you think it was shown?

**MR. FLINT:** It was not shown, but it was mentioned.

**THE COURT:** I'm going to allow that to go to the jury. If it was mentioned, then it's relevant, and I'm going to allow it to be shown to the jury.

**MR. FLINT:** His statement was mentioned, but it was never shown and, frankly, the judge indicated that I couldn't

use it. I got what I needed out of --

**MR. YOUNG:** Right. I'm assuming the statement is not going in?

**THE COURT:** The statement is not going in.

**THE DEPUTY CLERK:** What number are we talking about?

**MR. FLINT:** We omitted it. It was only going to be impeachment stuff.

**THE COURT:** No, that's not going in, but the document I am going to allow --

**MR. FLINT:** 15, I believe.

**THE COURT:** Is that it, 15?

**MR. YOUNG:** The safety alert, yes.

**MR. FLINT:** Safety alert.

**THE COURT:** Safety alert, that will go to the jury.

**MR. YOUNG:** Do you need the rig status report thing, the thing we --

**THE DEPUTY CLERK:** I don't know what you need.

**MR. FLINT:** Do you have --

**THE COURT:** Off the record, Jodi.

**(OFF THE RECORD)**

(WHEREUPON, the jury deliberated.)

**VERDICT**

**THE DEPUTY CLERK:** All rise.

**THE COURT:** Call in the jury, please.

(WHEREUPON, the jury entered the courtroom.)

**THE COURT:** Thank you very much. Please have a seat, everyone.

Has the jury reached a verdict?

**THE FOREPERSON:** We have, Your Honor.

**THE COURT:** Would you pass it to Mr. Crull?

**THE DEPUTY CLERK:** Civil Action 09-6099, *Bud John Chapman versus ENSCO Offshore Company*.

Part one, question 1: Do you find that ENSCO was negligent on September 27th, 2008, in a manner which was a cause of injury, in whole or in part, to the plaintiff, Bud John Chapman?

Answer: No.

Question 2: Was the *ENSCO Rig 7500* unseaworthy on September 27th, 2008, in a manner which was a cause of injury to the plaintiff, Bud John Chapman?

Answer: No.

Question 3 is unanswered. Question 4 is unanswered. Question 5 is unanswered.

Part two, question 6: Does the defendant, ENSCO Offshore Company, owe maintenance to Bud John Chapman in connection with the September 27th, 2008 injury?

Answer: No.

Question 7, unanswered.

Question 8: Do you find that ENSCO Offshore Company was unreasonable in regard to their payment of

maintenance?

Answer: No.

Question 9 is unanswered.

This is signed and dated by the foreperson.

**THE COURT:** Does any party request polling of the jury?

**MR. YOUNG:** We do, Your Honor.

**THE COURT:** Okay. Thank you.

****

(WHEREUPON, the jury panel was polled and all jurors answered in the affirmative.)

****

**THE COURT:** Ladies and gentlemen of the jury, pursuant to this court's rules, I now instruct you that no juror has any obligation to speak to any person about any case and may refuse all interviews or comments, and no person shall make repeated requests for interviews or questions after a juror has expressed his or her desire not to be interviewed.

Under no circumstances, except by court order, shall any juror, who may consent to be interviewed, disclose any information with respect to the following: The specific vote of any juror other than the juror being interviewed, the deliberations of the jury, or for the purpose of obtaining evidence of improprieties in the jury's deliberations.

I further instruct you that you should not

contact nor attempt to contact any party or attorney participating in this matter to discuss this case, and particularly the jury deliberations.

Ladies and gentlemen, after you all left to deliberate, I told both Mr. Chapman and Ms. Slocum that I was congratulating both of them for their selection of attorneys. Because I feel that, although the facts can't change, the facts are the facts, and you are the triers of fact, and you have so ruled, that they were both to be congratulated because of the outstanding job that their attorneys did for them.

I watched you very closely. I watched and listened to the attorneys very closely. I was very impressed with you as jurors. I was very impressed with counsel for both parties, and it was a real honor and pleasure for me to preside over this case. I have no doubt that you gave this case full and complete deliberation. I respect your verdict, and I appreciate your serving the court.

With that said, I'm now going to dismiss you. I'd like to meet with you in the back. It's 20 to 6:00, I'm not going to take much of your time, because I know you're going to be anxious to get home, but I would like to talk about your experience, and plus I have your certificates to give to you.

So, Marshal, if you would just bring them to my conference room and I'll visit with them in a minute.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON, the jury exited the courtroom.)

**THE COURT:** Mr. Young, do you have any motions at this time?

**MR. YOUNG:** No, we don't, Your Honor.

**THE COURT:** Mr. Flint, any motions at this time?

**MR. FLINT:** No, sir.

**THE COURT:** Again, it was a pleasure to work with you. I know, Mr. Young, you weren't happy with all my rulings, and Mr. Flint wasn't happy with all of my rulings. So I guess I did a good job since neither of you were happy with them. It's amazing, you never remember the rulings I rule in your favor, you just remember the rulings that go against you.

But, Mr. Chapman, I still say what I said before, the jury rendered its verdict, you won. You won because of the selection of your attorney. You have an excellent attorney. He presented the best case that he could present. It was a tough case. We all knew it was a tough case. I think you knew it. I certainly did not talk with your attorney about it, but I heard it from up here, and it sounded to me like an incredibly tough case.

I believe, and I know, that Mr. Young did everything that he could, and the jury ruled the way that it did. Again, it goes without saying that the jury found the facts to be in favor of the defendant in this case, and that

doesn't happen by accident either. It happens because everybody laid out the best picture that they could on behalf of their respective clients, and I respect the jury verdict. And I thank you very much.

Now, counsel, what I do, and I think Mr. Young knows this because he's had other trials with me, when I speak with the jury, I do not talk about their deliberations, because that's purely amongst them, but I do just talk about their jury experience. I also talk about attorney performance as well as judge performance. We always like to improve on how we handle ourselves.

If there's any items of interest, if you all want to give me a call tomorrow afternoon, I'll be in court most of the morning, but --

**MR. FLINT:** I would love to hear, Your Honor.

**THE COURT:** -- I'll be happy to share what they said as it relates to whatever they have to talk about. But as I said, I will not discuss with them their vote on the case.

Thank you all very much.

**MR. FLINT:** Thank you, Your Honor, for your time. It was a pleasure.

**MR. YOUNG:** Thank you, Your Honor.

(WHEREUPON, the proceedings were concluded.)

*****

**CERTIFICATE**

I, Jodi Simcox, RMR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

S/ Jodi Simcox, RMR, FCRR
Jodi Simcox, RMR, FCRR
Official Court Reporter